## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MISSOURI

|  |  |
|---|---|
| Jason Crady, and his wife Nicole Crady,<br><br>            Plaintiffs,<br><br>    v.<br><br>3M Company, et al.,<br><br>            Defendants. | Civil Action No. _____<br><br><br>**NOTICE OF REMOVAL** |

Defendant 3M Company ("3M"), by undersigned counsel, hereby gives notice of the removal of this action, pursuant to 28 U.S.C. §§ 1442(a)(1) and 1446, from the Circuit Court, Twenty-Second Judicial Circuit, for St. Louis City to the United States District Court for the Eastern District of Missouri. As grounds for removal, 3M alleges as follows.

### PRELIMINARY STATEMENT

1.    Plaintiff Jason Crady ("Mr. Crady")[1] was an emergency medical technician, paramedic, and firefighter who seeks to hold 3M and other Defendants liable for their alleged conduct in designing, manufacturing, or selling unspecified "cancer-causing Products," including "cancer-causing chemicals included in firefighting protective gear." *See* First Amended Petition ("FAP") ¶¶ 8-9, 12, attached hereto as Exhibit A. Based on Plaintiffs' allegations in this case and a prior lawsuit filed by Mr. Crady against many of the same defendants for the same alleged injury, it is apparent that the allegedly "cancer-causing Products" at issue in this case include per- and polyfluoroalkyl substances ("PFAS") and firefighting protective gear allegedly containing PFAS.

---

[1] Mr. Crady's wife, Nicole Crady, is the only other plaintiff in this action. Collectively, they are referred to herein as "Plaintiffs."

2.      However, one plausible source of at least some of Mr. Crady's alleged exposure giving rise to his claims is PFAS-containing aqueous film-forming foam ("AFFF") that was manufactured for and sold to the U.S. military and other users by a select group of suppliers (including 3M) in accordance with the military's rigorous specifications ("MilSpec"). Over time, 3M's MilSpec AFFF products have been used by firefighters across the United States, including in and around Missouri. Mr. Crady's prior lawsuit referenced above alleged exposure to PFAS from AFFF in addition to firefighting protective gear. That action became part of the multidistrict litigation concerning PFAS exposure from AFFF. *In re: Aqueous Film-Forming Foams (AFFF) Products Liability Litigation*, No. 2:18-mn-2873-RMG (D.S.C.) ("MDL"). But Mr. Crady voluntarily dismissed himself from that action and filed this one in state court, which attempts to avoid the MDL by not directly mentioning AFFF and/or PFAS.

3.      At the pleading stage, 3M maintains that Mr. Crady plausibly has been exposed to MilSpec AFFF. As the MDL Court has recognized, a plaintiff cannot "avoid the MDL and/or federal jurisdiction by denying, disclaiming, or omitting allegations concerning exposure to AFFF," regardless of the alleged source of their exposure. *See* Case Management Order No. 36, No. 2:18-mn-02873-RMG, ECF No. 7891 at 1 (D.S.C. August 22, 2025) ("CMO 36.").[2] Mr. Crady "may have lived in many locales over [his] lifetime[], consumed water daily," *id.* at 1, and alleges a variety of exposure pathways for PFAS, *see* FAP ¶ 12. Mr. Crady therefore cannot "isolate" injuries caused by non-AFFF PFAS, and thus, "there exists, at the very least, a plausible basis for alleging federal jurisdiction sufficient to satisfy [a defendant's] initial burden on a notice of removal." *See* CMO 36 at 1–2. Given his prior allegations, it is at the very least plausible that Mr. Crady's alleged exposures include exposure to PFAS from MilSpec AFFF.  With this backdrop,

---

[2] A true and correct copy of CMO 36 is attached as Exhibit B.

2

the MDL Court, where thousands of firefighter turnout gear cases already are proceeding, also made a "suggestion and request to the JPML that all such cases, including turnout gear cases, be transferred to this Court to enable it to efficient oversee and manage these cases." *Id.* at 2.

4.    Under the federal government contractor defense recognized in *Boyle v. United Technologies Corp.*, 487 U.S. 500 (1988), 3M is not subject to tort liability for its design and manufacture of MilSpec AFFF and its provision of warnings for the product. Under the federal officer removal statute, 28 U.S.C. § 1442(a)(1), 3M is entitled to remove this action in its entirety to have its federal defense adjudicated in a federal forum. *See Papp v. Fore-Kast Sales Co.*, 842 F.3d 805, 810–15 (3d Cir. 2016) (explaining that the "central aim" of the federal officer removal statute "is protecting officers of the federal government from interference by litigation in state court while those officers are trying to carry out their duties"); *In re Asbestos Prod. Liab. Litig. (No. VI)*, 770 F. Supp. 2d 736, 741 (E.D. Pa. 2011) ("The presumption in favor of removal [28 U.S.C. § 1442] is necessary to ensure that a federal officer does not have to win his case before he can have it removed and provides for a federal forum to adjudicate the merits of the defense.") (internal quotations omitted); *see also Albritton v. A Clemente, Inc.*, 2023 WL 2447422, at *3–8 (D.N.J. Mar. 10, 2023) (holding that defendant properly removed PFAS case based on federal officer jurisdiction because products at issue were made for the federal government). Removal is appropriate here.

## **BACKGROUND**

5.    On January 29, 2025, Mr. Crady, together with other plaintiffs, filed an action against 3M and other defendants in South Carolina state court. 3M removed that case to the MDL, where it remains pending with respect to other plaintiffs. *See Alvarez, et al. v. 3M Company, et al.*, No. 2:25-cv-02746-RMG (D.S.C.) ("MDL Compl."), attached hereto as Exhibit C.

6.      In that case, Mr. Crady—represented by the same firm and at least one of the same attorneys that filed the present case—sought to hold 3M and other defendants liable for their alleged roles in developing, manufacturing, and selling (among other things) firefighting foam containing PFAS, as well as protective firefighting clothing ("bunker gear") containing PFAS. MDL Compl. ¶¶ 6–11. Notably, plaintiff alleged that some of the same PFAS, including PFOS and PFOA, are present in both AFFF and protective firefighting gear. *See id.* ¶¶ 199, 232, 265, 267.

7.      In the MDL Complaint, Mr. Crady alleged that he "regularly used, and was thereby directly exposed to, Class B foams[3] and bunker gear containing PFAS in training and to extinguish fires during his working career as a military and/or civilian firefighter Robertson Fire Protection District and the Lincoln County Ambulance District in Missouri." *Id.* ¶ 34. As in this case, Mr. Crady alleged that he "was diagnosed with Thyroid Cancer as a result of exposure to Defendants' products." *Id.*

8.      On July 30, 2025, Mr. Crady filed a notice of voluntarily dismissal in his MDL action pursuant to Fed. R. Civ. P. 41(a)(1)(A)(i) and paragraph six of the MDL's Second Amended Case Management Order 28. *See Alvarez, et al. v. 3M Company, et al.*, No. 2:25-cv-02746-RMG, ECF No. 4 (D.S.C.), attached hereto as Exhibit D.[4]

---

[3] As alleged in Mr. Crady's MDL Complaint, AFFF is a PFAS-containing Class B foam. MDL Compl. ¶ 206.

[4] 3M reserves all rights with respect to Mr. Crady's violation of MDL Case Management Order 28. In particular, having invoked CMO 28 in his notice of voluntary dismissal, Mr. Crady was required to re-file this action in the MDL.

9.      Plaintiffs[5] subsequently filed the original Petition in this action on August 29, 2025 in the Circuit Court, Twenty-Second Judicial Circuit, for St. Louis City, Missouri, bearing civil action number 2522-CC09201. Plaintiffs filed their First Amended Petition on March 24, 2025. 3M was served with the original petition on September 9, 2025.

10.     In this action, Plaintiffs allege that Mr. Crady has worked as an emergency medical technician, paramedic, and firefighter in the City of St Louis, St. Louis County, and in St. Charles County from 2005 to present. FAP ¶ 11.

11.     Plaintiffs also allege that Mr. Crady was exposed to "cancer-causing chemicals in products, gear, and/or equipment (hereinafter collectively referred to as 'Products') manufactured, sold, distributed, marketed, designed, supplied, and/or used by Defendants caused or contributed to cause his thyroid cancer." *Id.* ¶ 8. Given his own prior allegations, it is evident that the "products" referenced in this Complaint plausibly include AFFF used while he served as a firefighter.

12.     Plaintiffs further allege that Mr. Crady's exposure occurred "during his career" from the "use, handling and transportation of firefighting protective gear," as well as the use, handling, and transportation of "Defendants' equipment or Products containing cancer-causing chemicals." *Id.* ¶ 12.

13.     Plaintiffs assert damages claims against 3M and the other Defendants for Strict Liability: Design Defect; Strict Liability: Failure to Warn; Negligence; Violations of the Missouri

---

[5] Although this action involves two plaintiffs, the First Amended Petition frequently refers to "Petitioner" in its allegations. It refers to the plural "Petitioners" only in the case caption, introductory statement, allegations regarding Plaintiffs' residence, and signature block. Accordingly, given the First Amended Petition's framing and Mr. Crady's allegations in the MDL Complaint, unless specified otherwise in the First Amended Petition, "Petitioner" most plausibly refers to Mr. Crady alone.

Merchandising Practices Act; Breach of Contract: Express Warranties; Breach of Contract: Implied Warranties; and Loss of Consortium. *Id.* ¶¶ 14–108.

14.    Besides referencing firefighting protective gear, Plaintiffs do not specify the nature of "Defendants equipment or Products." Nor do Plaintiffs define, specify, or otherwise explain the nature of the "cancer-causing chemicals" alleged to be in "Defendants' equipment or products." Given the nature of this action and Mr. Crady's original allegations in the MDL Complaint, the only plausible reading of the complaint is that Plaintiffs intend "cancer-causing chemicals" to include PFAS.

**THE PROCEDURAL REQUIREMENTS FOR REMOVAL
UNDER 28 U.S.C. §§ 1442(a)(1) AND 1446 ARE MET**

15.    Venue is proper in this Court pursuant to 28 U.S.C. §§ 105 and 1442(a) because the Circuit Court, Twenty-Second Judicial Circuit, for St. Louis City is located within the United States District Court for the Eastern District of Missouri.

16.    3M is not required to notify or obtain the consent of any other defendant to remove this action under § 1442(a)(1). *See, e.g.*, *Durham v. Lockheed Martin Corp.*, 445 F.3d 1247, 1253 (9th Cir. 2006); *Hilbert v. McDonnell Douglas Corp.*, 529 F. Supp. 2d 187, 195 (D. Mass. 2008).

17.    Pursuant to 28 U.S.C. § 1446(a), a true and correct copy of the operative complaint is attached as Exhibit A, and true and correct copies of all other documents on file in the state-court proceedings (including all process, pleadings, and orders served upon 3M) are attached as Exhibit E.

18.    Removal is timely under 28 U.S.C. § 1446(b). Although neither Plaintiffs' complaint nor any subsequent paper in this case provided the information necessary to inform 3M that all of the elements of federal jurisdiction are present, 3M has determined from its own

investigation that this case is removable on the grounds presented in this notice and has removed the case within 30 days of its receipt of service of the initial pleading.

19.     Pursuant to 28 U.S.C. § 1446(d), 3M is serving a copy of this Notice of Removal upon all other parties to this case and is also filing a copy with the Clerk of the Circuit Court, Twenty-Second Judicial Circuit, for St. Louis City.

20.     By filing a Notice of Removal in this matter, 3M does not waive the rights of any Defendant to object to service of process, the sufficiency of process, and/or jurisdiction over the person, or venue, and 3M specifically reserves the rights of all Defendants to assert any defenses and/or objections to which they may be entitled.

21.     3M reserves the right to amend or supplement this Notice of Removal.

22.     If any question arises as to the propriety of the removal of this action, 3M requests the opportunity to present a brief and oral argument in support of removal.

## REMOVAL IS PROPER UNDER THE FEDERAL OFFICER REMOVAL STATUTE, 28 U.S.C. § 1442(a)(1)

23.     Removal here is proper under the federal officer removal statute, 28 U.S.C. § 1442(a)(1), which provides for removal of an action relating to a defendant's acts undertaken at the direction of a federal officer. Removal is appropriate under this provision where the removing defendant establishes that: (a) it is a "person" within the meaning of the statute; (b) the plaintiff's claims are based on the defendant's conduct "acting under" the United States, its agencies, or officers; (c) the plaintiff's claims are "for or relating to" the defendant's acts under color of federal office; and (d) the defendant raises a colorable federal defense. *See Mesa v. California*, 489 U.S. 121, 124–25, 129–31, 133–35 (1989); *Papp*, 842 F.3d at 812; *Isaacson v. Dow Chem. Co.*, 517 F.3d 129, 135 (2d Cir. 2008); *see also* 28 U.S.C. § 1442(a)(1) (providing for removal of cases against United States officers that are "for or relating to any act under color of such office").

24.     Removal rights under the federal officer removal statute are broader than under the general removal statute. Suits against defendants acting on behalf of federal officers "may be removed despite the nonfederal cast of the complaint; the federal-question element is met if the defense depends on federal law." *Jefferson Cnty. v. Acker*, 527 U.S. 423, 431 (1999). This is because § 1442(a)(1) protects "the government's need to provide a federal forum for its officers and those who are 'acting under' a federal office." *Albrecht v. A.O. Smith Water Prods.*, No. 11 Civ. 5990(BJS), 2011 WL 5109532, at *3 (S.D.N.Y. Oct. 21, 2011) (citation omitted). This important federal policy "should not be frustrated by a narrow, grudging interpretation of [§] 1442(a)(1)." *Willingham v. Morgan*, 395 U.S. 402, 407 (1969); *see Durham*, 445 F.3d at 1252. To the contrary, § 1442 as a whole must be "liberally construe[d]" in favor of removal. *Papp*, 842 F.3d at 812 (alterations in original) (internal quotation marks omitted); *accord In re Asbestos*, 770 F. Supp.2d at 741.

25.     All requirements for removal under § 1442(a)(1) are satisfied where, as here, the notice of removal alleges that the plaintiffs' injuries are caused at least in part by MilSpec AFFF. *See, e.g.*, *Nessel v. Chemguard, Inc.*, No. 1:20-cv-1080, 2021 WL 744683, at *3 (W.D. Mich. Jan. 6, 2021) (denying motion to remand in AFFF case against manufacturers of MilSpec AFFF); *Ayo v. 3M Co.*, No. 18-CV-0373(JS)(AYS), 2018 WL 4781145 (E.D.N.Y. Sept. 30, 2018) (same). The court overseeing the MDL has found on multiple occasions that removal under § 1442(a)(1) is proper where the notice of removal alleges that plaintiff's injuries are caused, at least in part, by MilSpec AFFF. *See In re AFFF Prods. Liab. Litig.* ("*AFFF I*"), No. 2:18-mn-2873, 2019 WL 2807266, at *2–3 (D.S.C. May 24, 2019); Order, *In re AFFF Prods. Liab. Litig.*, MDL No. 2:18-mn-2873-RMG, ECF No. 320 (D.S.C. Sept. 27, 2019) ("*AFFF II*"), at 3–5; Order, *In re AFFF*

*Prods. Liab. Litig.*, MDL No. 2:18-mn-2873-RMG, ECF No. 325 (D.S.C. Oct. 1, 2019) ("*AFFF III*"), at 3–6.

26.    The MDL Court's holdings demonstrate that this case, too, is properly removed to federal court.[6] Moreover, in entering CMO 36, the MDL Court recognized that efforts to "avoid the MDL and/or federal jurisdiction by denying, disclaiming, or omitting allegations concerning exposure to AFFF" are "contrary to law," including where a plaintiff alleges exposure from "firefighter turnout gear." CMO 36 at 1 (citing *State of Maryland v. 3M et al.*, 130 F.4th 380 (4th Cir. 2025)). The MDL Court concluded that there is "at the very least a plausible basis for alleging federal jurisdiction sufficient to satisfy its initial burden on a notice of removal" given the various potential AFFF and non-AFFF sources of PFAS and the inability of a plaintiff to isolate personal injuries caused by one or the other, which is sufficient to "substantiate federal officer removal." *See id.* at 1–2.

### A.    MilSpec AFFF

27.    Since the late 1960s/early 1970s, the United States military has used MilSpec AFFF on military bases, airfields, and Navy ships—settings where fuel fires are inevitable and potentially devastating—to train its personnel, put out fires, save lives, and protect property. In fact, the United States Naval Research Laboratory developed AFFF—its researchers were granted the first AFFF patent in 1966.[7] Decades later, the Naval Research Laboratory described the development of AFFF as "one of the most far-reaching benefits to worldwide aviation safety."[8]

---

[6] Following removal, 3M intends to designate this action for transfer to the MDL.

[7] U.S. Patent No. 3,258,423 (filed Sept. 4, 1963; published June 28, 1966).

[8] U.S. Navy, NRL/MR/1001-06-8951, U.S. Naval Research Lab., *The U.S. Naval Research Laboratory (1923-2005): Fulfilling the Roosevelts' Vision for American Naval Power*, at 37 (June 30, 2006) ("*Fulfilling the Roosevelts' Vision*"), https://permanent.fdlp.gov/gpo125428/roosevelts.pdf.

28.    The design and manufacture of MilSpec AFFF are governed by rigorous military specifications created and administered by Naval Sea Systems Command, part of the Department of Defense ("DoD"). The applicable specification, Mil-F-24385, was first promulgated in 1969, and has been revised several times since.[9] All MilSpec AFFF products must be "qualified for listing on the applicable Qualified Products List" prior to military procurement.[10] Prior to such listing, a "manufacturer's . . . products are examined, tested, and approved to be in conformance with specification requirements."[11] The MilSpec designates Naval Sea Systems Command as the agency responsible for applying these criteria and determining whether AFFF products satisfy the MilSpec's requirements.[12] After a product is added to the Qualified Products List, "[c]riteria for retention of qualification are applied on a periodic basis to ensure continued integrity of the qualification status."[13] Naval Sea Systems Command "reserves the right to perform any of the [quality assurance] inspections set forth in the specification where such inspections are deemed necessary to ensure supplies and services conform to prescribed requirements."[14]

29.    From its inception until 2019, the MilSpec for AFFF included the express requirement that MilSpec AFFF contain "fluorocarbon surfactants."[15] The current MilSpec

---

[9] The 1969 MilSpec and all its revisions and amendments through April 2020 are available at https://tinyurl.com/yxwotjpg.

[10] MIL-PRF-24385F(4) § 3.1 (2020).

[11] DoD SD-6, Provisions Governing Qualification at 1 (Feb. 2014), https://tinyurl.com/y5asm5bw.

[12] *See, e.g.*, MIL-PRF-24385F(4) at 18 (2020). The cited MilSpec designates Naval Sea Systems Command as the "Preparing Activity." The "Preparing Activity" is responsible for qualification. (*See* DoD SD-6, *supra* n.11, at 3.)

[13] DoD SD-6, *supra* n.11, at 1.

[14] *See, e.g.*, MIL-PRF-24385F(4) § 4.1 (2020).

[15] *See* Mil-F-24385 § 3.2 (1969); MIL-PRF-24385F(2) § 3.2 (2017). In May 2019, the MilSpec was revised to drop the explicit requirement that the surfactants in the product be "fluorocarbon." *See* MIL-PRF-24385F(3) § 3.2 (2019). But under current technology, the only AFFF products capable of meeting the MilSpec's stringent performance requirements—and the only ones listed

expressly contemplates the presence of PFAS, including PFOA and PFOS (subject to recently imposed limits), in AFFF formulations.[16] Indeed, the current MilSpec recognizes that it is not yet technically feasible for manufacturers to completely eliminate PFOA and PFOS "while still meeting all other military specification requirements."[17]

30.    3M manufactured and sold PFAS-containing MilSpec AFFF to the U.S. military for over three decades pursuant to contracts with the United States. One or more of 3M's AFFF products were on the Navy's Qualified Products List for AFFF from 1970 until 2010 (even though 3M had phased out production of AFFF beginning in 2000).[18] Over time, the U.S. military used MilSpec AFFF manufactured by 3M throughout the United States, including in Missouri.

31.    3M also historically manufactured and sold PFAS-containing MilSpec AFFF to certain non-military users, including in Missouri. One notable example relates to so-called "Part 139" airports, i.e., certain large civilian airports. *See* 14 C.F.R. § 139.1 (2019). Part 139 airports historically have used MilSpec AFFF, including 3M's MilSpec AFFF products. In fact, by 2006, the U.S. government was requiring Part 139 airports to use AFFF meeting MilSpec standards.[19]

---

on the military's Qualified Product List—are those containing fluorocarbon surfactants. Thus, as a practical matter, the MilSpec still requires fluorocarbon surfactants.

[16] *See* MIL-PRF-24385F(4) § 6.6 & Tables 1, 3 (2020).

[17] MIL-PRF-24385F(4) § 6.6.

[18] *See* MIL-F-24385 QPL/QPD History for Type 3 AFFF (Oct. 24, 2014) & MIL-F-24385 QPL/QPD History for Type 6 AFFF (Oct. 24, 2014) (available at *In re AFFF Prods. Liab. Litig.*, No. 2:18-mn-02873, ECF No. 1969-24 (D.S.C.)).

[19] *See* FAA Part 139 CertAlert 06-02, Aqueous Film Forming Foam (AFFF) meeting MIL-F-24385 (Feb. 8, 2006) (available at *In re AFFF Prods. Liab. Litig.*, No. 2:18-mn-02873, ECF No. 1971-14 (D.S.C.)).

**B.** **MilSpec AFFF Plausibly Contributed to Mr. Crady's Alleged PFAS Exposures.**

32.    In addition to his plausible exposure to AFFF through his training and service as a firefighter, Mr. Crady was plausibly exposed to MilSpec AFFF through a variety of other means, including his regular consumption of water in many locales over his lifetime. And once exposed, whether by dermal contact, inhalation, or ingestion (*see* FAP ¶ 12; MDL Compl. ¶ 11), any PFOA and/or PFOS in Mr. Crady's body from MilSpec AFFF is indistinguishable from PFOA and/or PFOS from other sources, such as firefighting protective gear.

33.    Notably, the MDL Court entered CMO 36 to address plaintiffs who "have sought to avoid the MDL and/or federal jurisdiction by denying, disclaiming, or omitting allegations concerning exposure to AFFF." CMO 36 at 1. The MDL Court affirmed that "such efforts were contrary to law," explaining that "[t]he record in the MDL and its related discovery has demonstrated that plaintiffs cannot, at the pleading stage, easily isolate personal injuries caused by AFFF as opposed to personal injures allegedly caused by non-AFFF PFAS." *Id.* (*citing State of Maryland v. 3M Co.*, 130 F.4th 380 (4th Cir. 2025)).

34.    As recognized by the MDL Court in entering CMO 36, PFAS personal injury plaintiffs "may have lived in many locales over their lifetimes, consumed water daily, and, in many of the cases before this Court, allege that any type of AFFF has the potential to, and do spread through groundwater, surface water, and other media well beyond the locations where they were initially used." CMO 36 at 1.

35.    Plaintiffs here also make broad allegations about various, unspecified products containing PFAS. For example, Plaintiffs generally allege exposure from "firefighting protective gear," as well as other "equipment or Products" used and handled by Mr. Crady. FAP ¶ 9. And Mr. Crady previously alleged PFAS exposure from firefighting foam "and bunker gear containing

PFAS . . . during his working career as a military and/or civilian firefighter." MDL Compl. ¶ 34. In both this action and his MDL Complaint, Mr. Crady also alleged multiple exposure pathways from these various products. FAP ¶ 12 ("Petitioner was dermally exposed to, or otherwise inhaled, ingested, and/or otherwise absorbed cancer-causing chemicals included in firefighting protective gear"); MDL Compl. ¶ 11 (asserting plaintiffs "would repeatedly inhale, ingest, and/or have dermal contact with these harmful compounds during firefighting training exercises and in normal firefighting operations"). These allegations are precisely the sort of exposures the MDL Court noted in finding that plaintiffs, at the pleading stage, could not "easily isolate personal injuries alleged caused by AFFF as opposed to personal injuries allegedly caused by non-AFFF PFAS." CMO 36 at 1.

36.     Because Plaintiffs cannot at the pleading stage distinguish injuries allegedly caused by non-AFFF PFAS from any type of AFFF, which includes MilSpec AFFF, a "plausible basis for alleging federal jurisdiction sufficient to satisfy [a defendant's] initial burden on a notice of removal" exists where a defendant alleges potential MilSpec AFFF exposure, a theory that a federal court "must credit." *See* CMO 36 at 2 (internal quotations omitted). In other words, Plaintiffs' omission of AFFF-related allegations in this case cannot deprive 3M of its right to a federal forum, regardless of whether Plaintiffs allege Mr. Crady's exposure came from "drinking water, direct exposure to AFFF, firefighter turnout gear or other products allegedly containing PFAS, or some combination." *Id.* at 1.

**C.    <u>All the Requirements of 28 U.S.C. § 1442(a)(1) Are Satisfied.</u>**

### *1.    The "Person" Requirement Is Satisfied.*

37.     The first requirement for removal under the federal officer removal statute is satisfied here because 3M (a corporation) meets the definition of "person" under the statute. For purposes of § 1442(a)(1), the term "person" includes "corporations." *Papp*, 842 F.3d at 812

(quoting 1 U.S.C. § 1); *Johnson v. Sunoco, Inc. (R&M)*, No. 16-05512, 2017 WL 783773, at *3 (E.D. Pa. Feb. 28, 2017) (same).

### 2.    The "Acting Under" Requirement Is Satisfied.

38.    The second requirement ("acting under" a federal officer) is satisfied when an entity assists, or helps carry out, the duties or tasks of a federal officer. *Papp*, 842 F.3d at 812. "The words 'acting under' are to be interpreted broadly . . . ." *Isaacson*, 517 F.3d at 136 (citation omitted). Federal courts "have explicitly rejected the notion that a defendant could only be 'acting under' a federal officer if the complained of conduct was done at the specific behest of the federal officer or agency." *Papp*, 842 F.3d at 813. "[C]ourts have unhesitatingly treated the 'acting under' requirement as satisfied where a contractor seeks to remove a case involving injuries arising from equipment that it *manufactured for the government*." *Sawyer v. Foster Wheeler LLC*, 860 F.3d 249, 255 (4th Cir. 2017); *accord Johnson*, 2017 WL 783773, at *3 ("Where . . . 'the federal government uses a private corporation to achieve an end it would otherwise use its own ends to complete,' the corporation is deemed to be acting under the authority of the federal officer.") (quoting *Papp*, 842 F.3d at 812).

39.    The requirement of "acting under" a federal officer is met here because the alleged PFAS exposure that is the focus of Plaintiffs' claims plausibly stems in part from MilSpec AFFF, a vital product provided by 3M that otherwise "the Government would have had to produce itself." *Isaacson*, 517 F.3d at 137. MilSpec AFFF is a mission-critical military and aviation safety product that, without the support of private contractors, the government would have to produce for itself. *See Ayo*, 2018 WL 4781145, at *9 (describing MilSpec AFFF as a "mission-critical" and "life-saving product" used by all branches of the U.S. armed forces and NATO members) (internal quotation marks omitted). The Naval Research Laboratory stated that, "[a]lthough [it] was responsible for the original concepts and formulations, it was necessary to elicit the aid of the

14

chemical industry to synthesize the fluorinated intermediates and agents to achieve improvements in formulations."[20] Accordingly, the military has long depended on outside contractors like 3M to develop and supply AFFF. If 3M and other manufacturers did not provide MilSpec AFFF, the government would have to manufacture and supply the product itself.

40.     In designing and manufacturing the MilSpec AFFF at issue, 3M acted under the direction and control of one or more federal officers. Specifically, 3M acted in accordance with detailed specifications, promulgated by Naval Sea Systems Command, that govern AFFF formulation, performance, testing, storage, inspection, packaging, and labeling. Further, the AFFF products in question were subject to various tests by the U.S. Navy before and after being approved for use by the military and for inclusion on the Qualified Products List maintained by the DoD.[21] 3M has satisfied the "acting under" requirement. *See Nessel*, 2021 WL 744683, at *3 (holding that AFFF manufacturers were "acting under" a federal officer in connection with the manufacture and sale of MilSpec AFFF); *Ayo*, 2018 WL 4781145, at *8–9 (same); *AFFF I*, 2019 WL 2807266, at *2 (finding that the "acting under" requirement was satisfied because defendant demonstrated that it was manufacturing AFFF under the guidance of the U.S. military); *AFFF II*, at 3–5 (holding likewise in case involving MilSpec AFFF used at Part 139 airport); *AFFF III*, at 3–6 (same).

### 3.     The "Under Color of Federal Office" Requirement Is Satisfied.

41.     The third requirement, that the defendant's actions were taken "under color of federal office," requires a "nexus" between a plaintiff's claims and the defendant's acts undertaken at the direction of a federal officer. As with the "acting under" requirement, "[t]he hurdle erected by this requirement is quite low." *Isaacson*, 517 F.3d at 137. It is sufficient for a defendant to

---

[20] Fulfilling the Roosevelts' Vision, *supra* n.8, at 37.

[21] *See* DoD SD-6, *supra* n.11, at 1.

establish a connection or association between the lawsuit and the federal office. *See Sawyer*, 860

F.3d at 258 (explaining that 28 U.S.C. § 1442 permits removal of actions "for *or relating to* any

act under color of [federal] office"); *Isaacson*, 517 F.3d at 137–38 (explaining that it is sufficient

if the act that allegedly caused or contributed to the plaintiff's injuries occurred while the defendant

was performing its official duties); *Johsnson*, 2017 WL 783773, at *5 (explaining that under Third

Circuit precedent, "'in order to meet the for or relating to requirement, it is sufficient for there to

be a connection or association between the act in question and the federal office.'") (quoting *Papp*,

842 F.3d at 813); *see also Albritton*, 2023 WL 2447422, at *5 ("Congress revised the Officer

Removal Statute in 2011 to 'broaden the universe of acts that enable Federal officers to remove

[suits] to Federal Court,'" and accordingly it is "'sufficient for there to be a "connection" or

"association" between the act in question and the federal office'") (quoting *Papp*, 842 F.3d at

813).[22]

42.    Here, Plaintiffs' claims against 3M arise at least in part from alleged PFAS exposure

attributable to MilSpec AFFF. The military specifications have expressly or implicitly required the

use of PFAS in the product. As a result, Plaintiffs' claims against 3M are connected to its acts

taken under color of federal office. *See Ayo*, 2018 WL 4781145, at *9 ("[T]here is evidence of a

'casual connection' between the use of PFCs [perfluorinated compounds, *i.e.* PFAS] in AFFF and

the design and manufacture of AFFF for the government."); *AFFF I*, 2019 WL 2807266, at *3

(element satisfied where . . . claims arise out of use of AFFF products . . . for which the U.S.

military imposes MilSpec standards."); *AFFF II*, at 5 (element satisfied where AFFF products,

---

[22] The "acting under" and "under color of" prongs overlap. Both "are satisfied if the actions subject
to suit resulted directly from government specifications or direction." *Albrecht*, 2011 WL 5109532,
at *5.

"for which the military imposes MilSpec standards," were the alleged cause of plaintiff's injuries); *AFFF III*, at 5–6 (same).

43.    It is immaterial that Plaintiffs do not specifically assert exposure from AFFF. Courts "credit Defendants' theory of the case when determining whether [the] causal connection exists." *Isaacson*, 517 F.3d at 137; *see also Maryland v. 3M Co.*, 130 F.4th 380, 389 (4th Cir. 2025); *Puerto Rico v. Express Scripts, Inc.*, 119 F.4th 174, 192 (1st Cir. 2024); *Nessel*, 2021 WL 744683, at *3 (noting that "Plaintiffs cannot decide what defense Defendants might present"); *In Re Asbestos*, 770 F. Supp. 2d at 743 (finding removal proper and rejecting the plaintiff's disclaimer because recognizing it "would deprive the federal officer of the right to have the adequacy of the threshold determination, whether there is federal subject matter jurisdiction under the federal officer removal statute, made by a federal court"). As averred in this Notice of Removal, Plaintiffs' alleged injuries arise at least in part from alleged exposure to MilSpec AFFF. Accordingly, Plaintiffs' claims are "for or relating to" 3M's actions under color of federal office (28 U.S.C. § 1442(a)(1)), and 3M is entitled to remove this case as a whole pursuant to § 1442(a)(1). *See, e.g.*, *Bennett v. MIS Corp.*, 607 F.3d 1076, 1084 n.6 (6th Cir. 2010) ("[S]ection 1442(a)(1) authorizes removal of the entire case even if only one of the controversies it raises involves a federal officer or agency.").

44.    Indeed, Mr. Crady's previous allegations that exposure to PFAS from both AFFF and turnout gear caused his thyroid cancer strongly suggest that his vague allegations regarding unspecified "cancer-causing chemicals" are nothing more than an attempt to avoid federal jurisdiction and the MDL. However, Plaintiffs' attempt to avoid federal jurisdiction and the MDL

through "artful pleading . . . and bare conclusory allegations" should be rejected. *See* CMO 36 at 1–2.

### 4.    *The "Colorable Federal Defense" Requirement Is Satisfied.*

45.    The fourth requirement ("colorable federal defense") is satisfied by 3M's assertion of the government contractor defense.

46.    At the removal stage, a defendant need only show that its government contractor defense is colorable; that is, "that the defense was 'legitimate and [could] reasonably be asserted, given the facts presented and the current law.'" *Papp*, 842 F.3d at 815 (alteration in original) (citation omitted); *see also In Re Asbestos*, 770 F. Supp. 2d at 742 (defendant had a colorable federal defense where plaintiffs injuries stemmed directly from exposure to asbestos "on U.S. Naval Ships at U.S. Naval shipyards"); *Albritton*, 2023 WL 2447422, at *7–8 (defendant had "raised a colorable government contractor defense" because defendant "pointed to government contracts and specifications for chemicals alleged" in the complaint). "A defendant 'need not win his case before he can have it removed.'" *Papp*, 842 F.3d at 815 (quoting *Willingham*, 395 U.S. at 407); *see also Isaacson*, 517 F.3d at 139 ("To be 'colorable,' the defense need not be 'clearly sustainable,' as the purpose of the statute is to secure that the validity of the defense will be tried in federal court.") (citation omitted). At the removal stage, the inquiry "is purely jurisdictional, and neither the parties nor the district courts should be required to engage in fact-intensive motion practice, pre-discovery, to determine the threshold jurisdictional issue." *Cuomo v. Crane Co.*, 771 F.3d 113, 116 (2d Cir. 2014); *see also Kraus v. Alcatel-Lucent*, No. 18-2119, 2018 WL 3585088, at *2 (E.D. Pa. July 25, 2018) ("A court does not 'determine credibility, weigh the quantum of evidence or discredit the source of the defense' at this stage. Instead, [the court] only determine[s] whether there are sufficient facts alleged to raise a colorable defense.") (internal citation omitted). Moreover, "this inquiry is undertaken whilst viewing the facts in the light most favorable to

Defendants." *Hagen v. Benjamin Foster Co.*, 739 F. Supp. 2d 770, 783–84 (E.D. Pa. 2010). "Precisely in those cases where a plaintiff challenges the factual sufficiency of the defendant's defense, the defendant should 'have the opportunity to present [his] version of the facts to a federal, not a state, court.'" *Cuomo*, 771 F.3d at 116 (alteration in original) (citation omitted).

47.     Under the government contractor defense, the defendant is not liable for the design, manufacture, or warnings of equipment or supplies "when (1) the United States approved reasonably precise specifications; (2) the equipment conformed to those specifications; and (3) the supplier warned the United States about the dangers in the use of the equipment that were known to the supplier but not to the United States." *Boyle*, 487 U.S. at 512. 3M has satisfied these elements for purposes of removal.

48.     The requirement of "reasonably precise specifications" can be met by evidence showing either (a) that the government's participation in the design of the product "amount[ed] to more than a rubber stamping," or (b) that the government continued to purchase or use a product after the government became aware that the product contained the alleged defect. *Ramey v. Martin-Baker Aircraft Co. Ltd.*, 874 F.2d 946, 950 (4th Cir. 1989). Naval Sea Systems Command participated in the design of MilSpec AFFF, and its role was not merely "rubber stamping." It created (and has updated) detailed specifications governing the product's formulation, performance, testing, storage, inspection, packaging, and labeling.[23] Those specifications are "reasonably precise," including in requiring the use of PFAS.[24] In addition, in the past and

---

[23] *See* Mil-F-24385 (1969) and subsequent revisions and amendments, cited in note 9, *supra*.

[24] As noted earlier, until 2019 the specification expressly required that MilSpec AFFF contain "fluorocarbon surfactants," all of which are members of the PFAS family. Even since that express requirement was removed from the specification, the use of PFAS has been implicitly mandated because PFAS-containing surfactants are the only kind that allow AFFF to meet the performance requirements of the specification.

continuing to the present, the DoD has purchased and used MilSpec AFFF with awareness of the product's PFAS content and of the alleged risks associated with PFAS in the product. *See Ayo*, 2018 WL 4781145, at *12 ("That the DoD knows of the alleged risks of PFC-based AFFF products but continues to purchase them supports the position that the government approved reasonably precise specifications for the claimed defective design.").

49.    With respect to the second requirement, 3M's products have appeared on the DoD Qualified Products List,[25] which could have happened only if Naval Sea Systems Command first determined that they conformed to the MilSpec. *See Ayo*, 2018 WL 4781145, at *13 ("There is also colorable evidence . . . that Manufacturing Defendants' AFFF products conformed to the government's reasonably precise specifications."); *AFFF I*, 2019 WL 2807266, at *3 (finding that defendant demonstrated a colorable defense "where it contends that its AFFF products were manufactured according to the U.S. military's MilSpec specifications").

50.    Regarding the third requirement, the U.S. government was sufficiently informed regarding alleged product-related "dangers," *Boyle*, 487 U.S. at 512, to exercise its discretionary authority in specifying and procuring MilSpec AFFF. The military specifications have long included testing protocols and requirements for toxicity, chemical oxygen, and biological demand. Indeed, it is clear that the United States has long understood that AFFF contains PFAS and may contain or break down into PFOS and/or PFOA; that AFFF constituents can migrate through the soil and potentially reach groundwater; and that it has been reported that this may raise environmental or human health issues.[26] For example, as early as October 1980, a report supported by the U.S. Navy Civil Engineering Laboratory, U.S. Air Force Engineering Service Center, and

---

[25] *See* QPL/QPD Histories, *supra* n.18.

[26] *See, e.g.*, EPA, *Revised Draft Hazard Assessment of Perfluorooctanoic Acid and Its Salts* 1-6 (Nov. 4, 2002).

the U.S. Army Medical Research and Development Command stated that AFFF contained fluorocarbons and that "[a]ll of the constituents resulting from firefighting exercises are considered to have adverse effects environmentally."[27] In June 1991, the Air Force stated that past Air Force fire training activities resulted in "adverse environmental impact," including "soil contamination" and the "potential" for "groundwater contamination."[28] By no later than 2001, DoD was aware of data purportedly showing PFAS compounds in MilSpec AFFF to be "toxic" and "persistent."[29] In 2002, the United States Environmental Protection Agency issued a draft hazard assessment for PFOA, which reviewed in detail, among other data, human epidemiological studies and animal toxicology studies pertaining to alleged associations between PFOA and cancer.[30] More recently, in a November 2017 report to Congress, the DoD acknowledged the concerns raised by the EPA regarding PFOS and PFOA. Nonetheless, it still described AFFF containing PFOS or PFOA as a "mission critical product [that] saves lives and protects assets by quickly extinguishing petroleum-based fires."[31] Indeed, Naval Sea Systems Command continues to require that MilSpec AFFF contain "surfactants,"[32] and recognizes that PFAS, including PFOS and PFOA, will be present

---

[27] *See* Edward S. K. Chian et al., *Membrane Treatment of Aqueous Film Forming Foam (AFFF) Wastes for Recovery of Its Active Ingredients* 1 (Oct. 1980), https://apps.dtic.mil/dtic/tr/fulltext/u2/a136612.pdf.

[28] USAF, Engineering Technical Letter ETL 91-4: Site Selection Criteria for Fire Protection Training Areas 2 (June 14, 1991).

[29] EPA Presentation on Activities/Issues on Fluorosurfactants, March 16, 2001 (available at *In re AFFF Prods. Liab. Litig.*, No. 2:18-mn-02873 (D.S.C.), ECF No. 1971-2).

[30] *See* EPA, Revised Draft Hazard Assessment, *supra* n.26.

[31] DoD, *Aqueous Film Forming Foam Report to Congress* 1-2 (Oct. 2017) (pub. Nov. 3, 2017), https://tinyurl.com/wshcww4.

[32] MIL-PRF-24385F(4) § 3.2 (2020).

(subject to recently imposed limits for PFOS and PFOA) in AFFF formulations.[33] *See Ayo*, 2018 WL 4781145, at \*12 ("That the DoD knows of the alleged risks of PFC-based AFFF products but continues to purchase them supports the position that the government approved reasonably precise specifications for the claimed defective design."); *AFFF I*, 2019 WL 2807266, at \*3 ("As to whether [defendant] adequately informed the U.S. military of dangers associated with its AFFF products of which the military was not already aware, [defendant] points to materials such as a November 2017 Department of Defense report to Congress, in which the agency acknowledged the [EPA]'s stated concerns with PFOS/PFOA in drinking water . . . .").

51.    At minimum, these facts constitute colorable evidence that Naval Sea Systems Command "made a discretionary determination" regarding the formulation of MilSpec AFFF after weighing the fire-suppression benefits against the alleged risks. *See In re "Agent Orange" Prod. Liab. Litig.*, 517 F.3d 76, 90 (2d Cir. 2008); *see also Albrecht*, 2011 WL 5109532, at \*5 ("A defendant is not required to warn the government where 'the government knew as much or more than the defendant contractor about the hazards of the product.'") (citation omitted). Where, as here, the government has exercised "discretionary authority over areas of significant federal interest such as military procurement," the government contractor defense applies. *In re "Agent Orange" Prod. Liab. Litig.*, 517 F.3d at 89–90; *see also Ayo*, 2018 WL 4781145, at \*13.

52.    3M's use of PFAS in MilSpec AFFF was required by military specifications. By seeking to impose tort liability on 3M for alleged injuries that were caused in whole or in part by 3M's compliance with military specifications, Plaintiffs are attempting to use state tort law to

---

[33] MIL-PRF-24385F(4) § 6.6 & Tables I, III; *see also* David Vergun, *DOD Officials Discuss Fire-Fighting Foam Replacement, Remediation Efforts* (Sept. 16, 2020), https://tinyurl.com/ty5ku8hp.

attack design choices dictated by the military. The government contractor defense precludes such an attack. *See Boyle*, 487 U.S. at 509.

53.     In the MDL, the MDL court has found based on an extensive factual record that the government contractor defense asserted by 3M and other MilSpec AFFF manufacturers presents genuine issues of fact for trial. *See In re AFFF Prods. Liab. Litig.*, 2:18-mn-02873, 2022 WL 4291357, at *12, 15 (D.S.C. Sept. 16, 2022). A defense that presents triable issues is "colorable."

WHEREFORE, Defendant 3M Company hereby removes this action the Circuit Court, Twenty-Second Judicial Circuit, for St. Louis City to the United States District Court for the Eastern District of Missouri.

**DATED**:  September 16, 2025          DEFENDANT 3M COMPANY


Respectfully submitted,

**OSBURN, HINE & YATES, L.L.C.**
3071 Lexington Ave.
Cape Girardeau, MO  63701
Telephone:  (573) 651-9000
Facsimile:  (573) 651-9090
Email:  mdunn@ohylaw.com


By ____/s/  Mark R. Dunn_____
          Mark R. Dunn, #58388
          *Attorney for 3M Company*


### CERTIFICATE OF SERVICE

I hereby certify that on this 16th day of September, 2025, a true and correct copy of the foregoing Notice of Filing Notice of Removal was electronically filed and served upon counsel for plaintiff via email and United States Mail, and upon all other parties via United States Mail.

_____/s/  Mark R. Dunn_____