# EXHIBIT C

# EXHIBIT A

ELECTRONICALLY FILED - 2025 Jan 29 3:05 PM - YORK - COMMON PLEAS - CASE#2025CP4600398

**STATE OF SOUTH CAROLINA**

**COUNTY OF YORK**

JUSTIN ALVAREZ;
ARNULFO BONILLAS;
MATTHEW B. BUFFORD;
EDWARD BURGESS;
ADAM CHALOS;
SCOTT CLAY;
PETE CORBINO;
JASON CRADY;
CHARLES DEXTER;
CHAS PHILLIP DONNER;
CHRISTOPHER FRANKLIN;
KELLY FUGATE;
NICHOLAS GRASSO;
JAMES GRITSCHKE;
MAGUIRE HARRISON;
MATTHEW HECHT;
JACOB HEFLIN;
RAYMOND HEGARTY;
AUSTIN JACKS;
BILL KEATHLEY;
JOSEPH LAMENT;
ROGER MAYNARD;
DAVID MORGAN;
NICK PALACIOSIS MUÑA;
TODD NEWCOMER;
MATTHEW O'REILLY;
JOHNNY PADILLA;
CHARLES PEIFFER;
ZACHARY POINDEXTER;
EDWIN PUGH;
DALEN RANDA;
RONALD RAPOSA;
KEITH RENFROE;
KEVEN SANDERS;
KEVIN SCELZA;
ZANE SEIPLER;
JEREMY SHAWLEY;
CHRISTOPHER SPEARS;
PAUL STANFORD;
BAYLEE STRACHAN;
JIM THORPE; and

**IN THE COURT OF COMMON PLEAS**

**SIXTEENTH JUDICIAL CIRCUIT**

**SUMMONS**

FILE NO. ░░░░░

SCCA 401 (5/02)

ELECTRONICALLY FILED - 2025 Jan 29 3:05 PM - YORK - COMMON PLEAS - CASE#2025CP4600398

ZACHARY VOZELLA;

                          Plaintiffs,

v.

3M COMPANY (A/K/A MINNESOTA MINING
AND MANUFACTURING COMPANY);
AGC CHEMICALS AMERICAS, INC.;
ALLSTAR FIRE EQUIPMENT;
AMEREX CORPORATION;
ARCHROMA U.S. INC.;
ARKEMA, INC.;
BUCKEYE FIRE EQUIPMENT COMPANY;
CARRIER GLOBAL CORPORATION;
CB GARMENT, INC. (D/B/A CREWBOSS);
CHEMDESIGN PRODUCTS, INC.;
CHEMGUARD, INC.;
CHEMICALS, INC.;
CLARIANT CORPORATION;
CORTEVA, INC. (F/K/A DOWDUPONT INC.);
DAIKIN AMERICA, INC.;
DEEPWATER CHEMICALS, INC.;
DU PONT DE NEMOURS, INC (F/K/A
DOWDUPONT INC.);
DYNAX CORPORATION;
EIDP, INC. (A/K/A E. I. DU PONT DE NEMOURS
AND COMPANY);
FIRE SERVICE PLUS, INC.;
FIRE-DEX, INC;
FIRE-DEX, LLC;
GLOBE HOLDING COMPANY, LLC;
GLOBE MANUFACTURING COMPANY LLC;
HONEYWELL INTERNATIONAL, INC.;
HONEYWELL SAFETY PRODUCTS USA, INC.;
INNOTEX CORP.;
JOHNSON CONTROLS, INC.;
KIDDE P.L.C., INC.;
L.N. CURTIS & SONS;
LAKELAND INDUSTRIES, INC.;
LION APPAREL, INC;
LION GROUP, INC.;
MALLORY SAFETY AND SUPPLY LLC;
MILLIKEN & COMPANY;
MINE SAFETY APPLIANCE COMPANY LLC;
MSA SAFETY INCORPORATED;

ELECTRONICALLY FILED - 2025 Jan 29 3:05 PM - YORK - COMMON PLEAS - CASE#2025CP4600398

MUNICIPAL EMERGENCY SERVICES, INC.;
NARCOTE HOLDING CORP. (D/B/A
STEDFAST, INC. and/or STEDFAST USA, INC.);
NARCOTE, LLC (D/B/A STEDFAST, INC. and/or
STEDFAST USA, INC.);
NATION FORD CHEMICAL COMPANY;
NATIONAL FOAM, INC.;
PBI PERFORMANCE PRODUCTS, INC.;
PERIMETER SOLUTIONS, LP;
RICOCHET MANUFACTURING CO., INC.;
SAFETY COMPONENTS FABRIC
TECHNOLOGIES, INC. D/B/A SAFETY
COMPONENTS, INC.;
SOUTHERN MILLS, INC. D/B/A TENCATE
PROTECTIVE FABRICS USA;
STEDFAST USA INC.;
THE CHEMOURS COMPANY;
THE CHEMOURS COMPANY FC, LLC;
TYCO FIRE PRODUCTS, LP as successor-in-
interest to THE ANSUL COMPANY;
UNITED TECHNOLOGIES CORPORATION;
UTC FIRE & SECURITY AMERICAS
CORPORATION, INC. (F/K/A GE INTERLOGIX,
INC.);
VERIDIAN LIMITED D/B/A VERIDIAN FIRE
PROTECTIVE GEAR;
W. L. GORE & ASSOCIATES, INC.; and
WITMER PUBLIC SAFETY GROUP, INC. (D/B/A
THE FIRE STORE);

Defendants.

TO THE DEFENDANT ABOVE-NAMED:

YOU ARE HEREBY SUMMONED and required to answer the complaint herein, a copy of which is herewith served upon you, and to serve a copy of your answer to this complaint upon the subscriber, at the address shown below, within thirty (30) days after service hereof, exclusive of the day of such service, and if you fail to answer the complaint, judgment by default will be rendered against you for the relief demanded in the complaint.

SCCA 401 (5/02)

ELECTRONICALLY FILED - 2025 Jan 29 3:05 PM - YORK - COMMON PLEAS - CASE#2025CP4600398

_____/s/ T. David Hoyle_____
Plaintiff/Attorney for Plaintiff

Address:    T. David Hoyle
Motley Rice LLC
28 Bridgeside Boulevard
Mount Pleasant, SC 29464
dhoyle@motleyrice.com

Mount Pleasant, South Carolina
Dated: January 29, 2025

SCCA 401 (5/02)

ELECTRONICALLY FILED - 2025 Jan 29 3:05 PM - YORK - COMMON PLEAS - CASE#2025CP4600398

| | |
|---|---|
| **STATE OF SOUTH CAROLINA** | **IN THE COURT OF COMMON PLEAS** |
| **COUNTY OF YORK** | **SIXTEENTH JUDICIAL CIRCUIT** |
| | |
| JUSTIN ALVAREZ; | |
| ARNULFO BONILLAS; | |
| MATTHEW B. BUFFORD; | **Civil Action No.: 2025-CP-_____-_____** |
| EDWARD BURGESS; | |
| ADAM CHALOS; | |
| SCOTT CLAY; | **COMPLAINT** |
| PETE CORBINO; | |
| JASON CRADY; | **(Jury Trial Demanded)** |
| CHARLES DEXTER; | |
| CHAS PHILLIP DONNER; | |
| CHRISTOPHER FRANKLIN; | |
| KELLY FUGATE; | |
| NICHOLAS GRASSO; | |
| JAMES GRITSCHKE; | |
| MAGUIRE HARRISON; | |
| MATTHEW HECHT; | |
| JACOB HEFLIN; | |
| RAYMOND HEGARTY; | |
| AUSTIN JACKS; | |
| BILL KEATHLEY; | |
| JOSEPH LAMENT; | |
| ROGER MAYNARD; | |
| DAVID MORGAN; | |
| NICK PALACIOSIS MUÑA; | |
| TODD NEWCOMER; | |
| MATTHEW O'REILLY; | |
| JOHNNY PADILLA; | |
| CHARLES PEIFFER; | |
| ZACHARY POINDEXTER; | |
| EDWIN PUGH; | |
| DALEN RANDA; | |
| RONALD RAPOSA; | |
| KEITH RENFROE; | |
| JEROME SAN AGUSTIN REYES; | |
| KEVEN SANDERS; | |
| KEVIN SCELZA; | |
| ZANE SEIPLER; | |
| JEREMY SHAWLEY; | |
| CHRISTOPHER SPEARS; | |
| PAUL STANFORD; | |
| BAYLEE STRACHAN; | |
| JIM THORPE; and | |

ELECTRONICALLY FILED - 2025 Jan 29 3:05 PM - YORK - COMMON PLEAS - CASE#2025CP4600398

ZACHARY VOZELLA;

Plaintiffs,

v.

3M COMPANY (A/K/A MINNESOTA MINING
AND MANUFACTURING COMPANY);
AGC CHEMICALS AMERICAS, INC.;
ALLSTAR FIRE EQUIPMENT;
AMEREX CORPORATION;
ARCHROMA U.S. INC.;
ARKEMA, INC.;
BUCKEYE FIRE EQUIPMENT COMPANY;
CARRIER GLOBAL CORPORATION;
CB GARMENT, INC. (D/B/A CREWBOSS);
CHEMDESIGN PRODUCTS, INC.;
CHEMGUARD, INC.;
CHEMICALS, INC.;
CLARIANT CORPORATION;
CORTEVA, INC. (F/K/A DOWDUPONT INC.);
DAIKIN AMERICA, INC.;
DEEPWATER CHEMICALS, INC.;
DU PONT DE NEMOURS, INC (F/K/A
DOWDUPONT INC.);
DYNAX CORPORATION;
EIDP, INC. (A/K/A E. I. DU PONT DE NEMOURS
AND COMPANY);
FIRE SERVICE PLUS, INC.;
FIRE-DEX, INC;
FIRE-DEX, LLC;
GLOBE HOLDING COMPANY, LLC;
GLOBE MANUFACTURING COMPANY LLC;
HONEYWELL INTERNATIONAL, INC.;
HONEYWELL SAFETY PRODUCTS USA, INC.;
INNOTEX CORP.;
JOHNSON CONTROLS, INC.;
KIDDE P.L.C., INC.;
L.N. CURTIS & SONS;
LAKELAND INDUSTRIES, INC.;
LION APPAREL, INC;
LION GROUP, INC.;
MALLORY SAFETY AND SUPPLY LLC;

ELECTRONICALLY FILED - 2025 Jan 29 3:05 PM - YORK - COMMON PLEAS - CASE#2025CP4600398

MILLIKEN & COMPANY;
MINE SAFETY APPLIANCE COMPANY LLC;
MSA SAFETY INCORPORATED;
MUNICIPAL EMERGENCY SERVICES, INC.;
NARCOTE HOLDING CORP. (D/B/A
STEDFAST, INC. and/or STEDFAST USA, INC.);
NARCOTE, LLC (D/B/A STEDFAST, INC. and/or
STEDFAST USA, INC.);
NATION FORD CHEMICAL COMPANY;
NATIONAL FOAM, INC.;
PBI PERFORMANCE PRODUCTS, INC.;
PERIMETER SOLUTIONS, LP;
RICOCHET MANUFACTURING CO., INC.;
SAFETY COMPONENTS FABRIC
TECHNOLOGIES, INC. D/B/A SAFETY
COMPONENTS, INC.;
SOUTHERN MILLS, INC. D/B/A TENCATE
PROTECTIVE FABRICS USA;
STEDFAST USA INC.;
THE CHEMOURS COMPANY;
THE CHEMOURS COMPANY FC, LLC;
TYCO FIRE PRODUCTS, LP as successor-in-
interest to THE ANSUL COMPANY;
UNITED TECHNOLOGIES CORPORATION;
UTC FIRE & SECURITY AMERICAS
CORPORATION, INC. (F/K/A GE INTERLOGIX,
INC.);
VERIDIAN LIMITED D/B/A VERIDIAN FIRE
PROTECTIVE GEAR;
W. L. GORE & ASSOCIATES, INC.; and
WITMER PUBLIC SAFETY GROUP, INC. (D/B/A
THE FIRE STORE);

                          Defendants.

## **COMPLAINT**

COMES NOW, the Plaintiffs, by and through undersigned counsel, and allege upon

information and belief as follows:

1.      Plaintiffs bring this action for monetary damages and appropriate equitable and injunctive relief for harm resulting from exposure to per- and polyfluoroalkyl substances ("PFAS") that were manufactured, designed, sold, supplied, distributed and/or contained in products manufactured, designed, sold, supplied and/or distributed by each of the Defendants, individually or through their predecessors or subsidiaries.

2.      PFAS are human-made chemicals consisting of a chain of carbon and fluorine atoms used in manufactured products to, *inter alia,* resist and repel oil, stains, heat, and water. PFAS include "long-chain" PFAS made up of seven or more carbon atoms ("long-chain PFAS") as well as "short-chain" PFAS made up of six or fewer carbon atoms ("short-chain PFAS").

3.      PFAS are known as "forever chemicals," and per the Stockholm Convention on Persistent Organic Pollutants, to which the U.S. is a signatory, are defined as: Persistent – because they do not break down through organic processes or in the environment; Transboundary – as they migrate through surface and ground water, as well as in the atmosphere and through wildlife; and Bio-accumulative – as they concentrate within our bodies and are passed to the fetus within the womb and though breast milk. Exposure to PFAS in humans can occur through inhalation, ingestion, and dermal contact.[1]

4.      PFAS have been associated with multiple and serious adverse health effects in humans including cancer, tumors, liver damage, immune system and endocrine disorders, high cholesterol, thyroid disease, ulcerative colitis, birth defects, decreased fertility, and pregnancy-induced hypertension. PFAS have also been found to concentrate in human blood, bones, and

---

[1] Suzanne E. Fenton, MS, PhD, PFAS Collection, Environmental Health Perspectives (February 22, 2019), https://ehp.niehs.nih.gov/curated-collections/PFAS (last accessed May 15, 2023).

organs and, more recently, to reduce the effectiveness of vaccines, a significant concern in light of COVID-19.

5.      Firefighter occupational cancer is the leading cause of line-of-duty deaths in the fire service.

6.      Unbeknownst to Plaintiffs, Defendants have manufactured, marketed, distributed, sold, and/or used PFAS and PFAS-containing materials in protective clothing specifically designed for firefighters ("bunker gear") and/or in Class B firefighting foams.

7.      For decades, Defendants were aware of the toxic nature of PFAS and the harmful impact these substances have on human health. Yet, Defendants manufactured, designed, marketed, sold, supplied, and/or distributed PFAS and PFAS chemical feedstock, as well PFAS-containing bunker gear, to firefighting training facilities and fire departments nationally. Defendants did so, moreover, without ever informing firefighters or the public that their bunker gear contained PFAS, and without warning firefighters or the public of the substantial and serious health injuries that can result from exposure to PFAS or PFAS-containing materials in bunker gear and Class B firefighting foams. Even worse, Defendants concealed the hazardous toxicity, persistence and bioaccumulation of PFAS, and repeatedly misrepresented the safety of PFAS and/or PFAS-containing materials.

8.      Plaintiffs wore bunker gear in the normal course of performing their firefighting duties and were thereby repeatedly exposed to PFAS in their workplace. Plaintiffs were also exposed to PFAS via Class B firefighting foam used in the ordinary course of their employment. Plaintiffs did not know and, in the exercise of reasonable diligence, could not have known that these products contained PFAS or PFAS-containing materials. They also did not know that PFAS was in their body and blood.

ELECTRONICALLY FILED - 2025 Jan 29 3:05 PM - YORK - COMMON PLEAS - CASE#2025CP4600398

9.      At all relevant times and continuing to the present, Defendants have represented that their bunker gear and Class B foams are safe.

10.     Plaintiffs wore and/or used the bunker gear as they were intended and in a foreseeable manner which exposed them to PFAS in the normal course of their firefighting activities. This repeated and extensive exposure to PFAS resulted in cancers and other serious and life-threatening diseases to Plaintiffs. Plaintiffs' PFAS exposures continue to pose a significant threat to their personal health due to PFAS' persistence, pervasiveness, toxicity, and bioaccumulation.

11.     Defendants knowingly and willfully manufactured, designed, marketed, sold, and distributed chemicals and/or products containing PFAS for use, nationally, when they knew or reasonably should have known that Plaintiffs would repeatedly inhale, ingest, and/or have dermal contact with these harmful compounds during firefighting training exercises and in normal firefighting operations, and that such exposure would threaten the health and welfare of firefighters exposed to these dangerous and hazardous chemicals.

12.     Plaintiffs bring this action against Defendants and seek damages, together with any appropriate injunctive or other equitable relief.

### PARTIES, JURISDICTION & VENUE

### PLAINTIFFS

### Kidney (Renal) Cancer Plaintiffs

13.     Plaintiff Arnulfo Bonillas III is a resident and citizen of Tucson, Arizona. Plaintiff Bonillas III regularly used, and was thereby directly exposed to, Class B foams and bunker gear containing PFAS in training and to extinguish fires during his working career as a military and/or civilian firefighter at the City of Tucson Fire Department in Arizona. Plaintiff Bonillas III was diagnosed with Kidney (Renal) Cancer as a result of exposure to Defendants' products.

ELECTRONICALLY FILED - 2025 Jan 29 3:05 PM - YORK - COMMON PLEAS - CASE#2025CP4600398

ELECTRONICALLY FILED - 2025 Jan 29 3:05 PM - YORK - COMMON PLEAS - CASE#2025CP4600398

14. Plaintiff Edward Burgess is a resident and citizen of Norton, Massachusetts. Plaintiff Burgess regularly used, and was thereby directly exposed to, Class B foams and bunker gear containing PFAS in training and to extinguish fires during his working career as a military and/or civilian firefighter at the Town of Norton Fire-Rescue Department in Massachusetts. Plaintiff Burgess was diagnosed with Kidney (Renal) Cancer as a result of exposure to Defendants' products.

15. Plaintiff Charles Dexter is a resident and citizen of Albany, Georgia. Plaintiff Dexter regularly used, and was thereby directly exposed to, Class B foams and bunker gear containing PFAS in training and to extinguish fires during his working career as a military and/or civilian firefighter at the Albany Fire Department in Georgia. Plaintiff Dexter was diagnosed with Kidney (Renal) Cancer as a result of exposure to Defendants' products. Plaintiff Joseph Lament is a resident and citizen of South Carolina.

16. Plaintiff Nicholas Grasso is a resident and citizen of Hanson, Massachusetts. Plaintiff Grasso regularly used, and was thereby directly exposed to, Class B foams and bunker gear containing PFAS in training and to extinguish fires during his working career as a military and/or civilian firefighter at the Whitman Fire Department in Massachusetts. Plaintiff Grasso was diagnosed with Kidney (Renal) Cancer and Thyroid Cancer as a result of exposure to Defendants' products.

17. Plaintiff James Gritschke is a resident and citizen of Union, New Jersey. Plaintiff Gritschke regularly used, and was thereby directly exposed to, Class B foams and bunker gear containing PFAS in training and to extinguish fires during his working career as a military and/or civilian firefighter at the Newark Fire Department in New Jersey. Plaintiff Gritschke was diagnosed with Kidney (Renal) Cancer as a result of exposure to Defendants' products.

18.     Plaintiff William Keathley is a resident and citizen of Conway, Arkansas. Plaintiff Keathley regularly used, and was thereby directly exposed to, Class B foams and bunker gear containing PFAS in training and to extinguish fires during his working career as a military and/or civilian firefighter at the North Little Rock Fire Department and the Conway Fire Department in Arkansas. Plaintiff Keathley was diagnosed with Kidney (Renal) Cancer as a result of exposure to Defendants' products.

19.     Plaintiff Joseph Lament is a resident and citizen of Seneca, South Carolina. Plaintiff Lament regularly used, and was thereby directly exposed to, Class B foams and bunker gear containing PFAS in training and to extinguish fires during his working career as a military and/or civilian firefighter at the Seneca Fire Department, Keowee Ebenezer Fire Department, Keowee Fire District, and Corinth-Shiloh Volunteer Fire Department in South Carolina. Plaintiff Lament was diagnosed with Kidney (Renal) Cancer and Liver Cancer as a result of exposure to Defendants' products.

20.     Plaintiff Nick Palaciosis Muña a resident and citizen of Saipan, Northern Mariana Islands. Plaintiff Muña regularly used, and was thereby directly exposed to, Class B foams and bunker gear containing PFAS in training and to extinguish fires during his working career as a military and/or civilian firefighter at the Saipan International Airport Aircraft Rescue and Firefighting Department in Saipan, Mariana Islands. Plaintiff Muña was diagnosed with Kidney (Renal) Cancer as a result of exposure to Defendants' products.

21.     Plaintiff Johnny Padilla is a resident and citizen of Waddell, Arizona. Plaintiff Padilla regularly used, and was thereby directly exposed to, Class B foams and bunker gear containing PFAS in training and to extinguish fires during his working career as a military and/or civilian firefighter at the Wittman Fire District and the Arizona Fire and Medical Authority in

ELECTRONICALLY FILED - 2025 Jan 29 3:05 PM - YORK - COMMON PLEAS - CASE#2025CP4600398

ELECTRONICALLY FILED - 2025 Jan 29 3:05 PM - YORK - COMMON PLEAS - CASE#2025CP4600398

Arizona. Plaintiff Padilla was diagnosed with Kidney (Renal) Cancer as a result of exposure to Defendants' products.

22.     Plaintiff Edwin Pugh is a resident and citizen of Tuscaloosa, Alabama. Plaintiff Pugh regularly used, and was thereby directly exposed to, Class B foams and bunker gear containing PFAS in training and to extinguish fires during his working career as a military and/or civilian firefighter at the Tuscaloosa Fire Department in Alabama. Plaintiff Pugh was diagnosed with Kidney (Renal) Cancer as a result of exposure to Defendants' products.

23.     Plaintiff Ronald Raposa is a resident and citizen of Somerset, Massachusetts. Plaintiff Raposa regularly used, and was thereby directly exposed to, Class B foams and bunker gear containing PFAS in training and to extinguish fires during his working career as a military and/or civilian firefighter at the City of Fall River Fire Department in Massachusetts. Plaintiff Raposa was diagnosed with Kidney (Renal) Cancer as a result of exposure to Defendants' products.

24.     Plaintiff Keith Renfroe was a resident and citizen of Oak Lawn, IL. Plaintiff Renfroe regularly used, and was thereby directly exposed to, Class B foams and bunker gear containing PFAS in training and to extinguish fires during his working career as a military and/or civilian firefighter at the Chicago Fire Department in Illinois. Plaintiff Renfroe was diagnosed with Kidney (Renal) Cancer as a result of exposure to Defendants' products.

25.     Plaintiff Zachary Vozella is a resident and citizen of Chicopee, MA. Plaintiff Vozella regularly used, and was thereby directly exposed to, Class B foams and bunker gear containing PFAS in training and to extinguish fires during his working career as a military and/or civilian firefighter at the Chicopee Fire Department in Massachusetts. Plaintiff Vozella was diagnosed with Kidney (Renal) Cancer as a result of exposure to Defendants' products.

ELECTRONICALLY FILED - 2025 Jan 29 3:05 PM - YORK - COMMON PLEAS - CASE#2025CP4600398

**Testicular Cancer Plaintiffs**

26.     Plaintiff Christopher Franklin is a resident and citizen of Flintville, Tennessee. Plaintiff Franklin regularly used, and was thereby directly exposed to, Class B foams and bunker gear containing PFAS in training and to extinguish fires during his working career as a military and/or civilian firefighter at the Huntsville Fire and Rescue Department in Alabama. Plaintiff Franklin was diagnosed with Testicular Cancer as a result of exposure to Defendants' products.

27.     Plaintiff Maguire Harrison is a resident and citizen of Flagstaff, Arizona. Plaintiff Harrison regularly used, and was thereby directly exposed to, Class B foams and bunker gear containing PFAS in training and to extinguish fires during his working career as a military and/or civilian firefighter at the Summit Fire and Medical District in Arizona. Plaintiff Harrison was diagnosed with Testicular Cancer as a result of exposure to Defendants' products.

28.     Plaintiff Matthew Hecht is a resident and citizen of Sister Bay, Wisconsin. Plaintiff Hecht regularly used, and was thereby directly exposed to, Class B foams and bunker gear containing PFAS in training and to extinguish fires during his working career as a military and/or civilian firefighter at the Sister Bay and Liberty Grove Fire Department in Wisconsin. Plaintiff Hecht was diagnosed with Testicular Cancer as a result of exposure to Defendants' products.

29.     Plaintiff David Morgan is a resident and citizen of Wilmington, North Carolina. Plaintiff Morgan regularly used, and was thereby directly exposed to, Class B foams and bunker gear containing PFAS in training and to extinguish fires during his working career as a military and/or civilian firefighter at the New Hanover County Fire Rescue (NHCFR) Department in North Carolina. Plaintiff Morgan was diagnosed with Testicular Cancer as a result of exposure to Defendants' products.

30.     Plaintiff Todd Newcomer is a resident and citizen of Wayzata, Minnesota. Plaintiff Newcomer regularly used, and was thereby directly exposed to, Class B foams and bunker gear containing PFAS in training and to extinguish fires during his working career as a military and/or civilian firefighter at the Philomath Fire Department, Eugene Springfield Fire Department, and Tualatin Valley Fire and Rescue in Oregon. Plaintiff Newcomer was diagnosed with Testicular Cancer as a result of exposure to Defendants' products.

**Liver Cancer Plaintiffs**

31.     Plaintiff Roger Maynard is a resident and citizen of Worcester, Massachusetts. Plaintiff Maynard regularly used, and was thereby directly exposed to, Class B foams and bunker gear containing PFAS in training and to extinguish fires during his working career as a military and/or civilian firefighter at the Worcester Fire Department in Massachusetts. Plaintiff Maynard was diagnosed with Liver Cancer as a result of exposure to Defendants' products.

**Thyroid Cancer Plaintiffs**

32.     Plaintiff Justin Alvarez is a resident and citizen of Tucson, AZ. Plaintiff Alvarez regularly used, and was thereby directly exposed to, Class B foams and bunker gear containing PFAS in training and to extinguish fires during his working career as a military and/or civilian firefighter at the Drexel Heights Fire District and the South Tucson Fire Department in Arizona. Plaintiff Alvarez was diagnosed with Thyroid Cancer as a result of exposure to Defendants' products.

33.     Plaintiff Adam Chalos is a resident and citizen of Terre Haute, Indiana. Plaintiff Chalos regularly used, and was thereby directly exposed to, Class B foams and bunker gear containing PFAS in training and to extinguish fires during his working career as a military and/or civilian firefighter at the Terre Haute Fire Department, Honey Creek Fire Department, and New

ELECTRONICALLY FILED - 2025 Jan 29 3:05 PM - YORK - COMMON PLEAS - CASE#2025CP4600398

ELECTRONICALLY FILED - 2025 Jan 29 3:05 PM - YORK - COMMON PLEAS - CASE#2025CP4600398

Goshen Fire Department in Indiana. Plaintiff Chalos was diagnosed with Thyroid Cancer as a result of exposure to Defendants' products.

34.     Plaintiff Jason Crady is a resident and citizen of Lake St. Louis, Missouri. Plaintiff Crady regularly used, and was thereby directly exposed to, Class B foams and bunker gear containing PFAS in training and to extinguish fires during his working career as a military and/or civilian firefighter Robertson Fire Protection District and the Lincoln County Ambulance District in Missouri. Plaintiff Crady was diagnosed with Thyroid Cancer as a result of exposure to Defendants' products.

35.     Plaintiff Chas Phillip Donner is a resident and citizen of Buellton, California. Plaintiff Donner regularly used, and was thereby directly exposed to, Class B foams and bunker gear containing PFAS in training and to extinguish fires during his working career as a military and/or civilian firefighter at the Carpinteria-Summerland Fire Protection District in California. Plaintiff Donner was diagnosed with Thyroid Cancer as a result of exposure to Defendants' products.

36.     Plaintiff Kelly Fugate is a resident and citizen of Bellbrook, Ohio. Plaintiff Fugate regularly used, and was thereby directly exposed to, Class B foams and bunker gear containing PFAS in training and to extinguish fires during his working career as a military and/or civilian firefighter at the Sugarcreek Township Fire Department and Butler Township Fire Department in Ohio. Plaintiff Fugate was diagnosed with Thyroid Cancer as a result of exposure to Defendants' products.

37.     Plaintiff Austin Jacks is a resident and citizen of Clinton, Indiana. Plaintiff Jacks regularly used, and was thereby directly exposed to, Class B foams and bunker gear containing PFAS in training and to extinguish fires during his working career as a military and/or civilian

firefighter at the Honey Creek Fire Department, the City of Terre Haute Fire Department, and a volunteer firefighter at the Clinton City Fire Department in Indiana. Plaintiff Jacks was diagnosed with Thyroid Cancer as a result of exposure to Defendants' products.

38.     Plaintiff Matthew O'Reilly is a resident and citizen of Sun City, Arizona. Plaintiff O'Reilly regularly used, and was thereby directly exposed to, Class B foams and bunker gear containing PFAS in training and to extinguish fires during his working career as a military and/or civilian firefighter at the Sun City Fire and Medical Department in Arizona. Plaintiff O'Reilly was diagnosed with Thyroid Cancer as a result of exposure to Defendants' products.

39.     Plaintiff Zachary Poindexter is a resident and citizen of Rockwall, Texas. Plaintiff Poindexter regularly used, and was thereby directly exposed to, Class B foams and bunker gear containing PFAS in training and to extinguish fires during his working career as a military and/or civilian firefighter at the Melissa Fire Department, Farmersville Fire Department, Lavon Fire Department, and Fate Department of Public Safety in Texas. Plaintiff Poindexter was diagnosed with Thyroid Cancer as a result of exposure to Defendants' products.

40.     Plaintiff Jeremy Shawley is a resident and citizen of Windsor, Colorado. Plaintiff Shawley regularly used, and was thereby directly exposed to, Class B foams and bunker gear containing PFAS in training and to extinguish fires during his working career as a military and/or civilian firefighter at the Wellington Fire Department and Thornton Fire Department in Colorado. Plaintiff Shawley was diagnosed with Thyroid Cancer as a result of exposure to Defendants' products.

41.     Plaintiff Christopher Spears is a resident and citizen of Ashland, Kentucky. Plaintiff Spears regularly used, and was thereby directly exposed to, Class B foams and bunker gear containing PFAS in training and to extinguish fires during his working career as a military and/or

ELECTRONICALLY FILED - 2025 Jan 29 3:05 PM - YORK - COMMON PLEAS - CASE#2025CP4600398

ELECTRONICALLY FILED - 2025 Jan 29 3:05 PM - YORK - COMMON PLEAS - CASE#2025CP4600398

civilian firefighter Ashland Fire Department in Kentucky. Plaintiff Spears was diagnosed with Thyroid Cancer as a result of exposure to Defendants' products.

42.     Plaintiff Jim Thorpe is a resident and citizen of Sun City, Arizona. Plaintiff Thorpe regularly used, and was thereby directly exposed to, Class B foams and bunker gear containing PFAS in training and to extinguish fires during his working career as a military and/or civilian firefighter in the U.S. Airforce and at the Mass Port Fire and Rescue in Massachusetts. Plaintiff Thorpe was diagnosed with Thyroid Cancer as a result of exposure to Defendants' products.

### Thyroid Disease Plaintiffs

43.     Plaintiff Matthew B. Bufford is a resident and citizen of Frisco, Texas. Plaintiff Bufford regularly used, and was thereby directly exposed to, Class B foams and bunker gear containing PFAS in training and to extinguish fires during his working career as a military and/or civilian firefighter at the Galveston Fire Department and Highland Village Fire Department in Texas. Plaintiff Bufford was diagnosed with Thyroid Disease as a result of exposure to Defendants' products.

44.     Plaintiff Scott Clay is a resident and citizen of Fort Wayne, Indiana. Plaintiff Clay regularly used, and was thereby directly exposed to, Class B foams and bunker gear containing PFAS in training and to extinguish fires during his working career as a military and/or civilian firefighter at the Fort Wayne Fire Department in Indiana. Plaintiff Clay was diagnosed with Thyroid Disease as a result of exposure to Defendants' products.

45.     Plaintiff Pete Corbino is a resident and citizen of Fairfax, Virginia. Plaintiff Corbino regularly used, and was thereby directly exposed to, Class B foams and bunker gear containing PFAS in training and to extinguish fires during his working career as a military and/or civilian firefighter at the Arlington County Fire Department in Virginia and a volunteer firefighter

ELECTRONICALLY FILED - 2025 Jan 29 3:05 PM - YORK - COMMON PLEAS - CASE#2025CP4600398

at the Gettysburg Fire Department in Pennsylvania. Plaintiff Corbino was diagnosed with Thyroid Disease as a result of exposure to Defendants' products.

46. Plaintiff Raymond Hegarty is a resident and citizen of Salem, New Hampshire. Plaintiff Hegarty regularly used, and was thereby directly exposed to, Class B foams and bunker gear containing PFAS in training and to extinguish fires during his working career as a military and/or civilian firefighter at Massport Fire Rescue in Massachusetts. Plaintiff Hegarty was diagnosed with Thyroid Disease as a result of exposure to Defendants' products.

47. Plaintiff Charles Peiffer is a resident and citizen of Lake Havasu City, Arizona. Plaintiff Peiffer regularly used, and was thereby directly exposed to, Class B foams and bunker gear containing PFAS in training and to extinguish fires during his working career as a military and/or civilian firefighter at the Lakewood Fire District in Washington. Plaintiff Peiffer was diagnosed with Thyroid Disease as a result of exposure to Defendants' products.

48. Plaintiff Dalen Randa is a resident and citizen of Wise, Virginia. Plaintiff Randa regularly used, and was thereby directly exposed to, Class B foams and bunker gear containing PFAS in training and to extinguish fires during his working career as a military and/or civilian firefighter in the US Navy and the US Navy Reserves. Plaintiff Randa was diagnosed with Thyroid Disease as a result of exposure to Defendants' products.

49. Plaintiff Jerome San Agustin Reyes is a resident and citizen of Saipan, Mariana Islands. Plaintiff Reyes regularly used, and was thereby directly exposed to, Class B foams and bunker gear containing PFAS in training and to extinguish fires during his working career as a military and/or civilian firefighter at the Saipan International Airport Aircraft Rescue and Firefighting Department in Saipan, Mariana Islands. Plaintiff Reyes was diagnosed with Thyroid Disease as a result of exposure to Defendants' products.

50.     Plaintiff Keven Sanders is a resident and citizen of Omaha, Nebraska. Plaintiff Sanders regularly used, and was thereby directly exposed to, Class B foams and bunker gear containing PFAS in training and to extinguish fires during his working career as a military and/or civilian firefighter in the US Army and the Omaha Fire Department in Nebraska. Plaintiff Sanders was diagnosed with Thyroid Disease as a result of exposure to Defendants' products.

51.     Plaintiff Kevin Scelza is a resident and citizen of Peoria, Arizona. Plaintiff Scelza regularly used, and was thereby directly exposed to, Class B foams and bunker gear containing PFAS in training and to extinguish fires during his working career as a military and/or civilian firefighter in the U.S. Navy. Plaintiff Scelza was diagnosed with Thyroid Disease as a result of exposure to Defendants' products.

52.     Plaintiff Zane Seipler is a resident and citizen of Rocklin, California. Plaintiff Seipler regularly used, and was thereby directly exposed to, Class B foams and bunker gear containing PFAS in training and to extinguish fires during his working career as a military and/or civilian firefighter in the US Navy. Plaintiff Seipler was diagnosed with Thyroid Disease as a result of exposure to Defendants' products.

53.     Plaintiff Paul Stanford is a resident and citizen of Savannah, Georgia. Plaintiff Stanford regularly used, and was thereby directly exposed to, Class B foams and bunker gear containing PFAS in training and to extinguish fires during his working career as a military and/or civilian firefighter at the Savannah Fire Department. Plaintiff Stanford was diagnosed with Thyroid Disease as a result of exposure to Defendants' products.

54.     Plaintiff Baylee Strachan is a resident and citizen of Omaha, Nebraska. Plaintiff Strachan regularly used, and was thereby directly exposed to, Class B foams and bunker gear containing PFAS in training and to extinguish fires during his working career as a military and/or

ELECTRONICALLY FILED - 2025 Jan 29 3:05 PM - YORK - COMMON PLEAS - CASE#2025CP4600398

ELECTRONICALLY FILED - 2025 Jan 29 3:05 PM - YORK - COMMON PLEAS - CASE#2025CP4600398

civilian firefighter at the Omaha Fire and Rescue in Nebraska. Plaintiff Strachan was diagnosed with Thyroid Disease as a result of exposure to Defendants' products.

**Ulcerative Colitis Plaintiffs**

55.     Plaintiff Jacob Heflin is a resident and citizen of Lakewood, California. Plaintiff Heflin regularly used, and was thereby directly exposed to, Class B foams and bunker gear containing PFAS in training and to extinguish fires during his working career as a military and/or civilian firefighter at the Long Beach Fire Department in California. Plaintiff Heflin was diagnosed with Ulcerative Colitis as a result of exposure to Defendants' products.

## **DEFENDANTS**

56.     Defendant 3M Company (a/k/a Minnesota Mining and Manufacturing Company) ("3M") is a Delaware corporation that does business throughout the United States, including within South Carolina. 3M has its principal place of business in St. Paul, Minnesota. Defendant 3M is engaged in the business of developing, manufacturing, marketing distributing, releasing, selling, and/or using PFAS, PFAS materials, and products containing PFAS in bunker gear and/or Class B foams, throughout the United States, including within South Carolina.  In addition, upon information and belief, Defendant 3M has conducted substantial, ongoing business in this state and has extensive, ongoing, and specific contacts with South Carolina.

57.     Defendant 3M has purposefully availed itself of the privilege of conducting business in the State of South Carolina, has transacted business in the State of South Carolina, contracted to distribute and supply its products in the State of South Carolina, regularly caused its products to be sold in the State of South Carolina; this action arises out of business transacted in, as well as a tortious actions and/or omissions committed in whole or in part within South Carolina, and which resulted in injuries in South Carolina; and specific personal jurisdiction is proper under

ELECTRONICALLY FILED - 2025 Jan 29 3:05 PM - YORK - COMMON PLEAS - CASE#2025CP4600398

one or more provisions of S.C. Code Ann. § 36-2-803, as well as the Due Process Clauses of the Fifth and Fourteenth Amendments t0 the Constitution of the United States of America.

58.    Defendant AGC Chemicals Americas, Inc. ("AGC") is a Delaware corporation that does business throughout the United States, including within South Carolina. AGC has its principal place of business in Exton, Pennsylvania. AGC developed, manufactured, marketed, distributed, released, sold, and/or used PFAS, PFAS materials, and products containing PFAS in bunker gear and/or Class B foams, throughout the United States, including within South Carolina.  In addition, upon information and belief, Defendant AGC has conducted substantial, ongoing business in this state and has extensive, ongoing, and specific contacts with South Carolina.

59.    Defendant AGC has purposefully availed itself of the privilege of conducting business in the State of South Carolina, has transacted business in the State of South Carolina, contracted to distribute and supply its products in the State of South Carolina, regularly caused its products to be sold in the State of South Carolina; this action arises out of business transacted in, as well as a tortious actions and/or omissions committed in whole or in part within South Carolina, and which resulted in injuries in South Carolina; and specific personal jurisdiction is proper under one or more provisions of S.C. Code Ann. § 36-2-803, as well as the Due Process Clauses of the Fifth and Fourteenth Amendments of the Constitution of the United States of America.

60.    Defendant AllStar Fire Equipment ("AllStar") is a California corporation that does business throughout the United States. AllStar has its principal place of business in Arcadia, California. AllStar developed, manufactured, marketed, distributed, released, sold, and/or used PFAS, PFAS materials, and products containing PFAS in bunker gear and/or Class B foams.

61.    Defendant AllStar has purposefully availed itself of the privilege of conducting business in the State of South Carolina, has transacted business in the State of South Carolina,

ELECTRONICALLY FILED - 2025 Jan 29 3:05 PM - YORK - COMMON PLEAS - CASE#2025CP4600398

contracted to distribute and supply its products in the State of South Carolina, regularly caused its products to be sold in the State of South Carolina; this action arises out of business transacted in, as well as a tortious actions and/or omissions committed in whole or in part within South Carolina, and which resulted in injuries in South Carolina; and specific personal jurisdiction is proper under one or more provisions of S.C. Code Ann. § 36-2-803, as well as the Due Process Clauses of the Fifth and Fourteenth Amendments of the Constitution of the United States of America.

62. Defendant Amerex Corporation, also known as Alabama Amerex Corporation, ("Amerex") is an Alabama corporation that does business throughout the United States. Amerex has its principal place of business in Trussville, Alabama. Amerex developed, manufactured, marketed, distributed, released, sold, and/or used PFAS, PFAS materials, and products containing PFAS in bunker gear and/or Class B foams.

63. Defendant Amerex has purposefully availed itself of the privilege of conducting business in the State of South Carolina, has transacted business in the State of South Carolina, contracted to distribute and supply its products in the State of South Carolina, regularly caused its products to be sold in the State of South Carolina; this action arises out of business transacted in, as well as a tortious actions and/or omissions committed in whole or in part within South Carolina, and which resulted in injuries in South Carolina; and specific personal jurisdiction is proper under one or more provisions of S.C. Code Ann. § 36-2-803, as well as the Due Process Clauses of the Fifth and Fourteenth Amendments of the Constitution of the United States of America.

64. Defendant Archroma U.S., Inc. ("Archroma") is a North Carolina corporation that does business throughout the United States. Archroma has its principal place of business in Charlotte, North Carolina. Archroma developed, manufactured, marketed, distributed, released,

ELECTRONICALLY FILED - 2025 Jan 29 3:05 PM - YORK - COMMON PLEAS - CASE#2025CP4600398

sold, and/or used PFAS, PFAS materials, and products containing PFAS in bunker gear and/or Class B foams.

65.     Defendant Archroma has purposefully availed itself of the privilege of conducting business in the State of South Carolina, has transacted business in the State of South Carolina, contracted to distribute and supply its products in the State of South Carolina, regularly caused its products to be sold in the State of South Carolina; this action arises out of business transacted in, as well as a tortious actions and/or omissions committed in whole or in part within South Carolina, and which resulted in injuries in South Carolina; and specific personal jurisdiction is proper under one or more provisions of S.C. Code Ann. § 36-2-803, as well as the Due Process Clauses of the Fifth and Fourteenth Amendments of the Constitution of the United States of America.

66.     Defendant Arkema, Inc. ("Arkema") is a Pennsylvania corporation that does business throughout the United States. Arkema has its principal place of business in King of Prussia, Pennsylvania. Arkema developed, manufactured, marketed, distributed, released, sold, and/or used PFAS, PFAS materials, and products containing PFAS in bunker gear and/or Class B foams.

67.     Defendant Arkema has purposefully availed itself of the privilege of conducting business in the State of South Carolina, has transacted business in the State of South Carolina, contracted to distribute and supply its products in the State of South Carolina, regularly caused its products to be sold in the State of South Carolina; this action arises out of business transacted in, as well as a tortious actions and/or omissions committed in whole or in part within South Carolina, and which resulted in injuries in South Carolina; and specific personal jurisdiction is proper under one or more provisions of S.C. Code Ann. § 36-2-803, as well as the Due Process Clauses of the Fifth and Fourteenth Amendments of the Constitution of the United States of America.

ELECTRONICALLY FILED - 2025 Jan 29 3:05 PM - YORK - COMMON PLEAS - CASE#2025CP4600398

68.     Defendant Buckeye Fire Equipment Company ("Buckeye") is a North Carolina corporation that does business throughout the United States. Buckeye has its principal place of business in Kings Mountain, North Carolina. Buckeye developed, manufactured, marketed, distributed, released, sold, and/or used PFAS, PFAS materials, and products containing PFAS in bunker gear and/or Class B foams.

69.     Defendant Buckeye has purposefully availed itself of the privilege of conducting business in the State of South Carolina, has transacted business in the State of South Carolina, contracted to distribute and supply its products in the State of South Carolina, regularly caused its products to be sold in the State of South Carolina; this action arises out of business transacted in, as well as a tortious actions and/or omissions committed in whole or in part within South Carolina, and which resulted in injuries in South Carolina; and specific personal jurisdiction is proper under one or more provisions of S.C. Code Ann. § 36-2-803, as well as the Due Process Clauses of the Fifth and Fourteenth Amendments of the Constitution of the United States of America.

70.     Defendant Carrier Global Corporation ("Carrier") is a Delaware corporation that does business throughout the United States. Carrier has its principal place of business in Palm Beach Gardens, Florida. Carrier is the parent of and Defendant Kidde PLC Inc. and Kidde-Fenwal, Inc., the successor-in-interest to Kidde Fire Fighting, Inc. (f/k/a Chubb National Foam, Inc. f/k/a National Foam System, Inc.) (collectively, "Kidde/Kidde Fire"). Carrier developed, manufactured, marketed, distributed, released, sold, and/or used PFAS, PFAS materials, and products containing PFAS in bunker gear and/or Class B foams.

71.     Defendant Carrier has purposefully availed itself of the privilege of conducting business in the State of South Carolina, has transacted business in the State of South Carolina, contracted to distribute and supply its products in the State of South Carolina, regularly caused its

products to be sold in the State of South Carolina; this action arises out of business transacted in, as well as a tortious actions and/or omissions committed in whole or in part within South Carolina, and which resulted in injuries in South Carolina; and specific personal jurisdiction is proper under one or more provisions of S.C. Code Ann. § 36-2-803, as well as the Due Process Clauses of the Fifth and Fourteenth Amendments of the Constitution of the United States of America.

72.     Defendant CB Garment, Inc. (d/b/a "CrewBoss") is an Oregon corporation that does business throughout the United States. CrewBoss has its principal place of business in Eugene, Oregon. CrewBoss developed, manufactured, marketed, distributed, released, sold, and/or used PFAS, PFAS materials, and products containing PFAS in bunker gear and/or Class B foams.

73.     Defendant CrewBoss has purposefully availed itself of the privilege of conducting business in the State of South Carolina, has transacted business in the State of South Carolina, contracted to distribute and supply its products in the State of South Carolina, regularly caused its products to be sold in the State of South Carolina; this action arises out of business transacted in, as well as a tortious actions and/or omissions committed in whole or in part within South Carolina, and which resulted in injuries in South Carolina; and specific personal jurisdiction is proper under one or more provisions of S.C. Code Ann. § 36-2-803, as well as the Due Process Clauses of the Fifth and Fourteenth Amendments of the Constitution of the United States of America.

74.     Defendant ChemDesign Products, Inc. ("ChemDesign") is a Texas corporation and does business throughout the United States. ChemDesign has its principal place of business in Marinette, Wisconsin. ChemDesign developed, manufactured, marketed, distributed, released, sold, and/or used PFAS, PFAS materials, and products containing PFAS in bunker gear and/or Class B foams.

75.     Defendant ChemDesign has purposefully availed itself of the privilege of

ELECTRONICALLY FILED - 2025 Jan 29 3:05 PM - YORK - COMMON PLEAS - CASE#2025CP4600398

ELECTRONICALLY FILED - 2025 Jan 29 3:05 PM - YORK - COMMON PLEAS - CASE#2025CP4600398

conducting business in the State of South Carolina, has transacted business in the State of South Carolina, contracted to distribute and supply its products in the State of South Carolina, regularly caused its products to be sold in the State of South Carolina; this action arises out of business transacted in, as well as a tortious actions and/or omissions committed in whole or in part within South Carolina, and which resulted in injuries in South Carolina; and specific personal jurisdiction is proper under one or more provisions of S.C. Code Ann. § 36-2-803, as well as the Due Process Clauses of the Fifth and Fourteenth Amendments of the Constitution of the United States of America.

76.     Defendant Chemguard, Inc. ("Chemguard") is a Delaware corporation that does business throughout the United States. Chemguard has its principal place of business in Marinette, Wisconsin. Chemguard developed, manufactured, marketed, distributed, released, sold, and/or used PFAS, PFAS materials, and products containing PFAS in bunker gear and/or Class B foams.

77.     Defendant Chemguard has purposefully availed itself of the privilege of conducting business in the State of South Carolina, has transacted business in the State of South Carolina, contracted to distribute and supply its products in the State of South Carolina, regularly caused its products to be sold in the State of South Carolina; this action arises out of business transacted in, as well as a tortious actions and/or omissions committed in whole or in part within South Carolina, and which resulted in injuries in South Carolina; and specific personal jurisdiction is proper under one or more provisions of S.C. Code Ann. § 36-2-803, as well as the Due Process Clauses of the Fifth and Fourteenth Amendments of the Constitution of the United States of America.

78.     Defendant Chemicals, Inc. ("Chemicals") is a Texas corporation and does business throughout the United States. Chemicals has its principal place of business in Baytown, Texas.

ELECTRONICALLY FILED - 2025 Jan 29 3:05 PM - YORK - COMMON PLEAS - CASE#2025CP4600398

Chemicals developed, manufactured, marketed, distributed, released, sold, and/or used PFAS, PFAS materials, and products containing PFAS in bunker gear and/or Class B foams.

79.     Defendant Chemicals has purposefully availed itself of the privilege of conducting business in the State of South Carolina, has transacted business in the State of South Carolina, contracted to distribute and supply its products in the State of South Carolina, regularly caused its products to be sold in the State of South Carolina; this action arises out of business transacted in, as well as a tortious actions and/or omissions committed in whole or in part within South Carolina, and which resulted in injuries in South Carolina; and specific personal jurisdiction is proper under one or more provisions of S.C. Code Ann. § 36-2-803, as well as the Due Process Clauses of the Fifth and Fourteenth Amendments of the Constitution of the United States of America.

80.     Defendant Clariant Corporation ("Clariant") is a New York corporation that does business throughout the United States.  Clariant has its principal place of business in Charlotte, North Carolina. Clariant developed, manufactured, marketed, distributed, released, sold, and/or used PFAS, PFAS materials, and products containing PFAS in bunker gear and/or Class B foams.

81.     Defendant Clariant has purposefully availed itself of the privilege of conducting business in the State of South Carolina, has transacted business in the State of South Carolina, contracted to distribute and supply its products in the State of South Carolina, regularly caused its products to be sold in the State of South Carolina; this action arises out of business transacted in, as well as a tortious actions and/or omissions committed in whole or in part within South Carolina, and which resulted in injuries in South Carolina; and specific personal jurisdiction is proper under one or more provisions of S.C. Code Ann. § 36-2-803, as well as the Due Process Clauses of the Fifth and Fourteenth Amendments of the Constitution of the United States of America.

82. Defendant Corteva, Inc. (f/k/a DowDuPont Inc.) ("Corteva") is Delaware corporation that does business throughout the United States. Corteva has its principal place of business in Indianapolis, Indiana. Corteva is the parent company of direct subsidiary, EIDP, Inc. (formerly and also known as E.I. du Pont de Nemours and Company), which, on June 1, 2019, became an independent, publicly traded company through the previously announced separation of the agriculture business of DowDuPont Inc. Corteva currently conducts substantially all of its operations through EIDP. Corteva developed, manufactured, marketed, distributed, released, sold, and/or used PFAS, PFAS materials, and products containing PFAS in bunker gear and/or Class B foams.

83. Defendant Corteva has purposefully availed itself of the privilege of conducting business in the State of South Carolina, has transacted business in the State of South Carolina, contracted to distribute and supply its products in the State of South Carolina, regularly caused its products to be sold in the State of South Carolina; this action arises out of business transacted in, as well as a tortious actions and/or omissions committed in whole or in part within South Carolina, and which resulted in injuries in South Carolina; and specific personal jurisdiction is proper under one or more provisions of S.C. Code Ann. § 36-2-803, as well as the Due Process Clauses of the Fifth and Fourteenth Amendments of the Constitution of the United States of America.

84. Defendant Daikin America, Inc. ("Daikin America") is a Delaware corporation that does business throughout the United States. Daikin America has its principal place of business in Orangeburg, Oklahoma. Daikin America developed, manufactured, marketed, distributed, released, sold, and/or used PFAS, PFAS materials, and products containing PFAS in bunker gear and/or Class B foams.

85. Defendant Daikin America has purposefully availed itself of the privilege of

ELECTRONICALLY FILED - 2025 Jan 29 3:05 PM - YORK - COMMON PLEAS - CASE#2025CP4600398

ELECTRONICALLY FILED - 2025 Jan 29 3:05 PM - YORK - COMMON PLEAS - CASE#2025CP4600398

conducting business in the State of South Carolina, has transacted business in the State of South Carolina, contracted to distribute and supply its products in the State of South Carolina, regularly caused its products to be sold in the State of South Carolina; this action arises out of business transacted in, as well as a tortious actions and/or omissions committed in whole or in part within South Carolina, and which resulted in injuries in South Carolina; and specific personal jurisdiction is proper under one or more provisions of S.C. Code Ann. § 36-2-803, as well as the Due Process Clauses of the Fifth and Fourteenth Amendments of the Constitution of the United States of America.

86.    Defendant Deepwater Chemicals, Inc. ("Deepwater") is a Delaware corporation that does business throughout the United States. Deepwater has its principal place of business in Woodward, Oklahoma. Deepwater developed, manufactured, marketed, distributed, released, sold, and/or used PFAS, PFAS materials, and products containing PFAS in bunker gear and/or Class B foams.

87.    Defendant Deepwater has purposefully availed itself of the privilege of conducting business in the State of South Carolina, has transacted business in the State of South Carolina, contracted to distribute and supply its products in the State of South Carolina, regularly caused its products to be sold in the State of South Carolina; this action arises out of business transacted in, as well as a tortious actions and/or omissions committed in whole or in part within South Carolina, and which resulted in injuries in South Carolina; and specific personal jurisdiction is proper under one or more provisions of S.C. Code Ann. § 36-2-803, as well as the Due Process Clauses of the Fifth and Fourteenth Amendments of the Constitution of the United States of America.

88.    Defendant Du Pont de Nemours Inc. (f/k/a DowDuPont Inc.) ("DuPont Nemours") is a Delaware corporation that does business throughout the United States. DuPont Nemours has

its principal place of business in Wilmington, Delaware. DuPont Nemours developed, manufactured, marketed, distributed, released, sold, and/or used PFAS, PFAS materials, and products containing PFAS in bunker gear and/or Class B foams.

89.    Defendant DuPont Nemours has purposefully availed itself of the privilege of conducting business in the State of South Carolina, has transacted business in the State of South Carolina, contracted to distribute and supply its products in the State of South Carolina, regularly caused its products to be sold in the State of South Carolina; this action arises out of business transacted in, as well as a tortious actions and/or omissions committed in whole or in part within South Carolina, and which resulted in injuries in South Carolina; and specific personal jurisdiction is proper under one or more provisions of S.C. Code Ann. § 36-2-803, as well as the Due Process Clauses of the Fifth and Fourteenth Amendments of the Constitution of the United States of America.

90.    Defendant Dynax Corporation ("Dynax") is a Delaware corporation that does business throughout the United States. Dynax has its principal place of business in Elmsford, New York. Dynax developed, manufactured, marketed, distributed, released, sold, and/or used PFAS, PFAS materials, and products containing PFAS in bunker gear and/or Class B foams.

91.    Defendant Dynax has purposefully availed itself of the privilege of conducting business in the State of South Carolina, has transacted business in the State of South Carolina, contracted to distribute and supply its products in the State of South Carolina, regularly caused its products to be sold in the State of South Carolina; this action arises out of business transacted in, as well as a tortious actions and/or omissions committed in whole or in part within South Carolina, and which resulted in injuries in South Carolina; and specific personal jurisdiction is proper under one or more provisions of S.C. Code Ann. § 36-2-803, as well as the Due Process Clauses of the

ELECTRONICALLY FILED - 2025 Jan 29 3:05 PM - YORK - COMMON PLEAS - CASE#2025CP4600398

ELECTRONICALLY FILED - 2025 Jan 29 3:05 PM - YORK - COMMON PLEAS - CASE#2025CP4600398

Fifth and Fourteenth Amendments of the Constitution of the United States of America.

92.     Defendant EIDP, Inc. (a/k/a E. I. du Pont de Nemours & Company) ("DuPont") is a Delaware corporation that does business throughout the United States. DuPont has its principal place of business in Wilmington, Delaware. DuPont developed, manufactured, marketed, distributed, released, sold, and/or used PFAS, PFAS materials, and products containing PFAS in bunker gear and/or Class B foams.

93.     Defendant DuPont has purposefully availed itself of the privilege of conducting business in the State of South Carolina, has transacted business in the State of South Carolina, contracted to distribute and supply its products in the State of South Carolina, regularly caused its products to be sold in the State of South Carolina; this action arises out of business transacted in, as well as a tortious actions and/or omissions committed in whole or in part within South Carolina, and which resulted in injuries in South Carolina; and specific personal jurisdiction is proper under one or more provisions of S.C. Code Ann. § 36-2-803, as well as the Due Process Clauses of the Fifth and Fourteenth Amendments of the Constitution of the United States of America.

94.     Defendant Fire Service Plus, Inc. ("Fire Service Plus") is a Georgia corporation that does business throughout the United States. Fire Service Plus has its principal place of business in Peachtree City, GA. Fire Service Plus developed, manufactured, marketed, distributed, released, sold, and/or used PFAS, PFAS materials, and products containing PFAS in bunker gear and/or Class B foams.

95.     Defendant Fire Service Plus has purposefully availed itself of the privilege of conducting business in the State of South Carolina, has transacted business in the State of South Carolina, contracted to distribute and supply its products in the State of South Carolina, regularly caused its products to be sold in the State of South Carolina; this action arises out of business

ELECTRONICALLY FILED - 2025 Jan 29 3:05 PM - YORK - COMMON PLEAS - CASE#2025CP4600398

transacted in, as well as a tortious actions and/or omissions committed in whole or in part within South Carolina, and which resulted in injuries in South Carolina; and specific personal jurisdiction is proper under one or more provisions of S.C. Code Ann. § 36-2-803, as well as the Due Process Clauses of the Fifth and Fourteenth Amendments of the Constitution of the United States of America.

96.     Defendant Fire-Dex, Inc. ("Fire-Dex Ohio") is an Ohio corporation that does business throughout the United States. Fire-Dex Ohio has its principal place of business in Cleveland, Ohio. Fire-Dex Ohio developed, manufactured, marketed, distributed, released, sold, and/or used PFAS, PFAS materials, and products containing PFAS in bunker gear.

97.     Defendant Fire-Dex Ohio has purposefully availed itself of the privilege of conducting business in the State of South Carolina, has transacted business in the State of South Carolina, contracted to distribute and supply its products in the State of South Carolina, regularly caused its products to be sold in the State of South Carolina; this action arises out of business transacted in, as well as a tortious actions and/or omissions committed in whole or in part within South Carolina, and which resulted in injuries in South Carolina; and specific personal jurisdiction is proper under one or more provisions of S.C. Code Ann. § 36-2-803, as well as the Due Process Clauses of the Fifth and Fourteenth Amendments of the Constitution of the United States of America.

98.     Defendant Fire-Dex, LLC ("Fire-Dex Delaware") is a Delaware limited liability company that does business throughout the United States. Fire-Dex Delaware has its principal place of business in Medina, Ohio. Fire-Dex Delaware developed, manufactured, marketed, distributed, released, sold, and/or used PFAS, PFAS materials, and products containing PFAS in bunker gear. Fire-Dex Ohio and Fire-Dex Delaware are collectively referred to as "Fire-Dex."

ELECTRONICALLY FILED - 2025 Jan 29 3:05 PM - YORK - COMMON PLEAS - CASE#2025CP4600398

99.    Defendant Fire-Dex Delaware has purposefully availed itself of the privilege of conducting business in the State of South Carolina, has transacted business in the State of South Carolina, contracted to distribute and supply its products in the State of South Carolina, regularly caused its products to be sold in the State of South Carolina; this action arises out of business transacted in, as well as a tortious actions and/or omissions committed in whole or in part within South Carolina, and which resulted in injuries in South Carolina; and specific personal jurisdiction is proper under one or more provisions of S.C. Code Ann. § 36-2-803, as well as the Due Process Clauses of the Fifth and Fourteenth Amendments of the Constitution of the United States of America.

100.    Defendant Globe Holding Company, LLC ("Globe Holding") is a New Hampshire corporation that does business throughout the United States. Globe Holding has its principal place of business in Pittsfield, New Hampshire. Globe Holding developed, manufactured, marketed, distributed, released, sold, and/or used PFAS, PFAS materials, and products containing PFAS in bunker gear and/or Class B foams. Defendant MSA Safety Incorporated acquired Globe Holding Company, LLC and its subsidiaries, including Globe Manufacturing, LLC, (collectively, "MSA/Globe") in 2017 and continues to do business under the Globe name.

101.    Defendant Globe Holding has purposefully availed itself of the privilege of conducting business in the State of South Carolina, has transacted business in the State of South Carolina, contracted to distribute and supply its products in the State of South Carolina, regularly caused its products to be sold in the State of South Carolina; this action arises out of business transacted in, as well as a tortious actions and/or omissions committed in whole or in part within South Carolina, and which resulted in injuries in South Carolina; and specific personal jurisdiction is proper under one or more provisions of S.C. Code Ann. § 36-2-803, as well as the Due Process

ELECTRONICALLY FILED - 2025 Jan 29 3:05 PM - YORK - COMMON PLEAS - CASE#2025CP4600398

Clauses of the Fifth and Fourteenth Amendments of the Constitution of the United States of America.

102.    Defendant Globe Manufacturing Company, LLC ("Globe Manufacturing") is a New Hampshire corporation that does business throughout the United States. Globe Manufacturing has its principal place of business in Pittsfield, New Hampshire. Globe Manufacturing developed, manufactured, marketed, distributed, released, sold, and/or used PFAS, PFAS materials, and products containing PFAS in bunker gear and/or Class B foams. Defendant MSA Safety Incorporated acquired Globe Holding Company, LLC and its subsidiaries, including Globe Manufacturing Company, LLC, (collectively, "MSA/Globe") in 2017 and continues to do business under the Globe name.

103.    Defendant Globe Manufacturing has purposefully availed itself of the privilege of conducting business in the State of South Carolina, has transacted business in the State of South Carolina, contracted to distribute and supply its products in the State of South Carolina, regularly caused its products to be sold in the State of South Carolina; this action arises out of business transacted in, as well as a tortious actions and/or omissions committed in whole or in part within South Carolina, and which resulted in injuries in South Carolina; and specific personal jurisdiction is proper under one or more provisions of S.C. Code Ann. § 36-2-803, as well as the Due Process Clauses of the Fifth and Fourteenth Amendments of the Constitution of the United States of America.

104.    Defendant Honeywell International, Inc. ("Honeywell International") is a Delaware corporation that does business throughout the United States. Honeywell International has its principal place of business in Charlotte, North Carolina. Honeywell International, Inc. is the parent company of Honeywell Safety Products USA, Inc. developed, manufactured, marketed,

distributed, released, sold, and/or used PFAS, PFAS materials, and products containing PFAS in
bunker gear and/or Class B foams.

    105.    Defendant Honeywell International has purposefully availed itself of the privilege
of conducting business in the State of South Carolina, has transacted business in the State of South
Carolina, contracted to distribute and supply its products in the State of South Carolina, regularly
caused its products to be sold in the State of South Carolina; this action arises out of business
transacted in, as well as a tortious actions and/or omissions committed in whole or in part within
South Carolina, and which resulted in injuries in South Carolina; and specific personal jurisdiction
is proper under one or more provisions of S.C. Code Ann. § 36-2-803, as well as the Due Process
Clauses of the Fifth and Fourteenth Amendments of the Constitution of the United States of
America.

    106.    Defendant Honeywell Safety Products USA, Inc. ("Honeywell Safety Products")
is a Delaware corporation that does business throughout the United States. Honeywell Safety
Products has its principal place of business in Charlotte, North Carolina. Honeywell International,
Inc. is the parent company of Honeywell Safety Products USA, Inc. Honeywell Safety Products
developed, manufactured, marketed, distributed, released, sold, and/or used PFAS, PFAS
materials, and products containing PFAS in bunker gear and/or Class B foams. Throughout this
Complaint, "Honeywell" refers to both Honeywell International and Honeywell Safety Products.

    107.    Defendant Honeywell Safety Products has purposefully availed itself of the
privilege of conducting business in the State of South Carolina, has transacted business in the State
of South Carolina, contracted to distribute and supply its products in the State of South Carolina,
regularly caused its products to be sold in the State of South Carolina; this action arises out of
business transacted in, as well as a tortious actions and/or omissions committed in whole or in part

ELECTRONICALLY FILED - 2025 Jan 29 3:05 PM - YORK - COMMON PLEAS - CASE#2025CP4600398

ELECTRONICALLY FILED - 2025 Jan 29 3:05 PM - YORK - COMMON PLEAS - CASE#2025CP4600398

within South Carolina, and which resulted in injuries in South Carolina; and specific personal jurisdiction is proper under one or more provisions of S.C. Code Ann. § 36-2-803, as well as the Due Process Clauses of the Fifth and Fourteenth Amendments of the Constitution of the United States of America.

108.    Defendant Innotex Corp. ("Innotex") is a Delaware corporation that does business throughout the United States. Innotex has its principal place of business in Ohatchee, Alabama. Innotex developed, manufactured, marketed, distributed, released, sold, and/or used PFAS, PFAS materials, and products containing PFAS in bunker gear and/or Class B foams.

109.    Defendant Innotex has purposefully availed itself of the privilege of conducting business in the State of South Carolina, has transacted business in the State of South Carolina, contracted to distribute and supply its products in the State of South Carolina, regularly caused its products to be sold in the State of South Carolina; this action arises out of business transacted in, as well as a tortious actions and/or omissions committed in whole or in part within South Carolina, and which resulted in injuries in South Carolina; and specific personal jurisdiction is proper under one or more provisions of S.C. Code Ann. § 36-2-803, as well as the Due Process Clauses of the Fifth and Fourteenth Amendments of the Constitution of the United States of America.

110.    Defendant Johnson Controls, Inc. ("Johnson Controls") is a Delaware corporation that does business throughout the United States. Johnson Controls has its principal place of business in Milwaukee, Wisconsin. Johnson Controls is the parent of Defendants Tyco Fire Products, LP and Chemguard, Inc. Johnson Controls developed, manufactured, marketed, distributed, released, sold, and/or used PFAS, PFAS materials, and products containing PFAS in bunker gear and/or Class B foams.

111.    Defendant Johnson Controls has purposefully availed itself of the privilege of

conducting business in the State of South Carolina, has transacted business in the State of South Carolina, contracted to distribute and supply its products in the State of South Carolina, regularly caused its products to be sold in the State of South Carolina; this action arises out of business transacted in, as well as a tortious actions and/or omissions committed in whole or in part within South Carolina, and which resulted in injuries in South Carolina; and specific personal jurisdiction is proper under one or more provisions of S.C. Code Ann. § 36-2-803, as well as the Due Process Clauses of the Fifth and Fourteenth Amendments of the Constitution of the United States of America.

112.    Defendant Kidde, plc. Inc. ("Kidde PLC") is a Delaware corporation that does business throughout the United States.  Kidde PLC has its principal place of business in Palm Beach Gardens, Florida. Upon information and belief, Kidde PLC was formerly known as Williams Holdings plc, Williams Holdings, Inc., and/or Williams US, Inc. Kidde PLC developed, manufactured, marketed, distributed, released, sold, and/or used PFAS, PFAS materials, and products containing PFAS in bunker gear and/or Class B foams.

113.    Defendant Kidde P.L.C. has purposefully availed itself of the privilege of conducting business in the State of South Carolina, has transacted business in the State of South Carolina, contracted to distribute and supply its products in the State of South Carolina, regularly caused its products to be sold in the State of South Carolina; this action arises out of business transacted in, as well as a tortious actions and/or omissions committed in whole or in part within South Carolina, and which resulted in injuries in South Carolina; and specific personal jurisdiction is proper under one or more provisions of S.C. Code Ann. § 36-2-803, as well as the Due Process Clauses of the Fifth and Fourteenth Amendments of the Constitution of the United States of America.

ELECTRONICALLY FILED - 2025 Jan 29 3:05 PM - YORK - COMMON PLEAS - CASE#2025CP4600398

114.     Defendant L.N. Curtis & Sons ("LN Curtis") is a California corporation that does business in throughout the United States.  LN Curtis has its principal place of business is Walnut Creek, California. LN Curtis developed, manufactured, marketed, distributed, released, sold, and/or used PFAS, PFAS materials, and products containing PFAS in bunker gear and/or Class B foams.

115.     Defendant LN Curtis has purposefully availed itself of the privilege of conducting business in the State of South Carolina, has transacted business in the State of South Carolina, contracted to distribute and supply its products in the State of South Carolina, regularly caused its products to be sold in the State of South Carolina; this action arises out of business transacted in, as well as a tortious actions and/or omissions committed in whole or in part within South Carolina, and which resulted in injuries in South Carolina; and specific personal jurisdiction is proper under one or more provisions of S.C. Code Ann. § 36-2-803, as well as the Due Process Clauses of the Fifth and Fourteenth Amendments of the Constitution of the United States of America.

116.     Defendant Lakeland Industries, Inc., ("Lakeland") is a Delaware corporation that does business throughout the United States. Lakeland has its principal place of business in Huntsville, Alabama. Lakeland developed, manufactured, marketed, distributed, released, sold, and/or used PFAS, PFAS materials, and products containing PFAS in bunker gear and/or Class B foams.

117.     Defendant Lakeland has purposefully availed itself of the privilege of conducting business in the State of South Carolina, has transacted business in the State of South Carolina, contracted to distribute and supply its products in the State of South Carolina, regularly caused its products to be sold in the State of South Carolina; this action arises out of business transacted in, as well as a tortious actions and/or omissions committed in whole or in part within South Carolina,

ELECTRONICALLY FILED - 2025 Jan 29 3:05 PM - YORK - COMMON PLEAS - CASE#2025CP4600398

ELECTRONICALLY FILED - 2025 Jan 29 3:05 PM - YORK - COMMON PLEAS - CASE#2025CP4600398

and which resulted in injuries in South Carolina; and specific personal jurisdiction is proper under one or more provisions of S.C. Code Ann. § 36-2-803, as well as the Due Process Clauses of the Fifth and Fourteenth Amendments of the Constitution of the United States of America.

118.    Defendant Lion Apparel, Inc., ("Lion Apparel") is an Ohio corporation that does business throughout the United States. Lion Apparel has its principal place of business in Dayton, Ohio. Lion Apparel developed, manufactured, marketed, distributed, released, sold, and/or used PFAS, PFAS materials, and products containing PFAS in bunker gear and/or Class B foams.

119.    Defendant Lion Apparel has purposefully availed itself of the privilege of conducting business in the State of South Carolina, has transacted business in the State of South Carolina, contracted to distribute and supply its products in the State of South Carolina, regularly caused its products to be sold in the State of South Carolina; this action arises out of business transacted in, as well as a tortious actions and/or omissions committed in whole or in part within South Carolina, and which resulted in injuries in South Carolina; and specific personal jurisdiction is proper under one or more provisions of S.C. Code Ann. § 36-2-803, as well as the Due Process Clauses of the Fifth and Fourteenth Amendments of the Constitution of the United States of America.

120.    Defendant Lion Group, Inc., ("Lion Group") is an Ohio corporation that does business throughout the United States. Lion Group has its principal place of business in Dayton, Ohio. Lion Group developed, manufactured, marketed, distributed, released, sold, and/or used PFAS, PFAS materials, and products containing PFAS in bunker gear and/or Class B foams. Throughout this Complaint, "Lion" refers to both Lion Group and Lion Apparel.

121.    Defendant Lion Group has purposefully availed itself of the privilege of conducting business in the State of South Carolina, has transacted business in the State of South Carolina,

contracted to distribute and supply its products in the State of South Carolina, regularly caused its products to be sold in the State of South Carolina; this action arises out of business transacted in, as well as a tortious actions and/or omissions committed in whole or in part within South Carolina, and which resulted in injuries in South Carolina; and specific personal jurisdiction is proper under one or more provisions of S.C. Code Ann. § 36-2-803, as well as the Due Process Clauses of the Fifth and Fourteenth Amendments of the Constitution of the United States of America.

122.     Defendant Mallory Safety and Supply, LLC ("Mallory") is a California corporation that does business throughout the United States. Mallory has its principal place of business in Longview, Washington. Mallory developed, manufactured, marketed, distributed, released, sold, and/or used PFAS, PFAS materials, and products containing PFAS in bunker gear and/or Class B foams.

123.     Defendant Mallory has purposefully availed itself of the privilege of conducting business in the State of South Carolina, has transacted business in the State of South Carolina, contracted to distribute and supply its products in the State of South Carolina, regularly caused its products to be sold in the State of South Carolina; this action arises out of business transacted in, as well as a tortious actions and/or omissions committed in whole or in part within South Carolina, and which resulted in injuries in South Carolina; and specific personal jurisdiction is proper under one or more provisions of S.C. Code Ann. § 36-2-803, as well as the Due Process Clauses of the Fifth and Fourteenth Amendments of the Constitution of the United States of America.

124.     Defendant Milliken & Company ("Milliken") is a Delaware corporation that does business throughout the United States. Milliken has its principal place of business in Spartanburg, South Carolina. Milliken developed, manufactured, marketed, distributed, released, sold, and/or used PFAS, PFAS materials, and products containing PFAS in bunker gear and/or Class B foams.

ELECTRONICALLY FILED - 2025 Jan 29 3:05 PM - YORK - COMMON PLEAS - CASE#2025CP4600398

Case 4:25-cv-00134-JAR Date Filed 04/01/25 Entry Number 44 Page 1 of 2
Case 4:25-cv-00134-JAR Date Filed 04/01/25 Filed 09/10/25 Page 44 of 133 Page 2 of 2
#: 95

ELECTRONICALLY FILED - 2025 Jan 29 3:05 PM - YORK - COMMON PLEAS - CASE#2025CP4600398

125.    Defendant Milliken has purposefully availed itself of the privilege of conducting business in the State of South Carolina, has transacted business in the State of South Carolina, contracted to distribute and supply its products in the State of South Carolina, regularly caused its products to be sold in the State of South Carolina; this action arises out of business transacted in, as well as a tortious actions and/or omissions committed in whole or in part within South Carolina, and which resulted in injuries in South Carolina; and specific personal jurisdiction is proper under one or more provisions of S.C. Code Ann. § 36-2-803, as well as the Due Process Clauses of the Fifth and Fourteenth Amendments of the Constitution of the United States of America.

126.    Defendant Mine Safety Appliances Company, LLC ("MSA LLC") is a Pennsylvania corporation that does business throughout the United States. MSA has its principal place of business in Cranberry Township, Pennsylvania. MSA Safety Incorporated acquired Globe Holding Company, LLC and its subsidiaries, including Defendant Glove Manufacturing Company, LLC, (collectively, "MSA/Globe") in 2017 and continues to do business under the Globe name. MSA Safety Incorporated divested wholly owned subsidiary Defendant Mine Safety Appliances Company, LLC ("MSA LLC"), in January 2023.  MSA LLC developed, manufactured, marketed, distributed, released, sold, and/or used PFAS, PFAS materials, and products containing PFAS in bunker gear and/or Class B foams.

127.    Defendant MSA LLC has purposefully availed itself of the privilege of conducting business in the State of South Carolina, has transacted business in the State of South Carolina, contracted to distribute and supply its products in the State of South Carolina, regularly caused its products to be sold in the State of South Carolina; this action arises out of business transacted in, as well as a tortious actions and/or omissions committed in whole or in part within South Carolina, and which resulted in injuries in South Carolina; and specific personal jurisdiction is proper under

ELECTRONICALLY FILED - 2025 Jan 29 3:05 PM - YORK - COMMON PLEAS - CASE#2025CP4600398

one or more provisions of S.C. Code Ann. § 36-2-803, as well as the Due Process Clauses of the Fifth and Fourteenth Amendments of the Constitution of the United States of America.

128. Defendant MSA Safety Incorporated ("MSA") is a Pennsylvania corporation that does business throughout the United States. MSA has its principal place of business in Cranberry Township, Pennsylvania. MSA Safety Incorporated is the parent company of MSA Safety Development, LLC; MSA Safety Sales, LLC; MSA Technology, LLC; and MSA Worldwide, LLC; MSA Safety Jacksonville, LLC. MSA Safety Incorporated divested wholly owned subsidiary Defendant Mine Safety Appliances Company, LLC ("MSA LLC"), in January 2023. MSA Safety Incorporated acquired Globe Holding Company, LLC, and its subsidiaries (collectively, "MSA/Globe") in 2017 and continues to do business under the Globe name. MSA developed, manufactured, marketed, distributed, released, sold, and/or used PFAS, PFAS materials, and products containing PFAS in bunker gear and/or Class B foams.

129. Defendant MSA has purposefully availed itself of the privilege of conducting business in the State of South Carolina, has transacted business in the State of South Carolina, contracted to distribute and supply its products in the State of South Carolina, regularly caused its products to be sold in the State of South Carolina; this action arises out of business transacted in, as well as a tortious actions and/or omissions committed in whole or in part within South Carolina, and which resulted in injuries in South Carolina; and specific personal jurisdiction is proper under one or more provisions of S.C. Code Ann. § 36-2-803, as well as the Due Process Clauses of the Fifth and Fourteenth Amendments of the Constitution of the United States of America.

130. Defendant Municipal Emergency Services, Inc. ("MES") is a Delaware corporation that does business throughout the United States. MES has its principal place of business in Sandy Hook, Connecticut. MES developed, manufactured, marketed, distributed,

released, sold, and/or used PFAS, PFAS materials, and products containing PFAS in bunker gear and/or Class B foams.

131.     Defendant MES has purposefully availed itself of the privilege of conducting business in the State of South Carolina, has transacted business in the State of South Carolina, contracted to distribute and supply its products in the State of South Carolina, regularly caused its products to be sold in the State of South Carolina; this action arises out of business transacted in, as well as a tortious actions and/or omissions committed in whole or in part within South Carolina, and which resulted in injuries in South Carolina; and specific personal jurisdiction is proper under one or more provisions of S.C. Code Ann. § 36-2-803, as well as the Due Process Clauses of the Fifth and Fourteenth Amendments of the Constitution of the United States of America.

132.     Defendant Narcote Holding Corp., (d/k/a Stedfast, Inc. and/or Stedfast USA, Inc.) ("Narcote Holding") is a Delaware corporation that does business throughout the United States. Narcote Holding has its principal place of business in Piney Flats, Tennessee. Narcote Holding developed, manufactured, marketed, distributed, released, sold, and/or used PFAS, PFAS materials, and products containing PFAS in bunker gear. Throughout this Complaint, "Narcote" refers to both Narcote LLC and Narcote Holding.

133.     Defendant Narcote Holding has purposefully availed itself of the privilege of conducting business in the State of South Carolina, has transacted business in the State of South Carolina, contracted to distribute and supply its products in the State of South Carolina, regularly caused its products to be sold in the State of South Carolina; this action arises out of business transacted in, as well as a tortious actions and/or omissions committed in whole or in part within South Carolina, and which resulted in injuries in South Carolina; and specific personal

ELECTRONICALLY FILED - 2025 Jan 29 3:05 PM - YORK - COMMON PLEAS - CASE#2025CP4600398

ELECTRONICALLY FILED - 2025 Jan 29 3:05 PM - YORK - COMMON PLEAS - CASE#2025CP4600398

jurisdiction is proper under one or more provisions of S.C. Code Ann. § 36-2-803, as well as the Due Process Clauses of the Fifth and Fourteenth Amendments of the Constitution of the United States of America.

134. Defendant Narcote LLC, (d/b/a Stedfast, Inc. and/or Stedfast USA, Inc.) ("Narcote LLC") is a Delaware corporation that does business throughout the United States. Narcote LLC has its principal place of business in Piney Flats, Tennessee. Narcote LLC developed, manufactured, marketed, distributed, released, sold, and/or used PFAS, PFAS materials, and products containing PFAS in bunker gear. Throughout this Complaint, "Narcote" refers to both Narcote Holding and Narcote LLC.

135. Defendant Narcote LLC has purposefully availed itself of the privilege of conducting business in the State of South Carolina, has transacted business in the State of South Carolina, contracted to distribute and supply its products in the State of South Carolina, regularly caused its products to be sold in the State of South Carolina; this action arises out of business transacted in, as well as a tortious actions and/or omissions committed in whole or in part within South Carolina, and which resulted in injuries in South Carolina; and specific personal jurisdiction is proper under one or more provisions of S.C. Code Ann. § 36-2-803, as well as the Due Process Clauses of the Fifth and Fourteenth Amendments of the Constitution of the United States of America.

136. Defendant Nation Ford Chemical Company ("Nation Ford") is a South Carolina company and does business throughout the United States. Nation Ford has its principal place of business in Fort Mill, South Carolina. Nation Ford developed, manufactured, marketed, distributed, released, sold, and/or used PFAS, PFAS materials, and products containing PFAS in bunker gear and/or Class B foams.

137.     Defendant Nation Ford has purposefully availed itself of the privilege of conducting business in the State of South Carolina, has transacted business in the State of South Carolina, contracted to distribute and supply its products in the State of South Carolina, regularly caused its products to be sold in the State of South Carolina; this action arises out of business transacted in, as well as a tortious actions and/or omissions committed in whole or in part within South Carolina, and which resulted in injuries in South Carolina; and specific personal jurisdiction is proper under one or more provisions of S.C. Code Ann. § 36-2-803, as well as the Due Process Clauses of the Fifth and Fourteenth Amendments of the Constitution of the United States of America.

138.     Defendant National Foam, Inc., ("National Foam") is a Pennsylvania corporation that does business throughout the United States. National Foam has its principal place of business in West Chester, Pennsylvania. National Foam developed, manufactured, marketed, distributed, released, sold, and/or used PFAS, PFAS materials, and products containing PFAS in bunker gear and/or Class B foams.

139.     Defendant National Foam has purposefully availed itself of the privilege of conducting business in the State of South Carolina, has transacted business in the State of South Carolina, contracted to distribute and supply its products in the State of South Carolina, regularly caused its products to be sold in the State of South Carolina; this action arises out of business transacted in, as well as a tortious actions and/or omissions committed in whole or in part within South Carolina, and which resulted in injuries in South Carolina; and specific personal jurisdiction is proper under one or more provisions of S.C. Code Ann. § 36-2-803, as well as the Due Process Clauses of the Fifth and Fourteenth Amendments of the Constitution of the United States of America.

ELECTRONICALLY FILED - 2025 Jan 29 3:05 PM - YORK - COMMON PLEAS - CASE#2025CP4600398

140.    Defendant PBI Performance Products, Inc., ("PBI") is a Delaware corporation that does business throughout the United States. PBI has its principal place of business in Charlotte, North Carolina. PBI developed, manufactured, marketed, distributed, released, sold, and/or used PFAS, PFAS materials, and products containing PFAS in bunker gear and/or Class B foams.

141.    Defendant PBI has purposefully availed itself of the privilege of conducting business in the State of South Carolina, has transacted business in the State of South Carolina, contracted to distribute and supply its products in the State of South Carolina, regularly caused its products to be sold in the State of South Carolina; this action arises out of business transacted in, as well as a tortious actions and/or omissions committed in whole or in part within South Carolina, and which resulted in injuries in South Carolina; and specific personal jurisdiction is proper under one or more provisions of S.C. Code Ann. § 36-2-803, as well as the Due Process Clauses of the Fifth and Fourteenth Amendments of the Constitution of the United States of America.

142.    Defendant Perimeter Solutions, LP, ("Perimeter Solutions") is a Delaware corporation that does business throughout the United States. Perimeter Solutions has a principal place of business in Rancho Cucamonga, California. Perimeter Solutions developed, manufactured, marketed, distributed, released, sold, and/or used PFAS, PFAS materials, and products containing PFAS in bunker gear and/or Class B foams.

143.    Defendant Perimeter Solutions has purposefully availed itself of the privilege of conducting business in the State of South Carolina, has transacted business in the State of South Carolina, contracted to distribute and supply its products in the State of South Carolina, regularly caused its products to be sold in the State of South Carolina; this action arises out of business transacted in, as well as a tortious actions and/or omissions committed in whole or in part within South Carolina, and which resulted in injuries in South Carolina; and specific personal jurisdiction

ELECTRONICALLY FILED - 2025 Jan 29 3:05 PM - YORK - COMMON PLEAS - CASE#2025CP4600398

is proper under one or more provisions of S.C. Code Ann. § 36-2-803, as well as the Due Process Clauses of the Fifth and Fourteenth Amendments of the Constitution of the United States of America.

144. Defendant Ricochet Manufacturing Co., Inc. ("Ricochet") is a Pennsylvania corporation that does business throughout the United States. Ricochet has its principal place of business in Philadelphia, Pennsylvania. Ricochet developed, manufactured, marketed, distributed, released, sold, and/or used PFAS, PFAS materials, and products containing PFAS in bunker gear and/or Class B foams.

145. Defendant Ricochet has purposefully availed itself of the privilege of conducting business in the State of South Carolina, has transacted business in the State of South Carolina, contracted to distribute and supply its products in the State of South Carolina, regularly caused its products to be sold in the State of South Carolina; this action arises out of business transacted in, as well as a tortious actions and/or omissions committed in whole or in part within South Carolina, and which resulted in injuries in South Carolina; and specific personal jurisdiction is proper under one or more provisions of S.C. Code Ann. § 36-2-803, as well as the Due Process Clauses of the Fifth and Fourteenth Amendments of the Constitution of the United States of America.

146. Defendant Safety Components Fabric Technologies, Inc. d/b/a Safety Components, Inc. ("SCI") is a Delaware corporation that does business throughout the United States. SCI has a principal place of business in Greenville, South Carolina. SCI developed, manufactured, marketed, distributed, released, sold, and/or used PFAS, PFAS materials, and products containing PFAS in bunker gear and/or Class B foams.

147. Defendant SCI has purposefully availed itself of the privilege of conducting business in the State of South Carolina, has transacted business in the State of South Carolina,

ELECTRONICALLY FILED - 2025 Jan 29 3:05 PM - YORK - COMMON PLEAS - CASE#2025CP4600398

contracted to distribute and supply its products in the State of South Carolina, regularly caused its products to be sold in the State of South Carolina; this action arises out of business transacted in, as well as a tortious actions and/or omissions committed in whole or in part within South Carolina, and which resulted in injuries in South Carolina; and specific personal jurisdiction is proper under one or more provisions of S.C. Code Ann. § 36-2-803, as well as the Due Process Clauses of the Fifth and Fourteenth Amendments of the Constitution of the United States of America.

148.    Defendant Southern Mills, Inc. d/b/a Ten-Cate Protective Fabrics USA ("Tencate") is a Georgia corporation that does business throughout the United States. Tencate has its principal place of business in Senoia, Georgia. Tencate developed, manufactured, marketed, distributed, released, sold, and/or used PFAS, PFAS materials, and products containing PFAS in bunker gear and/or Class B foams.

149.    Defendant Tencate has purposefully availed itself of the privilege of conducting business in the State of South Carolina, has transacted business in the State of South Carolina, contracted to distribute and supply its products in the State of South Carolina, regularly caused its products to be sold in the State of South Carolina; this action arises out of business transacted in, as well as a tortious actions and/or omissions committed in whole or in part within South Carolina, and which resulted in injuries in South Carolina; and specific personal jurisdiction is proper under one or more provisions of S.C. Code Ann. § 36-2-803, as well as the Due Process Clauses of the Fifth and Fourteenth Amendments of the Constitution of the United States of America.

150.    Defendant StedFast USA Material Manufacturing, Inc. ("StedFast") is a Delaware corporation that does business throughout the United States. StedFast has its principal place of business in Piney Flats, Tennessee. StedFast developed, manufactured, marketed, distributed,

ELECTRONICALLY FILED - 2025 Jan 29 3:05 PM - YORK - COMMON PLEAS - CASE#2025CP4600398

ELECTRONICALLY FILED - 2025 Jan 29 3:05 PM - YORK - COMMON PLEAS - CASE#2025CP4600398

released, sold, and/or used PFAS, PFAS materials, and products containing PFAS in bunker gear and/or Class B foams.

151.    Defendant StedFast has purposefully availed itself of the privilege of conducting business in the State of South Carolina, has transacted business in the State of South Carolina, contracted to distribute and supply its products in the State of South Carolina, regularly caused its products to be sold in the State of South Carolina; this action arises out of business transacted in, as well as a tortious actions and/or omissions committed in whole or in part within South Carolina, and which resulted in injuries in South Carolina; and specific personal jurisdiction is proper under one or more provisions of S.C. Code Ann. § 36-2-803, as well as the Due Process Clauses of the Fifth and Fourteenth Amendments of the Constitution of the United States of America.

152.    Defendant The Chemours Company ("Chemours") is a Delaware corporation that does business throughout the United States. Chemours has its principal place of business in Wilmington, Delaware. Chemours is the parent of Defendant The Chemours Company FC, LLC. Chemours developed, manufactured, marketed, distributed, released, sold, and/or used PFAS, PFAS materials, and products containing PFAS in bunker gear and/or Class B foams.

153.    Defendant Chemours has purposefully availed itself of the privilege of conducting business in the State of South Carolina, has transacted business in the State of South Carolina, contracted to distribute and supply its products in the State of South Carolina, regularly caused its products to be sold in the State of South Carolina; this action arises out of business transacted in, as well as a tortious actions and/or omissions committed in whole or in part within South Carolina, and which resulted in injuries in South Carolina; and specific personal jurisdiction is proper under one or more provisions of S.C. Code Ann. § 36-2-803, as well as the Due Process Clauses of the Fifth and Fourteenth Amendments of the Constitution of the United States of America.

ELECTRONICALLY FILED - 2025 Jan 29 3:05 PM - YORK - COMMON PLEAS - CASE#2025CP4600398

154. Defendant The Chemours Company FC, LLC ("Chemours FC") is a Delaware limited liability company that does business throughout the United States. Chemours has its principal place of business in Wilmington, Delaware. Chemours developed, manufactured, marketed, distributed, released, sold, and/or used PFAS, PFAS materials, and products containing PFAS in bunker gear and/or Class B foams.

155. Defendant Chemours FC has purposefully availed itself of the privilege of conducting business in the State of South Carolina, has transacted business in the State of South Carolina, contracted to distribute and supply its products in the State of South Carolina, regularly caused its products to be sold in the State of South Carolina; this action arises out of business transacted in, as well as a tortious actions and/or omissions committed in whole or in part within South Carolina, and which resulted in injuries in South Carolina; and specific personal jurisdiction is proper under one or more provisions of S.C. Code Ann. § 36-2-803, as well as the Due Process Clauses of the Fifth and Fourteenth Amendments of the Constitution of the United States of America.

156. Defendant Tyco Fire Products, LP as Successor-In-Interest to The Ansul Company ("Tyco") is a Delaware corporation that does business throughout the United States. Tyco has its principal place of business in Exeter, New Hampshire. Tyco developed, manufactured, marketed, distributed, released, sold, and/or used PFAS, PFAS materials, and products containing PFAS in bunker gear and/or Class B foams.

157. Defendant Tyco has purposefully availed itself of the privilege of conducting business in the State of South Carolina, has transacted business in the State of South Carolina, contracted to distribute and supply its products in the State of South Carolina, regularly caused its products to be sold in the State of South Carolina; this action arises out of business transacted in,

as well as a tortious actions and/or omissions committed in whole or in part within South Carolina, and which resulted in injuries in South Carolina; and specific personal jurisdiction is proper under one or more provisions of S.C. Code Ann. § 36-2-803, as well as the Due Process Clauses of the Fifth and Fourteenth Amendments of the Constitution of the United States of America.

158.     Defendant United Technologies Corporation ("United Technologies") is a Delaware corporation that does business throughout the United States. United Technologies has its principal place of business in Farmington, Connecticut. United Technologies developed, manufactured, marketed, distributed, released, sold, and/or used PFAS, PFAS materials, and products containing PFAS in bunker gear and/or Class B foams.

159.     Defendant United Technologies has purposefully availed itself of the privilege of conducting business in the State of South Carolina, has transacted business in the State of South Carolina, contracted to distribute and supply its products in the State of South Carolina, regularly caused its products to be sold in the State of South Carolina; this action arises out of business transacted in, as well as a tortious actions and/or omissions committed in whole or in part within South Carolina, and which resulted in injuries in South Carolina; and specific personal jurisdiction is proper under one or more provisions of S.C. Code Ann. § 36-2-803, as well as the Due Process Clauses of the Fifth and Fourteenth Amendments of the Constitution of the United States of America.

160.     Defendant Veridian Limited d/b/a Veridian Fire Protective Gear ("Veridian") is an Iowa corporation that does business throughout the United States. Veridian has its principal place of business in Spencer, Iowa. Veridian developed, manufactured, marketed, distributed, released, sold, and/or used PFAS, PFAS materials, and products containing PFAS in bunker gear and/or Class B foams.

ELECTRONICALLY FILED - 2025 Jan 29 3:05 PM - YORK - COMMON PLEAS - CASE#2025CP4600398

161.    Defendant Veridian has purposefully availed itself of the privilege of conducting business in the State of South Carolina, has transacted business in the State of South Carolina, contracted to distribute and supply its products in the State of South Carolina, regularly caused its products to be sold in the State of South Carolina; this action arises out of business transacted in, as well as a tortious actions and/or omissions committed in whole or in part within South Carolina, and which resulted in injuries in South Carolina; and specific personal jurisdiction is proper under one or more provisions of S.C. Code Ann. § 36-2-803, as well as the Due Process Clauses of the Fifth and Fourteenth Amendments of the Constitution of the United States of America.

162.    Defendant W. L. Gore & Associates, Inc., ("Gore") is a Delaware corporation that does business throughout the United States. Gore has its principal place of business in Newark, Delaware. Gore developed, manufactured, marketed, distributed, released, sold, and/or used PFAS, PFAS materials, and products containing PFAS in bunker gear and/or Class B foams.

163.    Defendant Gore has purposefully availed itself of the privilege of conducting business in the State of South Carolina, has transacted business in the State of South Carolina, contracted to distribute and supply its products in the State of South Carolina, regularly caused its products to be sold in the State of South Carolina; this action arises out of business transacted in, as well as a tortious actions and/or omissions committed in whole or in part within South Carolina, and which resulted in injuries in South Carolina; and specific personal jurisdiction is proper under one or more provisions of S.C. Code Ann. § 36-2-803, as well as the Due Process Clauses of the Fifth and Fourteenth Amendments of the Constitution of the United States of America.

164.    Defendant Witmer Public Safety Group, Inc. (d/b/a "The Fire Store") is a Pennsylvania corporation that does business throughout the United States. The Fire Store has its principal place of business in Coatesville, Pennsylvania. The Fire Store developed, manufactured,

ELECTRONICALLY FILED - 2025 Jan 29 3:05 PM - YORK - COMMON PLEAS - CASE#2025CP4600398

ELECTRONICALLY FILED - 2025 Jan 29 3:05 PM - YORK - COMMON PLEAS - CASE#2025CP4600398

marketed, distributed, released, sold, and/or used PFAS, PFAS materials, and products containing PFAS in bunker gear and/or Class B foams.

165.     Defendant The Fire Store has purposefully availed itself of the privilege of conducting business in the State of South Carolina, has transacted business in the State of South Carolina, contracted to distribute and supply its products in the State of South Carolina, regularly caused its products to be sold in the State of South Carolina; this action arises out of business transacted in, as well as a tortious actions and/or omissions committed in whole or in part within South Carolina, and which resulted in injuries in South Carolina; and specific personal jurisdiction is proper under one or more provisions of S.C. Code Ann. § 36-2-803, as well as the Due Process Clauses of the Fifth and Fourteenth Amendments of the Constitution of the United States of America.

166.     Defendants expected or should have expected their acts to have consequences within the State of South Carolina and derived substantial revenue from interstate commerce.

167.     Defendants purposefully availed themselves of the privilege of conducting activities within the State of South Carolina, thus invoking the benefits and protections of its laws.

168.     Plaintiffs allege that each named Defendant is in some manner responsible for the acts alleged herein and that they proximately caused the injuries to Plaintiffs, as alleged herein.

169.     Jurisdiction is proper pursuant to the statutory laws and constitution of South Carolina.

170.     Venue is proper pursuant to S.C. Code Ann. § 15-7-30.

171.     Joinder of all parties is proper pursuant to Rule 20(a) of the SCRCP. Defendants are permissively joined in this action because the exposure, injuries, and relief requested all arise out of similar occurrences or transactions, and questions of law and fact are common to all parties.

## FACTUAL ALLEGATIONS

A.     **Plaintiffs Use of and Exposure to PFAS-Containing Products**

172.     Plaintiffs were and are firefighters who serve and have served in various Fire Departments worked in various fire stations, engines, trucks, and specialized companies around the country.

173.     As a first responder to fire, medical, and other emergency calls, Plaintiffs risked their lives daily. They not only saved lives and homes, but also provided emergency services and medical care, performed rescues, and offered support to people in traumatic circumstances. To prepare for this enormously challenging work, Plaintiffs wore bunker gear and received extensive and ongoing training in fire suppression (including the preparation, handling, and use of Class B foam), fire prevention, rescue, and emergency medical care techniques to protect and/or minimize the loss of life, property, and damage to the environment.

174.     For decades, Defendants, either individually or through their predecessors or subsidiaries, have manufactured, designed, d, supplied, and distributed chemical feedstock and/or bunker gear and Class B foam containing PFAS to firefighting training facilities and fire departments globally, including within the State of South Carolina.

175.     With over 5,000 individual chemicals, PFAS is a large and ever-growing category of human-made chemicals, consisting of a nearly indestructible chain of carbon and fluorine atoms that are widely used in products to, *inter alia,* resist and repel oil, heat and water, and have been found to have negative health effects. As detailed below, these toxic chemicals are present in firefighter bunker gear and Class B foam.

ELECTRONICALLY FILED - 2025 Jan 29 3:05 PM - YORK - COMMON PLEAS - CASE#2025CP4600398

ELECTRONICALLY FILED - 2025 Jan 29 3:05 PM - YORK - COMMON PLEAS - CASE#2025CP4600398

### B.  PFAS Chemicals

176.    PFAS chemicals are used in bunker gear to impart heat, water, and stain resistance to the outer shell and moisture barrier of bunker gear.

177.    PFAS are a family of synthetic chemicals containing fluorine and carbon atoms.

178.    PFAS were first invented in the 1930s.

179.    PFAS have strong surfactant properties, meaning they reduce the surface tension between a liquid and another liquid or id, and are thus effective for products which require fire resistance, and oil, stain, grease, and water repellency.

180.    The two most widely known and studied PFAS are PFOA and PFOS.

181.    PFOA, a perfluoroalkyl carboxylate, is an environmentally persistent anthropogenic chemical that is produced synthetically.

182.    PFOS, a perfluoroalkyl sulfonate, is an environmentally persistent anthropogenic chemical that is also produced synthetically.

183.    PTFE, when heated, can produce PFOA and other PFAS compounds which are hazardous to human health.[2]

184.    The chemical structure of PFOA and PFOS, and other PFAS, makes them mobile and extremely resistant to breakdown in the environment and in human tissue.

---

[2] *See e.g.,* Ellis DA, Mabury SA, Martin JW, Muir DC. *Thermolysis of fluoropolymers as a potential source of halogenated organic acids in the environment.* Nature. 2001 Jul 19; 412(6844):321-4. doi:10.1038/35085548. PMID: 11460160; Ellis DA, Martin JW, Muir DC, Mabury SA. *The use of 19F NMR and mass spectrometry for the elucidation of novel fluorinated acids and atmospheric fluoroacid precursors evolved in the thermolysis of fluoropolymers.* Analyst. 2003 Jun;128(6):756-64. doi: 10.1039/b212658c. PMID: 12866900.

ELECTRONICALLY FILED - 2025 Jan 29 3:05 PM - YORK - COMMON PLEAS - CASE#2025CP4600398

185.    PFAS are known as "forever chemicals" because they are immune to degradation, bio-accumulate in individual organisms and humans, and increase in concentration up the food chain.[3]

186.    Indeed, scientists are unable to estimate an environmental half-life (i.e. the time it takes for 50% of the chemical to disappear) for PFAS.[4]

187.    Additionally, some PFAS chemicals (known as "precursors") degrade into different long-chain PFAS chemicals.[5]

188.    PFAS are nearly indestructible and are highly transportable.[6]

189.    PFAS chemicals include "older" long-chain PFAS like PFOA, PFOS, and PFNA that have seven or more carbon atoms, and "newer" short-chain PFAS, like PFBA, PFBS, PFHxA, and PFHxS.

190.    The PFAS chemical industry has repeatedly asserted that short-chain PFAS are safer and bio-degrade more easily than long-chain PFAS. However, short-chain PFAS are molecularly similar to long-chain PFAS, and recent scientific research shows that short-chain PFAS are in fact extremely persistent, highly mobile and transportable, almost impossible to

---

[3] *Perfluoroalkyl and Polyfluoroalkyl Substances (PFAS),* National Institute of Environmental Health Sciences, https://www.niehs.nih.gov/health/topics/agents/pfc/index.cfm (last visited May 15, 2023).

[4] *Perfluoroalkyl and Polyfluoroalkyl Substances (PFAS),* National Institute of Environmental Health Sciences, https://www.niehs.nih.gov/health/materials/perfluoroalkyl_and_polyfluoroalkyl_substances_508.pdf (last visited May 15, 2023).

[5] Robert Bilott*, Exposure, at 174;* Young AS, Sparer-Fine EH, Pickard HM, Sunderland EM, Peaslee GF, Allen JG. Per- and polyfluoroalkyl substances (PFAS) and total fluorine in fire station dust. J Expo Sci Environ Epidemiol. 2021 Sep;31(5):930-942. doi: 10.1038/s41370-021-00288-7. Epub 2021 Feb 5. PMID: 33542478; PMCID: PMC8339150.

[6] *Toxicological Profile for Perfluoroalkyls, see* Relevance to Public Health, Agency for Toxic Substances & Disease Registry, https://www.atsdr.cdc.gov/toxprofiles/tp200.pdf, (last visited May 15, 2023).

remove from water, bio-accumulate in humans and the environment, and show similar toxicity as long-chain PFAS.[7]

191.   Short-chain PFAS also have lower technical performance and may therefore be used at higher quantities cancelling out any supposed benefits of lower bioaccumulation potential.[8]

192.   In October 2021, the U.S. Environmental Protection Agency ("EPA") updated its 2018 assessment of short-chain PFAS, also known as "GenX," finding that two of Defendant Chemours GenX chemicals are *more toxic* than PFOA - the highly toxic chemical they were intended to replace.[9]

---

[7] Cheryl Hogue, *Short-chain and long-chain PFAS show similar toxicity, US National Toxicology Program says,* Chem. And Eng'g News, (August 24, 2019), https://cen.acs.org/environment/persistent-%20pollutants/Short-chain-long-chain-PFAS/97/i33 (last accessed May 15, 2023); Rice PA, Aungst J, Cooper J, Bandele O, Kabadi SV. Comparative analysis of the toxicological databases for 6:2 fluorotelomer alcohol (6:2 FTOH) and perfluorohexanoic acid (PFHxA). Food Chem Toxicol. 2020 Apr;138:111210. doi: 10.1016/j.fct.2020.111210. Epub 2020 Feb 19. Erratum in: Food Chem Toxicol. 2020 Mar 17;:111249. PMID: 32087313.; Kabadi SV, Fisher JW, Doerge DR, Mehta D, Aungst J, Rice P. Characterizing biopersistence potential of the metabolite 5:3 fluorotelomer carboxylic acid after repeated oral exposure to the 6:2 fluorotelomer alcohol. Toxicol Appl Pharmacol. 2020 Feb 1;388:114878. doi: 10.1016/j.taap.2020.114878. Epub 2020 Jan 7. PMID: 31923437. Stephan Brendel et al., *Short-chain Perfluoroalkyl Acids: Environmental Concerns and A Regulatory Strategy Under REACH,* Env't Sci. Eur., Vol. 30, 1 (2018), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC5834591/(last visited May 15, 2023); Tom Neltner, *The Elephant in the Room: Potential Biopersistence of Short-Chain PFAS,* Environmental Defense Fund, (February 20, 2019), http://blogs.edf.org/health/2019/02/20/potential-biopersistence-short-chain-pfas/ (last visited May 15, 2023).
[8] Martin Scheringer et al., *Helsingør Statement on Poly- and Perfluorinated Alkyl Substances* (PFASs), Chemosphere (June 14, 2014), https://www.sciencedirect.com/science/article/pii/S004565351400678X (last visited May 15, 2023).
[9] Cheryl Hogue, *US EPA Deems Two GenX PFAS Chemicals More Toxic than PFOA,* Chemical & Engineering News (October 28, 2021), https://cen.acs.org/environment/persistentpollutants/US-EPA-deems-two-GenX-PFAS-chemicals-more-toxic-than-PFOA/99/i40 (last visited May 15, 2023).

ELECTRONICALLY FILED - 2025 Jan 29 3:05 PM - YORK - COMMON PLEAS - CASE#2025CP4600398

ELECTRONICALLY FILED - 2025 Jan 29 3:05 PM - YORK - COMMON PLEAS - CASE#2025CP4600398

193.    PFAS exposure to humans can occur through inhalation, ingestion, or dermal contact.[10]

194.    To date, there is no safe, acceptable or "normal" level of PFAS in the human body. Further, the fact that PFOA, PFOS, PFHxS, PFHpA, and PFNA are often found together presents a substantial risk to human health. Defendants' assertions that their products are safe because they do not contain PFOA or PFOS, or because they contain short-chain PFAS is just another example of their efforts to deflect from the reality that there are thousands of PFAS – including precursor PFAS which degrade into PFOA and PFOS.[11]

195.    PFAS exposure affects nearly every system in the human body.[12] It has been associated with multiple and serious adverse health effects in humans including, but not limited to, cancer, tumors, liver damage, immune system and endocrine disorders, thyroid disease, ulcerative colitis, birth defects, decreased fertility, pregnancy-induced hypertension, accelerated changes in gene expression, and increases in oxidative stress which can contribute to DNA changes, tumor promotion, and other health conditions.[13] It has also been found to concentrate in

---

[10] *Id.* at 3-4; Shane HL, Baur R, Lukomska E, Weatherly L, Anderson SE. Immunotoxicity and allergenic potential induced by topical application of perfluorooctanoic acid (PFOA) in a murine model. Food Chem Toxicol. 2020 Feb;136:111114. doi: 10.1016/j.fct.2020.111114. Epub 2020 Jan 3. Erratum in: Food Chem Toxicol. 2020 Mar;137:111141. PMID: 31904477; PMCID: PMC7753950.

[11] Technical Fact Sheet - Perfluorooctane Sulfonate (PFOS) and Perfluorooctanoic Acid (PFOA), U.S. Env't Prot. Agency, (Nov. 2017), https://19january2021snapshot.epa.gov/sites/static/files/2017-12/documents/ffrrofactsheet_contaminants_pfos_pfoa_11-20-17_508_0.pdf (last visited May 15, 2023).

[12] Kelly Lenox, *PFAS Senate Hearing, Birnbaum's Expert Scientific Testimony,* Environmental Factor, National Institute of Environmental Health Sciences (May 2019), https://factor.niehs.nih.gov/2019/5/feature/1-feature-pfas (last visited May 15, 2023).

[13] A. Koskela et al., *Perfluoroalkyl substances in human bone: concentrations in bones and effects on bone cell differentiation,* Scientific Reports, (July 28, 2017), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC5533791/ (last visited May 15, 2023); *National Toxicology Program Technical Report on the Toxicology and Carcinogenesis Studies of*

ELECTRONICALLY FILED - 2025 Jan 29 3:05 PM - YORK - COMMON PLEAS - CASE#2025CP4600398

human blood, bones and organs, and to reduce the effectiveness of certain vaccines, a significant
concern in light of COVID-19.[14]

### C.    Firefighter's Bunker Gear

196.    Plaintiffs, as first responders to fires, hazardous materials incidents, and other
emergency and medical calls, risked their lives daily. They not only saved lives and homes, but
also provided emergency services and medical care, performed rescues, and offered support to
people in traumatic circumstances. To prepare for this enormously challenging work, Plaintiffs
wore bunker gear and received extensive and ongoing training in fire suppression.

197.    During their training, and when responding to fires, firefighters wear bunker gear
intended to provide a degree of thermal, chemical, and biological protection.

198.    Bunker gear includes items such as helmets, hoods, jackets, pants and suspenders,
boots, and gloves. Each component of the jacket and pants are made of an outer layer, as well as
several inner layers that include a moisture barrier and thermal liner which are meant to protect
the firefighter from ambient heat.[15]

199.    Upon information and belief, bunker gear and its moisture barriers contain PFAS
compounds, PFAS, including PFAS which degrade into PFOA.[16]

---

*Perfluorooctanoic Acid Administered in Feed to Sprague Dawley (Hsd: Sprague Dawley SD) Rats,*
National          Toxicology          Program,          (May          2020),
https://ntp.niehs.nih.gov/ntp/htdocs/lt_rpts/tr598_508.pdf (last visited May 15, 2023);   Jaclyn
Goodrich et al., *Per- and Polyfluoroalkyl Substances, Epigenetic Age and DNA Methylation: A
Cross-Sectional   Study   of   Firefighters,*   Epigenomics   (October   2021),
https://pubmed.ncbi.nlm.nih.gov/34670402/ (last visited May 15, 2023).
[14] *Id.* (Koskela study); Fisher, M., Arbuckle, T.E., Liang, C.L. *et al.* Concentrations of persistent
organic pollutants in maternal and cord blood from the maternal-infant research on environmental
chemicals (MIREC) cohort study. *Environ Health* **15**, 59 (2016). https://doi.org/10.1186/s12940-
016-0143-y.
[15]    *What Materials Go Into Making Turnout Gear*?, Globe MSA Safety Website,
https://globe.msasafety.com/selecting-your-gear/materials (last visited May 15, 2023).
[16] Technical Fact Sheet - Perfluorooctane Sulfonate (PFOS) and Perfluorooctanoic Acid (PFOA),

200.     A June 2020 study of bunker gear by researchers at the University of Notre Dame analyzed 30 new and used bunker gear jackets and pants originally marketed, distributed, and d in 2008, 2014, and 2017, by six bunker gear makers, including Defendants MSA/Globe and Lion, and found high levels of PFAS in bunker gear worn, used, or handled by firefighters.[17]

201.     This study, which looked at used and unused bunker gear to assess the probability of PFAS migrating from the moisture barrier layer to other parts of the gear, found that concentrations of PFASs in the thermal liner were different in used versus unused bunker gear, suggesting that PFAs migrated from the moisture barrier to the thermal liner, which contacts firefighters' skin.[18]

202.     In a more recent study done at Oregon State University by Derek Muensterman, extractable volatile PFAS were found at exceedingly high concentrations in firefighter bunker gear as compared to earlier investigations of non-volatile PFAS like PFOA and PFOS. The highest level of these volatile PFAS were determined to originate from the PTFE moisture barrier. Bioavailability of volatile PFAS is considered high, as the inhalation route is of concern, especially given the application of the products which are worn by the firefighters on their bodies for extended durations.

---

United States Environmental Protection Agency, (Nov. 2017), https://19january2021snapshot.epa.gov/sites/static/files/2017-12/documents/ffrrofactsheet_contaminants_pfos_pfoa_11-20-17_508_0.pdf (last visited May 15, 2023).

[17] Graham Peaslee et al., *Another Pathway for Firefighter Exposure to Per- and Polyfluoroalkyl Substances: Firefighter Textiles,* Environmental Science & Technology Letters 2020, 7, 8, 594-599 (Ecotoxicology and Public Health) (June 23, 2020) (hereinafter, "the Notre Dame Turnout Study").

[18] *Id.*

203.    When exposed to heat, PFAS chemicals in the bunker gear off-gas, break down, and degrade into highly mobile and toxic particles and dust,[19] exposing firefighters to PFAS chemicals, particles and dust, including through skin contact/absorption, ingestion (e.g., hand-to-mouth contact), and/or inhalation.[20] Further firefighter exposure to these highly mobile and toxic materials occurs through normal workplace activities, because particles or dust from their bunker gear spread to fire vehicles and fire stations, as well as firefighters' personal vehicles and homes.[21]

204.    Such workplace exposure to PFAS or PFAS-containing materials has been found to be toxic to humans. For example, in an internal memo dated July 31, 1980, DuPont officials described measures that were needed to prevent workplace exposure to PFOA, which they knew could permeate all protective materials, and noted that PFOA's toxicity varied depending on the exposure pathway, acknowledging that ingestion was "slightly toxic," dermal contact was "slightly to moderately toxic" and inhalation was "highly toxic."[22] The memo concluded "continued exposure is not tolerable."[23]

205.    As alleged herein, Plaintiffs wore bunker gear in the ordinary course of performing their duties, and the bunker gear was intended to be used and in a foreseeable manner, which exposed them to significant levels of PFAS.

**D.    PFAS-Containing Class B Foam**

206.    Class B foam is one of the primary tools used by firefighters for suppression of fires, include those involving oil and/or chemicals commonly found at the scene of transportation

---

[19] A. S. Young et al., *Per- and Polyfluoroalkyl Substances (PFAS) and Total Fluorine in Fire Station Dust,* J. Expo. Sci. Environ. Epidemiology (2021), https://doi.org/10.1038/s41370-021-00288-7 (last visited May 15, 2023).
[20] *Id.*
[21] *Id.*
[22] Robert Bilott, *Exposure* (2019), 174.
[23] *Id.* at 175.

ELECTRONICALLY FILED - 2025 Jan 29 3:05 PM - YORK - COMMON PLEAS - CASE#2025CP4600398

accidents, aircraft accidents, and chemical spills. Class B foam is also used in structural or other types of non-chemical fires when water cannot penetrate deeply enough to ensure that unseen fire is extinguished. The most common Class B foam is aqueous film-forming foam ("AFFF"). AFFF and other Class B foams contain PFAS.

207.    To use Class B foam, a Class B foam concentrate must first be mixed with water. Class B foam concentrate is typically d in five-gallon containers that firefighters are responsible for storing on the fire engine and/or pouring into the foam bladder of the fire engine. To mix the foam concentrate and water from a fire engine that is not pre-plumbed for foam, an educator must be placed in the foam concentrate to draw up the concentrate and mix it with water to create a thick, foamy substance. Firefighters are responsible for this process of preparing the foam, applying the foam, and cleaning the equipment (hoses, nozzles, etc.) after use.

208.    The process of preparing and applying Class B foam, applying the foam, and then cleaning the equipment after foam use causes exposure to PFAS through skin contact, inhalation, or ingestion (e.g., hand-to-mouth contact). The Class B foam containers used by Plaintiffs and their fire departments to mix and prepare the Class B foam for use did not say that the foam contains PFAS and did not warn Plaintiffs of the serious health risks associated with exposure to PFAS.

209.    Class B foam is used in fire extinguishment in a manner typical of routine methods of fire extinguishment—by being sprayed through a fire hose, appliance, or nozzle.

210.    The techniques used for "laying a blanket" of Class B foam in fire extinguishment include banking the foam off a wall or vertical surface to agitate the foam before it covers the fire; or applying it to the ground surface where the fire is burning. In structure fires, it can also be

ELECTRONICALLY FILED - 2025 Jan 29 3:05 PM - YORK - COMMON PLEAS - CASE#2025CP4600398

ELECTRONICALLY FILED - 2025 Jan 29 3:05 PM - YORK - COMMON PLEAS - CASE#2025CP4600398

necessary to spray the ceilings, walls, and floors. Reapplication of foam is often necessary because the foam blanket will break down over a short time.

211.    These techniques are used routinely in firefighting training as well as in real-world fire extinguishment, and result in firefighters being sprayed or entirely soaked with Class B foam, walking in and through Class B foam (which can reach thigh- or even waist-high), or kneeling in Class B foam during use. As a result, the techniques cause exposure to PFAS through skin contact, inhalation, or ingestion (e.g., hand-to-mouth contact).

212.    As alleged herein, Plaintiffs used and/or were exposed to Class B foam in the ordinary course of performing their duties as it was intended to be used and in a foreseeable manner which exposed them to significant levels of PFAS.

213.    Plaintiffs did not know, and in the exercise of reasonable diligence could not have known, that the Class B foam they used and/or were exposed to in the course of performing their duties contained PFAS or PFAS-containing materials, and similarly did not know and could not have known that they routinely suffered exposure to PFAS or PFAS-containing materials in the Class B foam they used and/or were exposed to in performing their duties.

214.    These exposures to PFAS or PFAS-containing materials resulted in serious and life-threatening diseases to Plaintiffs and continue to pose a significant health threat to them given the bioaccumulation, pervasiveness, and persistence of PFAS.

**E.    Defendants Knowingly Manufactured, Developed, Marketed, Distributed, Supplied and/or d Toxic PFAS and/or Products Containing PFAS**

215.    Defendants have each marketed, developed, distributed, d, promoted, manufactured, released, or otherwise used PFAS chemicals in products, including in PFAS-containing bunker gear and Class B foam, throughout the United States and in South Carolina.

216.    PFAS were first developed in the 1930s and 1940s. Soon after, 3M began manufacturing a PFAS material called perfluorooctanoic acid ("PFOA"), selling it to other companies, including DuPont.

217.    By the 1950s, PFAS were widely used in large-scale manufacturing. Prior to this, PFAS had never been detected in nor were present in human blood or bodies.

218.    In the 1960s, Class B foam containing PFAS entered the global market and became the primary firefighting foam all over the world with 3M as one of the largest manufacturers.

219.    In the 1970s, Defendants National Foam and Tyco began to manufacture, market, and sell Class B foam containing PFAS, followed by Defendant Chemguard in the 1990s, and Defendant Buckeye in the 2000s.

220.    Founded in 1918, Defendant MSA/Globe began manufacturing, marketing, and selling bunker gear with DuPont's NOMEX® PFAS-containing flame resistant fabric in 1966. MSA/Globe (under the Globe name) continues to manufacture, market, and sell bunker gear using PFAS-containing fabrics supplied by its partners, DuPont, Gore, Tencate, and PBI.[24]

221.    Defendant Lion began to manufacture, market, and sell bunker gear in 1970. Since its founding, and continuing through to the present, Lion makes, markets, and sells bunker gear using PFAS-containing fabrics, including Teflon®F-PPE-treated thermal lining material supplied by Defendants DuPont's NOMEX® PFAS-containing flame/water/oil-resistant fabric, and moisture barrier fabrics supplied by Defendant Gore.[25]

---

[24] *See Globe History,* Globe MSA Safety Website, https://us.msasafety.com/about-globe/history (last visited May 15, 2023); *Turnout Gear Materials,* Globe MSA Safety Website, https://globe.msasafety.com/materials (last visited May 15, 2023).

[25] *See Our History,* Lion Website, http://www.lionprotects.com/lion-history (last visited May 15, 2023); *Firefighter Turnouts,* Lion Website, https://www.lionprotects.com/firefighter-turnout-gear# (last visited May 15, 2023).

ELECTRONICALLY FILED - 2025 Jan 29 3:05 PM - YORK - COMMON PLEAS - CASE#2025CP4600398

222.     Defendant Honeywell acquired Norcross Safety Products LLC in 2008, entering the protective gear industry and becoming one of the leading manufacturers of bunker gear. Honeywell makes, markets, and sells bunker gear using PFAS-containing fabrics, supplied by Defendants DuPont, Fire-Dex, Gore, PBI, StedFast and Tencate.

## F.     Defendants Know Exposure to PFAS Causes Serious Health Impacts

223.     Defendants, including specifically 3M and DuPont, have long known about the serious and significant impacts to health caused by exposure to PFAS, having conducted study after study on the exposure and health effects of PFAS on animals, and in some cases, even on their own employees. The findings of these studies were discussed within the companies internally yet were never made public or shared with any regulatory agencies. Among the findings:

a.     1950 3M study showed that PFAS could build up in the blood of mice and that PFAS could bind to proteins in human blood, suggesting that PFAS would not only remain but also persist and accumulate in the body of the exposed individuals with each additional exposure.[26]

b.     In 1961, a DuPont toxicologist warned that PFAS chemicals enlarge rat and rabbit livers.[27] A year later, these results were replicated in studies with dogs.[28]

c.     In 1963, 3M's technical handbook classified PFAS as toxic and advised that "due care should be exercised in handling these materials."[29]

d.     In 1970, a company that purchased 3M's firefighting foam had to abandon a test of the product because all the fish died.[30]

---

[26] Timeline - *For 50 Years, Polluters Knew PFAS Chemicals Were Dangerous But Hid Risks From Public,* Env't Working Grp., (2019), https://static.ewg.org/reports/2019/pfa-timeline/3M-DuPont-Timeline_sm.pdf (last visited May 15, 2023); *see also,* Jared Hayes, For Decades, *Polluters knew PFAS Chemicals Were Dangerous But Hid Risks From Public,* (Aug. 29, 2019) https://www.ewg.org/pfastimeline/ (last visited May 15, 2023).
[27] *Id.*
[28] Nathaniel Rich, *The Lawyer Who Became DuPont's Worst Nightmare,* Oklahoma Times (June 6, 2016), https://www.nytimes.com/2016/01/10/magazine/the-lawyer-who-becameduponts-worst-nightmare.html.
[29] *Id.*
[30] *Id.*

ELECTRONICALLY FILED - 2025 Jan 29 3:05 PM - YORK - COMMON PLEAS - CASE#2025CP4600398

e.     In the 1970s, DuPont discovered that there were high concentrations of PFOA in the blood samples of factory workers at DuPont's Washington Works site.[31]

f.     By the end of the 1970s, studies performed, by at least 3M, indicated that PFAS materials were resistant to environmental degradation and would persist in the environment.[32]

g.     In 1981, 3M, which still supplied PFOA to DuPont and other corporations, found that ingestion of PFOA caused birth defects in rats. 3M reported this information to DuPont. DuPont then tested the children of pregnant employees in their Teflon division and found that of seven births, two children had eye defects. Defendants reassigned the female employees but did not inform the EPA or make this information public.[33]

h.     In 1988, a company that purchased PFAS firefighting foam complained to 3M because the product was not biodegradable as 3M represented.[34] Subsequently, a 3M employee wrote an internal memo that "3M should stop perpetrating the myth that these fluorochemical surfactants are biodegradable, but the company continued to sell them."[35]

i.     By at least the end of the 1980s, research performed by Defendants, including specifically, Defendants 3M and DuPont, manufacturing and/or using PFAS materials indicated that at least one such PFAS material, PFOA, caused testicular tumors in a chronic cancer study in rats, resulting in at least Defendant DuPont

---

[31] Nathaniel Rich, *The Lawyer Who Became DuPont's Worst Nightmare,* Oklahoma Times (June 6, 2016), https://www.nytimes.com/2016/01/10/magazine/the-lawyer-who-became-duponts-worst-nightmare.html (last visited May 15, 2023).

[32] *PFCS: Global Contaminants: PFCs Last Forever,* Environmental Working Group, (April 3, 2003), https://www.ewg.org/research/pfcs-global-contaminants (last visited May 15, 2023). Gaber N, Bero L, Woodruff TJ. The Devil they Knew: Chemical Documents Analysis of Industry Influence on PFAS Science. Ann Glob Health. 2023 Jun 1;89(1):37. doi: 10.5334/aogh.4013. PMID: 37273487; PMCID: PMC10237242.

[33] Timeline - *For 50 Years, Polluters Knew PFAS Chemicals Were Dangerous But Hid Risks From Public,* Env't Working Grp., (2019), https://static.ewg.org/reports/2019/pfa-timeline/3M-DuPont-Timeline_sm.pdf (last visited May 15, 2023); *see also,* Jared Hayes, For Decades, *Polluters knew PFAS Chemicals Were Dangerous But Hid Risks From Public,* (Aug. 29, 2019) https://www.ewg.org/pfastimeline/ (last visited May 15, 2023).

[34] *The Devil They Knew: PFAS Contamination and the Need for Corporate Accountability, Part II,* Transcript of Hearing Before the Subcommittee on Environment of the Committee on Oversight and Reform, House of Representatives (September 19, 2019), https://www.congress.gov/116/meeting/house/109902/documents/HHRG-116-GO28-Transcript-20190910.pdf (last visited May 15, 2023).

[35] *Id.*

ELECTRONICALLY FILED - 2025 Jan 29 3:05 PM - YORK - COMMON PLEAS - CASE#2025CP4600398

classifying such PFAS material internally as a confirmed animal carcinogen and possible human carcinogen.[36]

j.  In the 1990s, Defendant DuPont knew that PFOA caused cancerous testicular, pancreatic, and liver tumors in lab animals. One study also suggested that PFOA exposure could cause possible DNA damage.[37] Another study of workers found a link between PFOA exposure and prostate cancer.[38]

k.  In response to the alarming and detrimental health impact, DuPont began to develop an alternative to PFOA and in 1993, an internal memo announced that "for the first time, we have a viable candidate" that appeared to be less toxic and showed less bioaccumulation.[39] DuPont decided against using this potentially safer alternative, however, because products manufactured with PFOA were worth $1 billion in annual profit.[40]

l.  On March 28, 1998, Richard Purdy of 3M resigned from his position with the company and stated that PFOS "is the most insidious pollutant since PCB" continuing to note that it was worse than PCB because "it does not degrade, whereas PCB does; it is more toxic to wildlife."[41]

m.  On June 30, 2000, 3M and DuPont met to share 3M's "pertinent data on PFOA". 3M informed DuPont that the half-life of PFOA was much longer than animal studies showed.[42]

224.  Additionally, approximately fifty years of studies by Defendants, including by 3M and DuPont, on human exposure to PFAS found unacceptable levels of toxicity and bioaccumulation, as well as a link to increased incidence of liver damage, various cancers, birth

---

[36] Timeline - *For 50 Years, Polluters Knew PFAS Chemicals Were Dangerous But Hid Risks From Public,* Env't Working Grp., (2019), https://static.ewg.org/reports/2019/pfa-timeline/3M-DuPont-Timeline_sm.pdf (last visited May 15, 2023); *see also,* Jared Hayes, For Decades, *Polluters knew PFAS Chemicals Were Dangerous But Hid Risks From Public,* (Aug. 29, 2019) https://www.ewg.org/pfastimeline/ (last visited May 15, 2023).
[37] *Id.*
[38] *Id.*
[39] *Id.*
[40] *Id.*
[41] Brock Purdy Resignation letter from 3M (March 28, 1999), https://www.ag.state.mn.us/Office/Cases/3M/docs/PTX/PTX1001.pdf (last visited August 31, 2023).
[42] Internal DuPont Memorandum, DuPont Haskell Laboratory Visit (June 30, 2000), https://www.ag.state.mn.us/Office/Cases/3M/docs/PTX/PTX1721.pdf (last visited May 15, 2023).

defects, and other diseases in humans exposed to PFAS.[43] These studies also revealed that, once in the body, PFAS has a very long half-life and that it takes years before even one-half of the chemicals begins to be eliminated from the body—assuming, of course, the body experiences no additional PFAS chemical exposure.[44]

225.    In the face of these findings, and despite passage of the Toxic Substances Control Act in 1976, which requires companies that manufacture, process, or distribute chemicals to immediately report to EPA information that "reasonably supports the conclusion" that a chemical presents a substantial risk to health or the environment, Defendants did not inform the EPA, Plaintiffs, or the public about the health impacts resulting from exposure to PFAS.[45] Indeed, in at least some instances, Defendants' own attorneys advised the companies to conceal their damaging findings on PFAS, which they did for decades.[46]

226.    In 2000, 3M announced that it would cease manufacturing a specific PFAS chemical, PFOS, as well as Class B foam, on the same day the EPA announced that PFOA and PFOS, two chemicals in the PFAS family, had a "strong tendency to accumulate in human and

---

[43] Timeline - *For 50 Years, Polluters Knew PFAS Chemicals Were Dangerous But Hid Risks From Public,* Env't Working Grp., (2019), https://static.ewg.org/reports/2019/pfa-timeline/3M-DuPont-Timeline_sm.pdf (last visited May 15, 2023); *see also,* Jared Hayes, For Decades, *Polluters knew PFAS Chemicals Were Dangerous But Hid Risks From Public,* (Aug. 29, 2019) https://www.ewg.org/pfastimeline/ (last visited May 15, 2023).

[44] *Id.*

[45] *Id.*

[46] *The Devil They Knew: PFAS Contamination and the Need for Corporate Accountability, Part II,* Transcript of Hearing Before the Subcommittee on Environment of the Committee on Oversight and Reform, House of Representatives (September 19, 2019), https://www.congress.gov/116/meeting/house/109902/documents/HHRG-116-GO28-Transcript-20190910.pdf (last visited May 15, 2023).

animal tissues and could potentially pose a risk to human health and the environment over the long term."[47]

227.    However, 3M did not recall PFOS, its chemical feedstock, or any Class B foam that it had previously manufactured, d, or distributed, or that was then stored at firehouses and being used by firefighters around the country. And no other Defendant stopped manufacturing PFAS chemicals or products containing PFAS. Rather, Defendants continued to manufacture, develop, market, promote, distribute, and sell PFAS chemicals and PFAS-containing products, including specifically PFAS-containing bunker gear, and Class B foams and did so without any warning to firefighters or to the public concerning the fact that these bunker gear and foams contained PFAS, or that they posed a serious health risk to human health. Defendants instead continued to claim their products were safe.

228.    By the 2000s, Defendants' own research of its employees revealed multiple adverse health effects among workers who had been exposed to PFAS, including increased cancer incidence, hormone changes, lipid changes, and thyroid and liver impacts.[48]

229.    In 2001, a class action lawsuit was filed in West Virginia against DuPont on behalf of people whose water had been contaminated by the nearby DuPont chemical plant where PFAS chemicals were manufactured.

---

[47] *EPA and 3M Announce Phase Out of PFOS,* Press Release, United States Environmental Protection Agency (May 16, 2000), https://www.epa.gov/archive/epapages/newsroom_archive/newsreleases/33aa946e6cb11f358525 68e1005246b4.html (last visited May 15, 2023).

[48] Timeline - *For 50 Years, Polluters Knew PFAS Chemicals Were Dangerous But Hid Risks From Public,* Env't Working Grp., (2019), https://static.ewg.org/reports/2019/pfa-timeline/3M-DuPont-Timeline_sm.pdf (last visited May 15, 2023); *see also,* Jared Hayes, For Decades, *Polluters knew PFAS Chemicals Were Dangerous But Hid Risks From Public,* (Aug. 29, 2019) https://www.ewg.org/pfastimeline/ (last visited May 15, 2023).

ELECTRONICALLY FILED - 2025 Jan 29 3:05 PM - YORK - COMMON PLEAS - CASE#2025CP4600398

ELECTRONICALLY FILED - 2025 Jan 29 3:05 PM - YORK - COMMON PLEAS - CASE#2025CP4600398

230.     Defendants continued to manufacture, market, promote, distribute, and/or sell PFAS and PFAS-containing products, including bunker gear and Class B foam, and continued to publicly claim that these products were safe. Defendants affirmatively suppressed independent research on PFAS, and instead commissioned research and white papers to support their claims that PFAS and PFAS-containing products were safe to use, engaging consultants to further this strategy and ensure that they would continue to profit from these toxic chemicals and products.

231.     As one consultant wrote in pitching its services to DuPont, it was critical that the PFAS industry develop an aggressive strategy to "[discourage] governmental agencies, the plaintiff's bar and misguided environmental groups" and "[implement] a strategy to limit the effect of litigation and regulation on the revenue stream generated by PFOA." The strategy was further described by consultant as follows:

> DUPONT MUST SHAPE THE DEBATE AT ALL LEVELS. . .. The outcome of this process will result in the preparation of a multifaceted plan to take control of the ongoing risk assessment by the EPA, looming regulatory challenges, likely litigation, and almost certain medical monitoring hurdles. The primary focus of this endeavor is to strive to create the climate and conditions that will obviate, or at the very least, minimize ongoing litigation and contemplated regulation relating to PFOA. ***This would include facilitating the publication of papers and articles dispelling the alleged nexus between PFOA and teratogenicity as well as other claimed harm.*** We would also lay the foundation for creating Daubert precedent to discourage additional lawsuits.[49]

232.     Class B foam manufacturers and distributors adopted a similarly aggressive industry campaign to evade government oversight or public attention of the risks posed by their products. At a March 2001 meeting of the National Fire Protection Association's ("NFPA") Technical Meeting on Foam, which included Defendant Class B foam manufacturers Tyco, Chemguard, and National Foam, a 3M representative informed attendees that 3M had discontinued

---

[49] Letter from P. Terrence Gaffney, Esq of The Weinberg Group to Jane Brooks, Vice President, Special Initiatives, DuPont de Nemours & Company, regarding PFOA (April 29, 2003).

ELECTRONICALLY FILED - 2025 Jan 29 3:05 PM - YORK - COMMON PLEAS - CASE#2025CP4600398

its Class B foam business, citing concerns about the "proven pervasiveness, persistence and toxicity" of PFOS.[50] Attendees also were informed of evidence that telomer-based fluorosurfactants (used by every Class B foam manufacture except 3M) degrade to PFOA and, worse, exhibit an even greater degree of pervasiveness and toxicity than PFOA.

233.    On or about the same time, certain Defendants, including at least Tyco, DuPont, Kidde, and Buckeye, founded and/or became members of the Fire Fighting Foam Coalition ("FFFC") – a non-profit organization of manufacturers, distributors, and suppliers of Class B foam (specifically AFFF). The FFFC's self-described role was to be "the environmental voice for users and manufacturers of AFFF"[51] – one designed to ignore the health impacts of exposure to PFAS containing Class B foams such as AFFF:

> Not too long ago, 3M had environmental concerns about a chemical in their product and decided to withdraw from the AFFF market. Even though no other manufacturers used the questionable chemical, the withdrawal of 3M from AFFF production raised a red flag. As a direct result, a lot of half-truths and misinformation published by some well-meaning, but misinformed, groups began to surface. One organization went so far as to label our products as "hazardous waste" and as posing an "occupational health or environmental hazard." At the same time, the Federal government was focusing its attention on the industry and needed to identify an industry representative that could provide fact-based information and serve as a focal point for dialogue. We decided, therefore, to form the FFFC in order to educate, inform and help persuade regulatory and legislative decision-makers that firefighting foams are a value-added component to any firefighting capability.[52]

234.    Defendants also pivoted with a new industry strategy. Defendants continued to produce Class B foams containing PFAS and continued to publicly represent that PFAS and/or products containing PFAS were safe, while developing newer, "short-chain" PFAS alternatives.

---

[50] NFPA-11 Technical Committee Meeting Notes (National Fire Protection Association for Standards on Low-, Medium- and High-Expansion Foam) (March 14-15, 2001).
[51] Fire Fighting Foam Council Website, https://www.fffc.org/afff-update  (last visited May 15, 2023).
[52] *Id.*

235.    In 2005, the EPA fined DuPont $16.5 million for failing to submit decades of toxicity studies of PFOA (one PFAS chemical manufactured by the company).[53] In the face of and undeterred by the EPA's action, Defendant turnout manufacturers, such as MSA/Globe and Lion, partnered with DuPont and with Defendant Gore to develop, manufacture, market, distribute and/or sell bunker gear made with DuPont's and/or Gore's PFAS-based textile coatings (e.g., Nomex® and Gore® Protective Fabrics).[54]

236.    In 2006, the EPA "invited" eight PFOA manufacturers, including Defendants DuPont, 3M, and Arkema to join in a "Global Stewardship Program" and phase out production of PFOA by 2015.[55]

237.    By this time, Defendants had begun to aggressively manufacture, market, sell and/or distribute short-chain PFAS, such as Gen X, claiming that these alternative PFAS chemicals did not pose significant health risks to humans or the environment. But, these claims, too, were false. Defendants knew that certain of these short-chain PFAS chemicals had been found in human

---

[53] Michael Janofsky, *DuPont to Pay $16.5 Million for Unreported Risks,* Oklahoma Times (December 5, 2005), https://www.nytimes.com/2005/12/15/politics/dupont-to-pay-165-million-for-unreported-risks.html (last visited May 15, 2023).
[54] *DuPont and LION Collaborate to Better Protect Firefighters and First Responders,* Press Release, DuPont and LION (January 30, 2013), https://www.prweb.com/releases/dupont_protection_tech/lion_turnout_gear/prweb10362363.htm (last visited May 15, 2023); *Our Partners,* Globe Website https://globe.msasafety.com/ourpartners (last visited May 15, 2023); and *PPE utions for Emergency Response,* DuPont Website, https://www.dupont.com/personal-protection/emergency-response-ppe.html (last visited May 15, 2023).
[55] *PFOA Stewardship Program,* United States Environmental Protection Agency, https://www.epa.gov/assessing-and-managing-chemicals-under-tsca/fact-sheet-20102015-pfoa-stewardship-program (last visited May 15, 2023).

blood and that at least one of them produces the same types of cancerous tumors (testicular, liver, and pancreatic) in rats as had been found in long-chain PFAS studies.[56]

238.    In 2011, a C8 Science Panel convened as part of a settlement in the West Virginia DuPont water contamination case described in paragraph 179, above, began releasing its findings. The Panel had analyzed the blood serum of nearly 70,000 residents living in the water contamination area for two long-chain PFAS (PFOA and PFOS), and found significant negative human health effects (including, kidney cancer, testicular cancer, ulcerative colitis, thyroid disease, high cholesterol, and preeclampsia) associated with exposure to these PFAS chemicals in the area groundwater.

239.    In 2013, DuPont entered an agreement with the EPA and ceased production and use of PFOA – just one of thousands of PFAS chemicals the company makes, promotes, and sells. Defendants, however, continued manufacturing short-chain PFAS materials, chemical feedstock, and products—all the while peddling them as safer, and as more easily bio-degraded than long-chain PFAS, despite evidence to the contrary.[57]

240.    In 2015, DuPont spun-off its PFAS chemicals business, as well two-thirds of its environmental liabilities and 90% of its active litigation, to Defendant Chemours. As part of the transaction, DuPont required Chemours to indemnify the "new" DuPont for all assigned

---

[56] Sharon Lerner, *New Teflon Toxin Causes Cancer in Lab Animals,* The Intercept (March 3, 2016), https://theintercept.com/2016/03/03/new-teflon-toxin-causes-cancer-in-lab-animals/ (last visited May 15, 2023).

[57] Cheryl Hogue, *Short-chain and long-chain PFAS show similar toxicity, US National Toxicology Program says,* Chem. And Eng'g News, (August 24, 2019), https://cen.acs.org/environment/persistent-pollutants/Short-chain-long-chain-PFAS/97/i33 (last visited May 15, 2023); Tom Neltner, *The Elephant in the Room: Potential Biopersistence of Short-Chain PFAS,* Environmental Defense Fund, (February 20, 2019), http://blogs.edf.org/health/2019/02/20/potential-biopersistence-short-chain-pfas/ (last visited May 15, 2023).

ELECTRONICALLY FILED - 2025 Jan 29 3:05 PM - YORK - COMMON PLEAS - CASE#2025CP4600398

environmental liabilities should a regulatory agency or plaintiff seek to hold the "new" DuPont accountable. As Chemours President Paul Kirsch testified before Congress: "DuPont designed the separation of Chemours to create a company where it could dump its liabilities to protect itself from environmental cleanup and related responsibilities."[58]

241.   In June 2018, the Agency for Toxic Substances and Disease Registry (ASTDR), a division of the Centers for Disease Control and Prevention at the U.S. Department of Health and Human Services released an 852-page draft toxicology report analyzing scientific data about the most common PFAS chemical variants, finding that PFAS "are potentially more hazardous than previously known, are particularly concerning because of these compounds' persistence in the environment and widespread prevalence—PFAS are extremely slow to biodegrade."[59]

242.   In September 2019, DuPont chief operations and engineering officer Daryl Roberts testified before Congress that the "new DuPont" (to be distinguished from the "old DuPont" which manufactured and d PFAS for decades before being spun-off to Chemours) no longer uses or manufactures PFAS and is no longer responsible for obligations and harms resulting from over 65 years of producing PFAS.[60] Roberts remarked that he knew nothing about "old DuPont's" efforts to suppress research on PFAS' toxicity – as testified to by one of DuPont's former scientists only

---

[58] *The Devil They Knew: PFAS Contamination and the Need for Corporate Accountability, Part II,* Transcript of Hearing Before the Subcommittee on Environment of the Committee on Oversight and Reform, House of Representatives (September 19, 2019), https://www.congress.gov/116/meeting/house/109902/documents/HHRG-116-GO28-Transcript-20190910.pdf (last visited May 15, 2023).

[59] *A Toxic Threat: Government Must Act Now on PFAS Contamination at Military Bases,* Center for Science and Democracy (September 2018), https://www.ucsusa.org/resources/toxic-threat-pfas-contamination-military-bases (last visited May 15, 2023).

[60] *The Devil They Knew: PFAS Contamination and the Need for Corporate Accountability, Part II,* Transcript of Hearing Before the Subcommittee on Environment of the Committee on Oversight and Reform, House of Representatives (September 19, 2019), https://www.congress.gov/116/meeting/house/109902/documents/HHRG-116-GO28-Transcript-20190910.pdf (last visited May 15, 2023).

ELECTRONICALLY FILED - 2025 Jan 29 3:05 PM - YORK - COMMON PLEAS - CASE#2025CP4600398

a few days earlier.[61] Finally, he stated that any liabilities from "old DuPont's" PFAS operations were now Chemours' problem because DuPont is essentially a completely new company with no past – only a bright future of doing good in the world.[62]

### G.   Defendants Failed to Warn Plaintiffs of the Dangers of Exposure to PFAS and Falsely Represented That Their PFAS Products Were Safe

243.   As alleged above, Defendants knew that PFAS are persistent, toxic, and bioaccumulating with a very long half-life. They knew that exposure to PFAS can cause serious and life-threatening diseases, including cancer.

244.   Yet, Defendants ***did not warn*** Plaintiffs that PFAS and Defendants' PFAS containing products, including bunker gear and Class B foams used by Plaintiffs, contained PFAS, or that exposure to PFAS in the normal and intended use of such products causes serious bodily harm and illnesses, including cancer.

245.   Instead, Defendants falsely represented—and continue to falsely represent— that PFAS and PFAS-containing products, including bunker gear and Class B foams, are safe and not harmful to humans or the environment.

246.   Such assertions fly in the face of science and a global movement toward eliminating this class of chemicals from consumer products. In 2020, for example, Congress passed legislation to address PFAS in bunker gear and foam,[63] and numerous states have severely restricted and/or banned PFAS-containing firefighting foam. For example, California will require sellers of bunker gear to notify purchasers if it contains PFAS, while Colorado has banned PFAS-containing bunker

---

[61] *Id.*

[62] *Id.*

[63] Ryan Woodward, *Congress Passes Legislation to Address PFAS Chemicals Impacting Firefighters,* Fire Rescue 1,(December 17, 2020), https://www.firerescue1.com/legislation-funding/articles/congress-passes-legislation-to-address-pfas-chemicals-impacting-firefighters-Sp8MFif5dAbD4ZrI/ (last visited May 15, 2023).

ELECTRONICALLY FILED - 2025 Jan 29 3:05 PM - YORK - COMMON PLEAS - CASE#2025CP4600398

gear as of 2022.[64] The U.S. Food and Drug Administration similarly has called for phasing out of short-chain PFAS that contain 6:2 fluorotelomer alcohol (6:2 FTOH).[65] And private companies like Home Depot, Lowes, and Staples recently have begun to discontinue selling products containing any PFAS, as have several outdoor, durable clothing companies (e.g. Columbia and Marmot), clothing retailers (e.g. H&M and Levi Strauss & Co), shoe companies (e.g. Adidas and New Balance), car seat manufacturers (e.g. Britax and Graco), furniture companies (e.g. IKEA), personal care companies (e.g. Johnson & Johnson and Oral-B), and textile manufacturing companies.[66]

**(1)** **Defendants Provide No Safety Warning on Product Labels**

247.    Plaintiffs allege that the packaging on the PFAS-containing Class B foam containers, used for mixing Class B foam with water and for spraying and laying foam blankets

---

[64] Andrew Wallender, *Toxic Firefighting Foam With PFAS Scrutinized by Multiple States,* Bloomberg Law (June 18, 2020), https://www.firerescue1.com/legislation-funding/articles/congress-passes-legislation-to-address-pfas-chemicals-impacting-firefighters-Sp8MFif5dAbD4ZrI/ (last visited May 15, 2023); Cheryl Hogue, *California Bans PFAS Firefighting Foams,* Chemical & Engineering News (October 1, 2020), https://cen.acs.org/environment/persistent-pollutants/California-bans-PFAS-firefighting-foams/98/i38 (last visited May 15, 2023); Marianne Goodland, *While Dozens of Bills Are Getting Axed, A Bill on Firefighting Chemicals Sails On,* Colorado Politics (May 28, 2020), https://www.coloradopolitics.com/legislature/while-dozens-of-bills-are-getting-axed-a-bill-on-firefighting-chemicals-sails-on/article_1b1e05f2-a11e-11ea-a270-230a36e06594.html (last visited May 15, 2023); *Legislature Takes Strongest Stand Yet to Phase out PFAS in Firefighting Foam,* Washington State Council of Fire Fighters (March 5, 2020), https://www.wscff.us/legislature-takes-strongeststand-yet-to-phase-out-pfas-in-firefighting-foam/ (last visited May 15, 2023).

[65] *FDA Announces the Voluntary Phase-Out by Industry of Certain PFAS Used in Food Packaging,* U.S. Food and Drug Administration, (July 31, 2020), https://www.fda.gov/food/cfsan-constituent-updates/fda-announces-voluntary-phase-out-industry-certain-pfas-used-food-packaging (last visited May 15, 2023).

[66] Muhannad Malas, *Home Depot, Lowe's and Staples Take Action to Protect Their Customers from PFAS and Other Harmful Toxics Lurking in Carpets and Office Supplies,* Environmental Defence (November 5, 2019), https://environmentaldefence.ca/2019/11/05/home-depot-lowes-staples-protect-customers-toxics/ (last visited May 15, 2023); *PFAS-Free Products,* PFAS Central, https://pfascentral.org/pfas-free-products/ (last visited May 15, 2023).

ELECTRONICALLY FILED - 2025 Jan 29 3:05 PM - YORK - COMMON PLEAS - CASE#2025CP4600398

for fire suppression or fire suppression training, contained no warning that the Class B foam contained PFAS. Nor did it inform persons handling or using the foam as it was intended to be handled that such use can result in exposure to PFAS and serious bodily harm.

248. The Class B foam containers manufactured, marketed, distributed, or d by Defendants that Plaintiffs were potentially exposed to in training or in fire suppression during their firefighting career warn only of possible skin or eye irritation and suggest rinsing areas of contact with water. They contain *no information* about the Class B foam containing PFAS or PFAS-containing materials and provide *no warning whatsoever* of the human health risks and serious health conditions associated with PFAS exposure resulting from the normal and intended use of Class B foam in fire suppression or fire suppression training

249. Plaintiffs further allege that bunker gear containing PFAS or PFAS materials d by Defendants and used by Plaintiffs in training, emergency incidents, or in fire suppression during their firefighting career, also contained no warning that the bunker gear contain PFAS or PFAS materials. Nor did these labels inform persons handling, wearing, or using the bunker gear as they were intended to be handled, worn, or used can result in exposure to PFAS and serious bodily harm.

250. Furthermore, the warning labels for bunker gear manufactured, marked, d, and distributed by Defendants do not disclose that the PFAS or PFAS materials in the bunker gear are toxic, and contain no warning that handling, wearing, or using the bunker gear as they were intended to be handled, worn, or used can result in exposure to PFAS and serious bodily harm. Moreover, while the labels provide washing instructions, the instructions do not advise that bunker gear should be washed in a commercial extractor to prevent cross-contamination and PFAS-

ELECTRONICALLY FILED - 2025 Jan 29 3:05 PM - YORK - COMMON PLEAS - CASE#2025CP4600398

exposure to family members who handle or wash the bunker gear with other garments in home washing machines.

<b>(2)</b>     <b><u>Defendants' MSDS Sheets Do Not Warn About PFAS or PFAS Exposure</u></b>

251.    A Material Safety Data Sheet (or "MSDS") is a document that Occupational Safety and Health Administration (OSHA) requires companies to provide to end users for products that contain substances or chemicals that are classified as hazardous or dangerous. Access to such information is necessary for Plaintiffs to provide a safe and effective response in emergency situations.

252.    The MSDS provided with Defendants' Class B foams did not – and to this day do not – state that these foams contain PFAS or PFAS-containing materials; that PFAS is persistent, toxic and bio-accumulating; or that PFAS exposure causes serious bodily harm. To the contrary, the MSDS falsely stated that the Class B foams and/or their contents were **not** known carcinogens and did not cause birth defects.

253.    Even now, the MSDS do not reflect the known serious health risks and hazards associated with exposure to PFAS in these Class B foams. For example, a MSDS updated on as recently as May 19, 2021, by Defendant National Foam for AFFF stated the product **was not considered carcinogenic** – contrary to decades of science.[67]

<b>(3)</b>     <b><u>Defendants Coercively Influenced the NFPA</u></b>

254.    As frequent sponsors and advertisers in fire service publications, Defendants have been so influential in the industry that fire service leadership has echoed the narratives that the

---

[67] National Foam Safety Data Sheet for Centurion (TMC6) 6% Aqueous Film Forming Foam Concentrate (AFFF) (May 19, 2021), https://nationalfoam.com/wp-content/uploads/sites/4/NMS340_Centurion-6-AFFF-Concentrate_052192021.pdf (last visited May 15, 2023).

ELECTRONICALLY FILED - 2025 Jan 29 3:05 PM - YORK - COMMON PLEAS - CASE#2025CP4600398

ELECTRONICALLY FILED - 2025 Jan 29 3:05 PM - YORK - COMMON PLEAS - CASE#2025CP4600398

industry bunker gear did not have significant levels of PFAS and that the bunker gear was completely safe for use.

255. In firefighter cancer-related publications, programs, and events, Defendants repeatedly used the summit as an opportunity to push the narrative that incidence of cancer among firefighters in attributable to other chemicals encountered in the line of duty, or firefighters' failure to wash their bunker gear after every call. Not once have the Defendants admitted that the PFAS material in their products has been found to be carcinogenic and that the very equipment that should be protecting firefighters are causing the most harm. Further, Lion's launched "Not in Our House" cancer awareness program is sadly ironic in that it encourages fighters, themselves, to make a pledge to protect themselves from carcinogens linked to cancer ("I will make every effort to protect myself and my team by doing my part to take precautions that will minimize the risk of exposure to carcinogens that may lead to cancer…."), while all the while refusing to take any corporate responsibility for continually exposing firefighters to carcinogens in their protective gear.[68]

256. The Defendants have a similar influence over the NFPA and their regulations for appropriate firefighting bunker gear.

257. Defendants hold numerous positions on NFPA committees and were the driving force behind the UV light degradation test, which is one of the main reasons why PFAS continues to be in bunker gear today.

258. Defendants have continued to show their influence over the decades by providing mischaracterized science and studies lacking in peer review. This can be seen in Defendants'

---

[68] Rachel Zoch, *Take A Pledge To Stop Cancer At the Door,* Fire Rescue 1 (January 28, 2019), https://www.firerescue1.com/fire-products/personal-protective-equipment-ppe/articles/take-a-pledge-to-stop-cancer-at-the-door-e8bn7uAbtIXWdQau/ (last visited May 15, 2023).

continued used of a thesis paper of a master's student in 2000, Defendants' industry funded studies of their materials, and continued statements that their bunker gear and materials used for bunker gear are safe.

### (4) Defendants' Fraudulent Concealment and Misrepresentations About PFAS Continue to this Day

259.    Despite their decades of knowledge about PFAS and its dangers, Defendants continue to make false claims, continue to misrepresent the safety of PFAS, and continue to minimize and fail to warn about the hazards of exposure to PFAS, or bunker gear and Class B foams made with or containing PFAS.

260.    For example, Gore has known for decades that PFAS compounds can be absorbed through the skin and that inhalation, ingestion, and dermal absorption are all potential roots of exposure for PFOS, PFOA, and APFO.

261.    As alleged above, Defendants' misinformation campaign is long-standing, and continues to this day. Some pertinent examples include:

a.    2017 – Lion's President, Stephen Schwartz, wrote a letter to the editor of the Columbus Dispatch, expressing outrage at the assertion in a government filing that firefighters may have been exposed to PFAS through bunker gear. Schwartz called this assertion false, stating that Lion's bunker gear is not treated or made with PFOS or PFOA, and further stating, *inter alia,* that: "PFOAs and PFOSs have never been components of Lion's turn-out gear, either as a coating or as a textile."  He acknowledged that bunker gear is treated with PTFE to provide a durable water repellant, and that the textile industry in the past had used PFOA as a processing aid to manufacture PTFE moisture barrier films and repellants. "It is possible that trace amounts may have been present as a residue when the films and finishes were incorporated into [the company's] turn-out gear. ***However, based on all available scientific data, such nominal trace amounts, if they existed at all, would not have posed any health risk to firefighters. There is absolutely no connection at all between PFOS and firefighter turnout gear."*** (Emphasis added).

b.    2018 – The National Fire Protection Association (which maintains committees on foams and bunker gear that are comprised, in part, of certain Defendants) issued a publication listing 11 ways to minimize risk of occupational cancer – the suggestions centered on wearing bunker gear for protection resulting from

ELECTRONICALLY FILED - 2025 Jan 29 3:05 PM - YORK - COMMON PLEAS - CASE#2025CP4600398

combustion or spills, and cleaning bunker gear after exposure to chemicals. There was not a single mention of avoiding contact with foam and/or the risks of wearing bunker gear containing PFAS or PFAS-containing materials.[69]

c.     2019 – Defendant Lion issued a Customer Safety Alert for PFOA and Turnout Gear stating: "Your Lion turnout gear continues to be safe and ready for action especially when properly maintained. It is extremely important that firefighters continue to wear and properly care for their gear to stay safe on the job."[70]

d.     2019 – Defendant 3M Vice President, Denise Rutherford, testified before Congress that she *absolutely agreed with the statement that "the weight of current scientific evidence does not show that PFOS or PFOA cause adverse health effects in humans at current rates of exposure."* (Emphasis added).[71]

e.     2019 – The Fire Fighting Foam Council (of which many Defendants have been members of since its inception in 2001) wrote in their newsletter that: "Shortchain (C6) fluorosurfactants do not contain or breakdown in the environment to PFOS or PFOA and are currently considered lower in toxicity and have significantly reduced bio-accumulative potential than long-chain PFAS."[72]

f.     2019 – Defendant Gore issued a public statement, stating that "the potential exposures and associated risks of cancer effects from PFOA alternative and non-polymeric perfluoroalkyl substances in Gore Components [bunker gear] are insignificant."[73]

g.     2020 – FluoroCouncil – the lobbying arm of the PFAS industry – maintains that PFAS fluorotelomers that are in Class B foam and bunker gear do not cause cancer, disrupt endocrine activity, negatively affect human development or reproductive

---

[69] *11 Best Practices for Preventing Firefighter Cancer Outlined in New Report Put Out by VCOS and NVFC,* National Fire Protection Association Xchange (August 16, 2018), https://www.nfpa.org/News-and-Research/Publications-and-media/Blogs-Landing-Page/NFPA-Today/Blog-Posts/2018/08/16/11-best-practices-for-preventing-firefighter-cancer-outlined-in-new-report-put-out-by-vcos-and-nvfc (last visited May 15, 2023).

[70] Lion Customer Safety Alert, *PFOA And Turnout Gear,* https://legacy-assets.eenews.net/open_files/assets/2021/02/16/document_gw_08.pdf (last visited May 15, 2023).

[71] Gabe Schneider, *3M Grilled over PFAS Chemicals at Congressional Hearing,* MinnPost (September 11, 2019), https://www.minnpost.com/national/2019/09/3m-grilled-over-pfaschemicals-at-congressional-hearing/ (last visited May 15, 2023).

[72] AFFF Update Newsletter, Fire Fighting Foam Coal. (April 2019), https://tinyurl.com/y57c5jwx, (last visited May 15, 2023).

[73] W. L. Gore and Associates, *Exposure Assessment and Cancer Risk Characterization for Firefighters from Non- Polymeric PFAS Residuals in Gore Components Used in Firefighting Gear,* (August 20, 2019), https://www.goretexprofessional.com/sites/default/files/pdfs/Firefighter%20Exposure%20Assessment%20Short%20Chain%20Non%20Polymer%20Residual.pdf (last visited May 15, 2023).

ELECTRONICALLY FILED - 2025 Jan 29 3:05 PM - YORK - COMMON PLEAS - CASE#2025CP4600398

systems, do not build up in the human body, and do not become concentrated in the
bodies of living organisms.[74]

h.  2020 – The Fire Fighting Foam Council website states: "The short-chain (C6)
fluorosurfactants that have been the predominant fluorochemicals used in
fluorotelomer-based AFFF for the last 25 years are low in toxicity and not
considered to be bio-accumulative based on current regulatory criteria."[75]

i.  2020 – The Fire Fighting Foam Council's Best Practice Guidance for Use of Class
B Foam - which was published in May 2016 and has not been updated to reflect the
latest research - focuses entirely on eliminating and containing foam to minimize
impact on the environment. It makes no mention of how to minimize the impact on
firefighters who routinely handle, prepare, spray, or use Class B foam during
training or in firefighting.[76]

j.  2020 – Defendant Lion's hired consultant Paul Chrostowski, PhD took out a full-
page in a fire service trade publication, Firefighter Nation, to argue that bunker gear
is completely safe and any evidence to the contrary, including the Notre Dame
study, is unreliable and fearmongering. "[E]ven if PFAS were found in their turnout
gear, at this time there is no credible evidence that it ends up in firefighters' bodies
in amounts that would be higher than the general population…. the connection
between PFAS and cancer is extremely weak. The few peer-reviewed
epidemiological studies that have found an association were not statistically
significant and inconsistent with other studies…. The materials used in turnout gear
are the safest materials available, and without them, firefighters would be at
extreme risk for burns and exposure to known cancer-causing toxic chemicals
present on the fireground, as well as metabolic heat stress…. Alternative materials
tried by the U.S. fire service thus far have proven to be unsafe.[77]

k.  2020 – Defendant Lion's hired consultant Chrostowski also stated in Firefighter
Nation that all bunker gear are compliant with the standards set by the NFPA and
Swiss organization OEKO-TEX's Standard 100 for PPE and Materials for PPE.

---

[74] *FluoroCouncil PFAS Information,* Glob. Indus. Council for FluoroTechnology, (August 23,
2019)      https://portal.ct.gov/DEEP/Remediation--Site-Clean-Up/PFAS-Task-Force/Pollution-
Prevention-Committee (last visited May 15, 2023).
[75] *Fact Sheet on AFFF Fire Fighting Agents,* Fire Fighting Foam Coal. (2017),
https://tinyurl.com/yyxscyas (last visited May 15, 2023).
[76] *Best Practice Guidance for Use of Class B Firefighting Foams,* Fire Fighting Foam Coal. (May
2016), https://tinyurl.com/2kzdsed9 (last visited May 15, 2023).
[77] Paul Chrostowski, *Research and Independent Testing Shows Firefighters' Turnout Gear
Remains Safe Despite Claims* (June 3, 2020), https://www.firefighternation.com/health-
safety/research-and-independent-testing-shows-firefighters-turnout-gear-remains-safe-despite-
claims/#gref (last visited May 15, 2023).

"The OEKO-TEX certification process tests for the presence of unsafe levels of trace materials, including PFOA."[78]

l.      2021 – In an Oklahoma Times article, Defendant W.L. Gore maintained that its turnout products were safe.[79]

m.      2021 – Defendant Lion stated that the representations articulated by its consultant Paul Chrostowski in 2020 (see above), reflect its position: "Dr. Chrostowski's report says it all for Lion."[80]

n.      2021 – Defendant MSA/Globe and W. L. Gore have continued to state that their products have been tested and are safe.[81]

o.      2022 – Defendant 3M stated that it was not "necessary or appropriate" to declare any PFAS hazardous.[82] It also states on its website that: "The weight of scientific evidence from decades of research does not show that PFOS or PFOA causes harm in people at current or past levels….Decades of research into the health of these workers has not identified negative health outcomes caused by exposure to PFOA or PFOS….It is important to know that while some studies may find links or associations with possible health outcomes, this is not the same as causation. The weight of scientific evidence does not show that PFOS or PFOA causes harm to people at current or historical levels. Although PFAS have been detected in the environment at extremely low levels, their mere presence does not mean they are harmful…. Although it has been widely reported that no causal connection has been identified between exposure to PFOS or PFOA and harm to people's health, there is a great deal of misinformation in the public domain…. The findings of the C-8 science panel are also frequently misunderstood."[83]

---

[78] *Id.*

[79] Hiroko Tabuchi, *Firefighters Battle an Unseen Hazard: Their Gear Could Be Toxic,* Oklahoma Times, (January 26, 2021), https://www.nytimes.com/2021/01/26/climate/pfas-firefighter-safety.html (last visited May 15, 2023).

[80] David Ferry, *The Toxic Job of Being A Hero,* Men's Health, (September 21, 2021), https://www.menshealth.com/health/a37624731/cancer-firefighter-gear-pfas/ (last visited May 15, 2023).

[81] Andrew Wallander, *Firefighters Want Halt on Money From Makers of PFAS-Laden Gear,* Bloomberg Law, (January 19, 2021), https://news.bloomberglaw.com/pfas-project/firefighters-want-halt-on-money-from-makers-of-pfas-laden-gear (last visited May 15, 2023).

[82] Jim Spencer, *3M's Support for PFAS Could Cost Taxpayers Billions of Dollars,* Star Tribune (September 11, 2021), https://www.startribune.com/3m-s-support-for-pfas-could-cost-taxpayersbillions-of-dollars/600096094/ (last visited May 15, 2023).

[83] *3M's Commitment to PFAS Stewardship,* 3M, https://www.3m.com/3M/en_US/pfas-stewardship-us/health-science/ (last visited May 15, 2023).

ELECTRONICALLY FILED - 2025 Jan 29 3:05 PM - YORK - COMMON PLEAS - CASE#2025CP4600398

p.  2022 – DuPont and Chemours also continue to assert that there is little scientific evidence to support that PFAS and/or certain PFAS, like fluoropolymers, are harmful to human health.[84]

q.  2022 – DuPont maintains that bunker gear keeps firefighters safe and "protect against the intrusion of…chemicals."[85]

262.  As frequent sponsors and advertisers in fire service publications, Defendants have been so influential in the industry that fire service leadership has echoed these narratives.

263.  Also, in January 2021, Defendants DuPont and Chemours along with Corteva (the agricultural unit of DuPont that it spun off in 2019) announced a cost-sharing agreement worth $4 billion to settle lawsuits involving the historic use of PFAS – thereby acknowledging, at long last, the significant harm their PFAS chemicals have caused to human health and the environment.

## H.  Research Indicates That Firefighters are at Significant Risk of Harm From Exposure to PFAS in Bunker Gear and Class B Foams — But Defendants Continue to Discount or Deny These Risks

264.  While historical research (and follow-on litigation) has centered on environmental impacts and environmental exposures associated with PFAS and PFAS-containing products, recent studies have focused specifically on the serious health impacts to firefighters stemming from their occupational exposure to bunker gear and Class B foams containing PFAS.

265.  In October 2019, for example, an expert panel of the International Pollutants Elimination Network (IPEN), an international non-profit organization comprised of over 600 public interest non-governmental organizations dedicated to improving global chemical waste policies, published a scientific paper that, in the words of its authors, "presents unequivocal

---

[84] *What Government Agencies Say,* DuPont, https://www.pp.dupont.com/pfas/what-governmental-agencies-say.html (last visited May 15, 2023); *Our Commitment to PFAS Stewardship,* Chemours, https://www.chemours.com/en/corporate-responsibility/sustainability-safety/our-commitment-to-pfas-stewardship  (last visited May 15, 2023).
[85]  *Technology inside your turnout gear,*  DuPont,  https://www.dupont.com/knowledge/dupont-technology-in-your-turnout-gear.html (last visited May 15, 2023).

ELECTRONICALLY FILED - 2025 Jan 29 3:05 PM - YORK - COMMON PLEAS - CASE#2025CP4600398

ELECTRONICALLY FILED - 2025 Jan 29 3:05 PM - YORK - COMMON PLEAS - CASE#2025CP4600398

evidence from recent studies that firefighters" using Class B foams (primarily AFFF) "have unexpectedly elevated blood levels" of PFAS, including, specifically, PFHxS and PFOS, with PFHxS (a short-chain, C6 PFAS) being "potentially of greater concern than PFOS given its much longer elimination half-life in humans."[86] The paper explains that "[f]irefighters can be significantly exposed to PFHxS and other PFAS from firefighting foam via various occupational mechanisms including direct exposure during use as well as exposure from contaminated personal protective equipment (PPE), handling of contaminated equipment, managing PFAS foam wastes, occupation of contaminated fire stations and consumption of contaminated local water and produce. Cross-contamination and legacy PFAS residues from inadequately decontaminated appliances after transitioning to fluorine-free foam can remain a long-term problem."[87] The panel concluded that "[o]ngoing exposure to PFHxS, PFOS and other PFAS amongst firefighters remains a major occupational health issue," noting that "[b]io-accumulation and very slow bioelimination may be very significant influencing factors in PFHxS exposure" in firefighters.[88] "Of greater concern," the panel observed, "is that firefighter blood levels for PFOS and PFHxS are many times higher than the median values for the general…population."[89]

266.    In June 2020, the Notre Dame Turnout Study, which analyzed over 30 sets of used and unused (still in their original packaging) bunker gear made by six U.S. manufacturers,

---

[86] *Perfluorohexane Sulfonate (PFHxS) – Socio-Economic Impact, Exposure and the Precautionary Principle Report,* IPEN Expert Panel (October 2019), https://ipen.org/sites/default/files/documents/pfhxs_socio-economic_impact_final_oct.2019.pdf (last visited May 15, 2023).
[87] *Id.* at 25.
[88] *Id.*
[89] *Id.*

ELECTRONICALLY FILED - 2025 Jan 29 3:05 PM - YORK - COMMON PLEAS - CASE#2025CP4600398

including Defendants MSA/Globe, Lion and Honeywell, over several production years, was published.[90]

267.    The Notre Dame Turnout Study noted that these manufacturers' bunker gear (or personal protective equipment-PPE, as it is described in the study) are manufactured "from textiles that are made from fluoropolymers (one form of PFAS) or extensively treated by PFAS in the form of side-chain fluoropolymers."[91] According to the researchers, "[t]hese PFAS include fluoropolymer materials such as PTFE used as a moisture barrier in the inner layers of turnout gear."[92] The study found significant levels of PFAS chemicals – including PFOA, PFOS, PFBA, PFPeA, PFHxA, PFHpA, PFNA, PFDA, PFUnA, PFDoA, PFTrDA, PFToDA, PFBS, PFOSA, NEtFOSA, MeFOSAA, N-MeFOSE, N-EtFOSE and 6:20FTS – in both new and used bunker gear and across layers, portions, and materials in the bunker gear, including in material layers that are not intentionally treated with PFAS by the manufacturer, thereby providing "the first evidence that suggests PFAS appear to migrate from the highly fluorinated layers and collect in the untreated layer of clothing worn against the skin."[93]

268.    These findings suggest that, as the garments are worn, PFAS from the outer shell and the moisture barrier can migrate from the bunker gear and contaminate the firefighter, their apparatus, and their workplace with PFAS. The analysis also indicated that fluoropolymers from the outer layer decompose into other PFAS, including PFOA.

269.    "Startlingly," researchers reported, "garment to hand transfer of total fluorine in the ppm range was also observed when researchers simply manipulated the textiles in [the]

---

[90] Graham Peaslee et al., Environmental Science & Technology Letters 2020, 7, 8, 594-599 (June 23, 2020).
[91] *Id.*
[92] *Id.*
[93] *Id.* at 596.

laboratory."[94] The accumulation of PFAS on researchers' hands strongly suggests that transference of ppm levels of PFAS can occur merely by handling the bunker gear and that PFAS exposure pathways include inhalation, ingestion, and/or absorption (through dermal contact) – all of which DuPont internally acknowledged as being toxic in 1980. Such exposure pathways are a concern not only for firefighters that rely on bunker gear to protect them from heat, fire, water, and chemical hazards in the field, but to family members who may be exposed to the PFAS in bunker gear as the result of home washing or storage. Lead researcher Dr. Graham Peaslee commented that bunker gear are "the most highly fluorinated textiles I've ever seen"[95] and that the level of PFAS in turnout ear means that firefighters are "swimming in a sea of [PFAS]. Those numbers for scientists are scarily high..."[96]

270.    Despite these findings, Defendants have been quick to mischaracterize, dismiss, or downplay the significance of the Notre Dame Turnout Study."[97]

271.    Defendant MSA/Globe, when contacted about the study and asked whether Globe planned to study this issue and find an alternative to PFAS for bunker gear, merely responded

---

[94] Graham Peaslee et al., Environmental Science & Technology Letters 2020, 7, 8, 594-599 (June 23, 2020).

[95] Raleigh McElvery, *Protective Gear Could Expose Firefighters to PFAS,* Chemical and Engineering News (July 1, 2020), https://cen.acs.org/environment/persistent-pollutants/Protective-gear-expose-firefighters-PFAS/98/i26 (last visited May 15, 2023).

[96] Andrew Wallender, *Firefighters Face New Possible Risk From Toxic PFAS: Their Gear,* Bloomberg Law (June 23, 2020), https://news.bloomberglaw.com/pfas-project/firefighters-face-new-possible-risk-from-toxic-pfas-their-gear (last visited May 15, 2023).

[97] Blair Miller, *Local Firefighters Concerned About Potentially Dangerous Chemicals on Gear,* Boston 25 News (February 26, 2019), https://www.boston25news.com/news/local-firefighters-facing-concerns-over-potentially-dangerous-chemicals-on-gear/925236612/ (last visited May 15, 2023).

ELECTRONICALLY FILED - 2025 Jan 29 3:05 PM - YORK - COMMON PLEAS - CASE#2025CP4600398

thusly: "[P]rotecting (firefighters) is Globe's business; every piece of our turnout gear meets or exceeds applicable industry standards."[98]

272.    As noted above, Defendant Lion has also dismissed or minimized the significance of the Notre Dame Turnout Study's findings, stating: "Your Lion turnout gear continues to be safe and ready for action especially when properly maintained. It is extremely important that firefighters continue to wear and properly care for their gear to stay safe on the job."[99]

273.    The Customer Safety Alert goes on to stress that Lion does not use PFOA or PFOS (two long-chain PFAS chemicals) in its bunker gear.[100] It does not, however, address that Lion's bunker gear in fact contain other PFAS chemicals, nor warn firefighters or the public about health harms associated with exposure to these toxic, bio-accumulating chemicals.

274.    Defendant Lion's paid consultant, Dr. Paul Chrostowski, also has taken aim at the Notre Dame Turnout Study and its findings. Attempting to refute a *Fire Rescue* magazine article about the study, Chrostowski repeated Lion's website statement that "PFOA was never part of the gear itself and frequent independent testing has found only trace amounts of it in any of the gear – not nearly enough to cause concern, and in amounts similar to consumer products."[101] Chrostowski went on to say, "[t]he fact is that one may find trace amounts of 'short-chain' PFAS such as PFBS and PFHxA in firefighting textiles, but the scientific research shows that these materials are far less toxic than even PFOA and at the tiny trace levels the risk are extremely low based on numerous

---

[98] Blair Miller, *Local Firefighters Concerned About Potentially Dangerous Chemicals on Gear,* Boston 25 News (February 26, 2019), https://www.boston25news.com/news/local-firefighters-facing-concerns-over-potentially-dangerous-chemicals-on-gear/925236612/ (last visited May 15, 2023).

[99] Lion Customer Safety Alert, *PFOA And Turnout Gear,* https://legacy-assets.eenews.net/open_files/assets/2021/02/16/document_gw_08.pdf (last visited May 15, 2023).

[100] *Id.*

[101] Paul Chrostowski, Firefighter Nation (June 3, 2020), *supra,* FN 75.

ELECTRONICALLY FILED - 2025 Jan 29 3:05 PM - YORK - COMMON PLEAS - CASE#2025CP4600398

ELECTRONICALLY FILED - 2025 Jan 29 3:05 PM - YORK - COMMON PLEAS - CASE#2025CP4600398

credible published scientific research papers."[102] Finally, as mentioned above, Chrostowski falsely stated that the link between PFAS exposure and cancer is "extremely weak."[103]

275.    And yet, Lion has admitted publicly that dermal absorption is a pathway of exposure to cancer-causing chemicals for firefighters. In Lion's *Not in Our House* cancer awareness fact sheet that currently appears on the company's website, Lion warns firefighters: "For every 5 degrees increase in temperature, skin becomes up to 400% more absorbent. The hotter you are, the more carcinogens your skin absorbs."[104] This statistic is alarming given that the core body temperature of firefighters routinely increases during firefighting activities while wearing bunker gear which contain known carcinogens.[105]

276.    On September 26, 2022, the International Agency for Research for Cancer ("IARC"), the specialized agency of the World Health Organization, announced that it would be having a Meeting on PFOA and PFOS from November 7–November 14, 2023.

277.    In effect, the IARC nominated PFOA and PFOS for review and publishing in the IARC Monographs. The expectation of the meeting is to reach an industry-wide consensus on the strength of evidence available to classify those agents as carcinogenic.

---

[102] *Id.*

[103] *Id.*

[104] *Cancer Awareness Infographic,* Lion Group Inc., https://www.lionprotects.com/not-in-our-house (last visited May 15, 2023).

[105] Nancy Espinoza, *Can We Stand the Heat?,* Journal of Emergency Medical Services, (April 30, 2008), https://www.jems.com/operations/can-we-stand-heat-study-reveal/ (last visited May 16, 2023); Gavin P. Horn, et al., *Thermal Response to Firefighting Activities in Residential Structure Fires: Impact of Job Assignment and Suppression Tactic,* Ergonomics (July 31, 2017), https://tinyurl.com/4j2mz7f7 (last visited May 15, 2023).

278.    Likewise, Defendant Honeywell has stated: "The skin on the neck is very thin and prone to absorbing carcinogenic particulates."[106]

279.    Another recent Harvard study examining PFAS levels in fire stations dust found that "dust in turnout gear locker areas and adjoining apparatus bays had significantly higher fluorine concentrations compared to living rooms in fire stations," as well as fluorine concentrations typically found in in Class B foam and/or textiles as opposed to consumer products.[107]

280.    Plaintiffs deserve more. They were among the first to respond to emergencies faced by their community and never hesitated to help. Whether delivering a baby, responding to a fire, medical emergency, accident, mass shooting, terrorist attack, natural disaster, or teaching kids about fire safety, firefighters always put the community first. When a child is drowning in a pool or a family is caught in a burning house, they do not stop to calculate whether they will benefit by doing the right thing. They are true public servants. They step in and do what is needed when it is needed the most. Their health, safety, and well-being must be of the highest priority.

I.    **Research Indicates It Was Technologically and Economically Feasible for Defendants to Design Safer Firefighting Foams and Bunker Gear**

281.    Defendants have long known that safer, reasonable, alternative designs existed and could be utilized. These designs are and were not only technologically feasible, but also economically. Indeed, given the enormous cost of remediation of the environment and litigation,

---

[106] Ronnie Wendt, *Innovations in Turnout Gear, Industrial Fire World* (March 17, 2021), https://www.industrialfireworld.com/598931/innovations-in-turnout-gear (last visited May 15, 2023).

[107] A.S. Young et al., *Per- and Polyfluoroalkyl Substances (PFAS) and Total Fluorine in Fire Station Dust,* J. Expo. Sci. Environ. Epidemiology (2021), https://www.nature.com/articles/s41370-021-00288-7 (last visited May 15, 2023).

ELECTRONICALLY FILED - 2025 Jan 29 3:05 PM - YORK - COMMON PLEAS - CASE#2025CP4600398

not to mention the cost of human lives, these safe, feasible alternatives would have cost significantly less.

282.   In the early 2000s, 3M, in conjunction with berg Scandinavian AS, developed Re-Healing Foam ("RF"), a high-performance, AFFF-comparable product that contained no fluorochemicals and resulted in two patents and three commercial products of PFAS-free firefighting foam. RF met the standard of "ICAO [International Civil Aviation Organization] Level B and matched AFFF in performance including a U.S. MIL-Spec product."[108] In 2007, Solberg bought 3M's patent rights to RF and continued to market and sell RF. In 2011, Defendant Amerex acquired Solberg and continued to manufacture, market, and sell RF. In 2014, the EPA presented Solberg with the Presidential Green Chemistry Challenge Award for its fluorine-free foams; the award recognizes technologies that prevent pollution and match or improve the performance of existing products.[109] In 2018, Defendant Perimeter Solutions acquired Solberg and continued to manufacture, market, and sell RF.

283.   Also, beginning in the early 2000s, BIOEX launched a highly effective, fluorine free Class B F3 foam which has been approved and used by international airports, fire departments, oil and gas companies, the marine industry and pharmaceutical, and chemical companies around the world.[110]

---

[108] *Fluorine Free Firefighting Foams (3F) – Viable Alternatives to Fluorinated Aqueous Film Forming Foams (AFFF),* IPEN Expert Panel (September 2018), https://ipen.org/sites/default/files/documents/IPEN_F3_Position_Paper_POPRC-14_12September2018d.pdf (last visited May 15, 2023); Schaefer, Ted. H. et al., *New Foam Technology, New Found Benefits,* Solberg, IAFPA Sydney 2005 Conference Proceedings (Oct. 5-7, 2005), https://www.kappetijn.eu/wp-content/uploads/2019/05/new-foam-technology-new-found-results-conferentie-sydney-2005.pdf (last visited May 15, 2023).
[109] *Presidential Green Chemistry Challenge: 2014 Designing Greener Chemicals Award,* U.S. Env't Prot. Agency (October 2014), https://www.epa.gov/greenchemistry/presidential-green-chemistry-challenge-2014-designing-greener-chemicals-award (last visited May 15, 2023).
[110] *Fluorine Free Firefighting Foam (FFF) – Firefighting Foam Concentrates,* BIOEX website

ELECTRONICALLY FILED - 2025 Jan 29 3:05 PM - YORK - COMMON PLEAS - CASE#2025CP4600398

284.    However, lobbyists and companies invested in maintaining profits on fluorinated Class B foam not only continued to represent that PFAS-containing foam was safe, but also intentionally maligned the fluorine free foams, falsely asserting that these foams were less effective and more expensive.[111] As noted by IPEN:

> Over the years since the serious introduction on the market of Class B fluorine-free F3 foams suitable for hydrocarbon and polar vent fires: there have been many attempts by the fluorochemical side of the industry and their lobbyist trade associations to undermine and downplay the operational performance of Class B fluorine-free foams whilst minimizing the environmental issues associated with fluorinated products. This has included publishing in the technical trade literature spurious performance tests carried out by non-independent or certified bodies funded by competitors to F3 producing companies, as well as continually perpetrating unsupported myths. It is these myths in particular that must be controverted for what they are: marketing hype, misrepresentation of test conditions, frank untruths or only partial truths, criticism of a competitor's product, and an exhibition of vested interests.[112]

285.    In 2011, the Fire Fighting Foam Coalition, which includes Defendants Tyco, DuPont, Kidde, and Buckeye, misrepresented a U.S. Navy report comparing Solberg's fluorine free RF with Defendant National Foam's 6-Em AFFF and Defendant Buckeye's FC-3MS AFFF, asserting Solberg's RF was less effective. In fact, though Solberg RF **was not made per military specifications** as it did not include fluorine, the U.S. Navy Report found:

> For iso-octane, the non-fluorinated foam had shorter extinguishment times than the two AFFFs and was the only foam to achieve an extinguishment time under 30 seconds…. The non-fluorinated foam had substantially better performance on iso-octane than on any of the other fuels. Conclusions: For the AFFF foams which were intended to work via formation of an aqueous film, fire extinction times were lengthened considerably in cases where film formation was made difficult by the low surface tension of the fuel. ***For the non-filming fluorine-free foam, however,***

---

(last visited December 13, 2021), https://www.bio-ex.com/en/our-products/compositions/fluorine-free-foam/ (last visited May 15, 2023); Fluorine Free Firefighting Foams (3F) – Viable Alternatives to Fluorinated Aqueous Film Forming Foams (AFFF), IPEN Expert Panel, p. 48 (September                                                                                            2018), https://ipen.org/sites/default/files/documents/IPEN_F3_Position_Paper_POPRC-14_12September2018d.pdf (last visited May 15, 2023).

[111] *Id.* at 20.

[112] *Id.* at 22.

ELECTRONICALLY FILED - 2025 Jan 29 3:05 PM - YORK - COMMON PLEAS - CASE#2025CP4600398

*no such performance decrement was observed, and the fire extinction times on the lowest surface tension fuel were lower than for fuels with higher surface tensions, and within the 30 second time limit specified (on gasoline) by MIL-F24385F.*[113] (emphasis added)

286.    Further, the study found that AFFF foams had a 25% drain time (between 4-6 minutes), whereas the fluorine-free RF's drain time was 12 minutes. This slower drain time leads to greater burn back resistance and greater safety for firefighters.

287.    The technology to develop safer, effective, and economical fluorine-free Class B foam is and has been available for, at least, over 20 years. In fact, many firefighting foam manufacturers and distributors companies manufacture, market and/or sell fluorine-free firefighting foams, including Defendants Tyco, Perimeter Solutions, Chemguard, Johnson Controls, and National Foam.

288.    EUROFEU, an umbrella organization representing fire protection trade associations and companies including Defendant Tyco, even stated in 2019: "We believe that F3s [fluorine-free foams] are very suitable for a growing number of applications such as municipal firefighting, training, some testing, and as foam agents in first responding fire trucks."[114]

289.    LAST FIRE, a consortium of international oil companies developing best industry practice in storage tank Fire Hazard Management including Shell Oil, Chevron, BP, Exxon, and Defendant Perimeter Solutions, concluded after conducting 200 tests that: "Fluorine free foams

---

[113] Solberg Foam Technical Bulletin, *Re-Healing Foam Fire Performance,* Technical Bulletin, #1009 (last visited December 13, 2021), https://www.interfireagencies.com.au/wp-content/uploads/2015/04/TechB-1009-RE-HEALING-Foam-Fire-Performance-2.pdf (last visited May 15, 2023).
[114] *The Use of PFAS and Fluorine-Free Alternatives in Fire-Fighting Foams,* European Commission DG Environment and European Chemicals Agency (ECHA), Final Report, June 2020, p. 273, https://echa.europa.eu/documents/10162/28801697/pfas_flourinefree_alternatives_fire_fighting_en.pdf/d5b24e2a-d027-0168-cdd8-f723c675fa98 (last visited May 15, 2023).

can provide equivalent performance to C6 foams [AFFF] and provide appropriate performance for hydrocarbon [fires]."[115]

290.     Safe fluorine-free bunker gear was and is also technologically and economically feasible.

291.     Defendant Fire-Dex, manufactures, markets and sells an entire line of PFAS-free bunker gear, as well as non-fluorinated fabrics from Safety Components Inc. with a PFAS-free water-repellent.[116] "Made with the same fabric as our traditional TECGEN71 outer shell, this Case material is designed to reduce heat stress while offering the same performance levels in TPP, breathability, and overall reduction of composite weight."[117] Further, because of the increased breathability and thermal protection, the PFAS-free gear is the only outer shell that can currently be paired with the lightest and thinnest thermal liners and moisture barriers.[118] This, according to Fire-Dex, significantly reduces heat stress and cardiac failure for firefighters while also reducing the risk of cancer and other diseases by eliminating PFAS exposure though bunker gear.

292.     Defendants MSA/Globe, Honeywell, Tencate, and Gore have developed, manufactured, marketed and/or d PFAS-free waterproofing technology, PFAS-free outer shells in bunker gear and/or durable PFAS-free fabrics.[119]

---

[115] *Id.* at pp. 314-315. Hydrocarbon fires are flammable gas or liquid fires that may involve gas, oil, kerosene, ethanol, propane, acetylene, hydrogen, and methane, to name a few.

[116] Fire-Dex Launches Non-Fluorinated PPE Fabrics, Firehouse.com (February 17, 2021), https://www.firehouse.com/safety-health/ppe/turnout-gear/press release/21210722/firedexfiredex-launches-nonfluorinated-ppe-fabrics (last visited May 15, 2023).

[117] Alternative PPE, Fire-Dex website, https://www.firedex.com/catalog/tecgen51-fatigues/#materials (last visited May 15, 2023).

[118] TecGen71 Outer Shell, Fire-Dex website, https://www.firedex.com/tecgen71/ (last visited May 15, 2023).

[119] FreeFAS Durable Water Repellent (DWR) Coating, MSA/Globe website, https://globe.msasafety.com/newoutershells (last visited May 15, 2023); Wendt, Innovations in Turnout Gear, Industrial Fire World (March 17, 2021), https://www.industrialfireworld.com/598931/innovations-in-turnout-gear (last visited May 15,

293.     Defendant Honeywell even admitted that these PFAS-free alternatives are safe, feasible, and economical: "Any minor tradeoffs with PFAS-free fabrics are outweighed by worker safety. And the protection level is unchanged. PFAS-free gear offers the same thermal protection and moves the same way. The color fastness and wear remain the same."[120]

294.     While the technology to develop fluorine-free bunker gear has been available for years, the NFPA turnout standards-setting technical committee continued to adhere to certain guidelines for bunker gear that require PFAS—knowingly putting firefighters at risk for exposure to PFAS. This committee has included industry consultants, textile and gear manufacturers, and representatives Defendants Lion, Tyco, and Honeywell.[121]

295.     The economic and technological feasibility of fluorine-free foams and bunker gear is well-established and based on technology that has been available for years. The alternative designs detailed above are far safer for firefighters and eliminate the serious health risks that result from PFAS exposure.

296.     The only barrier to producing safer alternatives to PFAS-containing foams and bunker gear has been Defendants' opposition. Their continued manufacturing, marketing, selling and/or distributing PFAS-containing foams and bunker gear has exposed firefighters to toxic PFAS chemicals. These defective designs are and/or have been a substantial factor in causing Plaintiffs' injuries.

---

2023); WL Gore to Release PFAS-free Waterproof Material for Apparel, Chemical Watch (October 4, 2021), https://chemicalwatch.com/346695/wl-gore-to-release-pfas-free-waterproof-material-for-apparel (last visited May 15, 2023).

[120] Wendt, Innovations in Turnout Gear, Industrial Fire World (March 17, 2021), https://www.industrialfireworld.com/598931/innovations-in-turnout-gear (last visited May 15, 2023).

[121] NFPA 1971/1851 Technical Committee Meeting Minutes (March 31, 2020); NFPA 1971/1851 Technical Committee Meeting Minutes (January 11-12, 2012).

ELECTRONICALLY FILED - 2025 Jan 29 3:05 PM - YORK - COMMON PLEAS - CASE#2025CP4600398

297.    Based on all of the foregoing, Plaintiffs bring this action for damages and for other appropriate relief sufficient to compensate them for the significant harm Defendants' PFAS chemicals and PFAS-containing products have caused.

### EQUITABLE TOLLING OF APPLICABLE STATUE OF LIMITATIONS

298.    Plaintiffs incorporate by reference all prior paragraphs of this complaint as though fully set forth herein.

### A.    Fraudulent Concealment

299.    Defendants have known or should have known about the hazardous toxicity, persistence, and bioaccumulation associated with the use of PFAS and PFAS-containing materials since at least the 1960s and as late as the early 1990s when study after study showed not only unacceptable levels of toxicity and bioaccumulation in human blood, but links to increased incidence of liver damage, various cancers, birth defects, and other diseases.

300.    Through no fault or lack of diligence, Plaintiffs were deceived regarding the safety of bunker gear and Class B foam and could not reasonably discover the hazardous toxicity, persistence, and bioaccumulation associated with the use of PFAS or PFAS-containing materials in bunker gear and Class B foam, nor Defendants' deception with respect to the hazardous toxicity, persistence, and bioaccumulation associated with the use of PFAS or PFAS-containing materials in bunker gear and Class B foam.

301.    Plaintiffs did not discover and did not know of any facts that would have caused a reasonable person to suspect that Defendants were concealing the hazardous toxicity, persistence, and bioaccumulation associated with the use of PFAS or PFAS-containing materials in bunker gear and Class B foam. As alleged herein, the existence of the hazardous toxicity, persistence, and bioaccumulation associated with the use of PFAS or PFAS-containing materials in bunker gear

ELECTRONICALLY FILED - 2025 Jan 29 3:05 PM - YORK - COMMON PLEAS - CASE#2025CP4600398

and Class B foam was material to Plaintiffs at all relevant times. Within the time period of any applicable statutes of limitations, Plaintiffs could not have discovered through the exercise of reasonable diligence the existence of the hazardous toxicity, persistence, and bioaccumulation associated with the use of PFAS or PFAS-containing materials in bunker gear and Class B foam, nor that Defendants were concealing the fact of the hazardous toxicity, persistence, and bioaccumulation associated with the use of PFAS or PFAS-containing materials in bunker gear and Class B foam.

302.    Defendants did not fully disclose the seriousness of the hazardous toxicity, persistence, and bioaccumulation associated with the use of PFAS or PFAS-containing materials in bunker gear and Class B foam, but instead ignored and/or concealed the defect from Plaintiffs, and the public, and refused to provide safe alternatives to PFAS or PFAS-containing materials in bunker gear and Class B foam.

303.    At all times, Defendants are and were under a continuous duty to disclose to Plaintiffs the hazardous toxicity, persistence, and bioaccumulation associated with the use of PFAS or PFAS containing materials in bunker gear and Class B foam.

304.    Defendants knowingly, actively, and affirmatively concealed the facts alleged herein. Plaintiffs reasonably relied on Defendants' knowing, active, and affirmative concealment.

305.    For these reasons, any and all applicable statutes of limitations have been tolled as a consequence Defendants' ongoing knowledge, active concealment, and denial of the facts alleged herein.

ELECTRONICALLY FILED - 2025 Jan 29 3:05 PM - YORK - COMMON PLEAS - CASE#2025CP4600398

### B.   Estoppel

306.   Defendants were and are under a continuous duty to disclose to Plaintiffs the hazardous toxicity, persistence, and bioaccumulation associated with the use of PFAS or PFAS containing materials in Class B foam and bunker gear.

307.   Instead, Defendants actively concealed the hazardous toxicity, persistence, and bioaccumulation associated with the use of PFAS and PFAS-containing materials in Class B foam and bunker gear; and knowingly made misrepresentations about the quality, reliability, characteristics, safety and performance of Class B foam and bunker gear.

308.   Plaintiffs reasonably relied upon Defendants' knowing and affirmative misrepresentations, and/or active concealment, of these facts.

309.   Based on the foregoing, Defendants are estopped from relying on any and all applicable statutes of limitations in defense of this action.

### C.   Discovery Rule

310.   The causes of action alleged herein did not accrue until Plaintiffs discovered that the hazardous toxicity, persistence, and bioaccumulation associated with the use of PFAS or PFAS containing materials in Class B foam and bunker gear.

311.   Plaintiffs, however, had no realistic ability to discern or suspect that the hazardous toxicity, persistence, and bioaccumulation associated with the use of PFAS or PFAS-containing materials in Class B foam and bunker gear were a substantial cause of their injuries until very recently, when Plaintiffs learned that PFAS or PFAS-containing materials could cause cancer, ulcerative colitis and thyroid disease.

312.   Even then, Plaintiffs would have had no reason to discover their causes of action, because of Defendants' active and ongoing concealment of the true nature of the hazardous

ELECTRONICALLY FILED - 2025 Jan 29 3:05 PM - YORK - COMMON PLEAS - CASE#2025CP4600398

ELECTRONICALLY FILED - 2025 Jan 29 3:05 PM - YORK - COMMON PLEAS - CASE#2025CP4600398

toxicity, persistence, and bioaccumulation associated with the use of PFAS or PFAS-containing materials in Class B foam and bunker gear, and their prior knowledge of it.

313.    Accordingly, Defendants are precluded by the Discovery Rule and/or doctrine of fraudulent concealment, and/or the doctrine of estoppel from relying upon any and all applicable statutes of limitations.

## FIRST CAUSE OF ACTION

## STRICT LIABILITY – DESIGN DEFECT

314.    Plaintiffs incorporate by reference all prior paragraphs of this complaint, as though fully set forth herein.

315.    Each Defendant, their predecessors-in-interest, and/or their alter egos, and/or entities they have acquired, have engaged in the business of manufacturing, designing, selling, distributing, supplying, testing, inspecting, labeling, promoting, and/or advertising of bunker gear, Class B foam, and/or PFAS chemicals incorporated into such bunker gear and/or Class B foam, and through that conduct have knowingly placed PFAS-containing products into the stream of commerce with full knowledge that they were d to fire departments, or to companies that sold bunker gear and Class B foam to fire departments for use by firefighters such as Plaintiffs, who are and/or were exposed to PFAS through ordinary and foreseeable uses for the purpose of firefighting activities and training.

316.    Defendants intended that the bunker gear, Class B foam, and/or PFAS chemicals incorporated into such bunker gear and/or Class B foam that they are and/or were manufacturing, designing, selling, distributing, supplying, testing, inspecting, labeling, promoting, and/or advertising would be used by firefighters, including Plaintiffs, without any substantial change in

the condition of the products from when it was initially manufactured, sold, distributed, and marketed by Defendants.

317.    Defendants' bunker gear and/or Class B foam are and/or were defective and unreasonably dangerous because they contain toxic PFAS chemicals which, as detailed above, are highly mobile, persistent known carcinogens and immune system disruptors that pose a substantial likelihood of harm to firefighters even when used as directed by the manufacturer for its intended purpose of firefighting activities, including training, extinguishment, ventilation, search-and-rescue, salvage, containment, and overhaul.

318.    Bunker gear, Class B foam, and/or PFAS chemicals incorporated into such bunker gear and/or Class B foam designed, manufactured, marketed, tested, inspected, labeled, advertised, promoted, d and/or distributed by the Defendants are and/or were unreasonably dangerous and defective in design or formulation because, at the time in which the products left the hands of the manufacturer or distributors, the utility and benefit of these products did not outweigh the risks inherent in the design or formulation of the PFAS-containing bunker gear.

319.    Firefighters wear their bunker gear on every shift and use Class B foam regularly and in training and firefighting activities. Defendants have known for decades that exposure to PFAS or PFAS-containing materials is toxic to humans and animals, and results in significant – often catastrophic – health effects, including cancer, ulcerative colitis, thyroid disease and birth defects. This risk is heightened for people with consistent exposure to these chemicals which have a long half-life and impact the body on a cellular level. The risk of such serious health effects is and/or was not outweighed by the utility and benefit of PFAS or PFAS-containing, particularly in light of the availability of PFAS-free bunker gear and firefighting foam.

ELECTRONICALLY FILED - 2025 Jan 29 3:05 PM - YORK - COMMON PLEAS - CASE#2025CP4600398

320.    The bunker gear and/or Class B foam designed, manufactured, marketed, tested, inspected, labeled, advertised, promoted, d, and/or distributed by the Defendants were dangerous and defective in design or formulation because, when the PFAS-containing products left the hands of the manufacturer or distributors, these products posed significant health risks and were unreasonably dangerous in normal use.

321.    Further, knowing of the dangerous and hazardous properties of bunker gear, Class B foam, and/or PFAS chemicals incorporated into such bunker gear and/or Class B foam, Defendants could have manufactured, marketed, distributed, and/or d alternative designs or formulations of fluorine-free chemicals, fluorine-free bunker gear.

322.    These alternative designs and/or formulations were already practical, similar in cost, technologically feasible and/or available.

323.    Indeed, in the 1990s, DuPont had a viable replacement for PFOA that was less toxic, less-bio-accumulative, but chose not to pursue it. In the 2000s, multiple companies developed safer, effective fluorine-free foams. PFAS-free bunker gear is also available and feasible, and would be more widely available if its development, manufacture and sale were not hindered by Defendants' actions and misrepresentations.

324.    The use of these alternative designs would have reduced or prevented the substantial likelihood of harm to Plaintiffs that was caused by the Defendants' design, manufacture, testing, inspecting, labeling, marketing, advertising, promotion, sale and/or distribution of bunker gear, Class B foam, and/or PFAS chemicals incorporated into such bunker gear and/or Class B foam.

325.    Additionally, the bunker gear and/or Class B foam, that were designed, manufactured, marketed, tested, inspected, labeled, advertised, marketed, promoted, d, and/or

ELECTRONICALLY FILED - 2025 Jan 29 3:05 PM - YORK - COMMON PLEAS - CASE#2025CP4600398

ELECTRONICALLY FILED - 2025 Jan 29 3:05 PM - YORK - COMMON PLEAS - CASE#2025CP4600398

distributed by the Defendants contained PFAS or PFAS-containing materials that were so toxic and unreasonably dangerous to human health and the environment, with the toxic chemicals being highly mobile and persistent, that the act of designing, formulating, manufacturing, testing, labeling, marketing, distributing, and/or selling these products was unreasonably dangerous and the foreseeable risks of causing serious health consequences exceeded the benefits associated with the design or formulation of PFAS-containing bunker gear and/or Class B foam.

326.  Defendants' design of bunker gear, Class B foam, and/or PFAS chemicals incorporated into such bunker gear and/or Class B foam was unreasonably dangerous and substantial factor in causing Plaintiffs 's injuries.

327.  As a result of Defendants' defective design, Defendants are strictly liable in damages to Plaintiffs.

328.  Defendants acted with willful or conscious disregard for the rights, health, and safety of Plaintiffs, as described herein, thereby entitling Plaintiffs to an award of punitive damages.

329.  Plaintiffs demand judgment against Defendants, jointly and severally, for all actual and compensatory damages suffered, as well as for punitive damages in an amount sufficient to keep such wrongful conduct from being repeated, together with interest, if applicable, and all costs of this action and for such other and further relief as this Honorable Court and/or jury may deem just and proper.

## SECOND CAUSE OF ACTIONT

## NEGLIGENCE – FAILURE TO WARN

330.  Plaintiffs incorporate by reference all prior paragraphs of this complaint, as though fully set forth herein.

331. Each Defendant, their predecessors-in-interest, and/or their alter egos, and/or entities they have acquired, have engaged in the business of manufacturing, distributing, supplying, testing, labeling, promoting, or advertising of bunker gear, Class B foam, and/or PFAS chemicals incorporated into such bunker gear and/or Class B foam, through that conduct, have knowingly placed PFAS-containing products into the stream of commerce with full knowledge that they were d to fire departments and/or to companies that sold bunker gear and/or Class B foam to fire departments for use by firefighters, such as Plaintiffs .

332. Defendants' bunker gear, Class B foam, and/or PFAS chemicals incorporated into such bunker gear and/or Class B foam were unreasonably dangerous for their anticipated use because of exposure to PFAS poses a significant threat to human health.

333. Defendants knew or should have reasonably known that the manner in which they were designing, manufacturing, testing, inspecting, labeling, marketing, distributing, and/or selling bunker gear, Class B foam, and PFAS chemicals incorporated into such bunker gear and Class B foam was hazardous to human health, and that firefighters, like Plaintiffs, would be exposed to PFAS through ordinary and foreseeable uses of bunker gear and/or Class B foam in the course of engaging in firefighting activities and training.

334. Each Defendant failed to provide adequate warnings or instructions regarding the dangers posed by foreseeable uses of its bunker gear, Class B foam, and/or PFAS chemicals incorporated into such bunker gear and/or Class B foam, of which each Defendant knew or should have known.

335. At the time of manufacture, distribution, promotion, labeling, and/or sale, Defendants could have provided warnings or instructions regarding the full and complete risks of

bunker gear, Class B foam, and/or PFAS chemicals incorporated into such bunker gear and/or Class B foam.

336.    Defendants, however, failed to provide adequate warnings that would lead an ordinary reasonable user, such as Plaintiffs, to contemplate the danger to human health posed by exposure to PFAS within Defendants' bunker gear, Class B foam, and/or PFAS chemicals incorporated into such bunker gear and/or Class B foam.

337.    In fact, Defendants failed to issue any warnings, instructions, recalls and/or advice as to the danger of exposure to the toxic PFAS-containing bunker gear and/or Class B foam, and the potential for such exposure to cause serious physical injury or disease.

338.    Defendants also did not instruct Plaintiffs on the proper steps they could take to reduce the harmful effects of previous exposure, the need to have periodic medical examinations, and the need to have immediate and vigorous medical treatment for all related adverse health effects.

339.    Plaintiffs did not and could not have known that the use of bunker gear and/or Class B foam in the ordinary course of performing their duties as a firefighter could be hazardous to their health, bioaccumulate in the blood, and cause serious health effects, including cancer, ulcerative colitis and thyroid disease. Had Defendants adequately warned Plaintiffs, they would have heeded such warnings.

340.    The burden on Defendants to guard against this foreseeable harm to Plaintiffs was minimal, and merely required that they provide adequate instructions, proper labeling, and sufficient warnings about their PFAS-containing products.

341.    Defendants were in the best position to provide adequate instructions, proper labeling, and sufficient warnings about the bunker gear, Class B foam, and/or PFAS chemicals

ELECTRONICALLY FILED - 2025 Jan 29 3:05 PM - YORK - COMMON PLEAS - CASE#2025CP4600398

incorporated into such bunker gear and/or Class B foam and to take steps to eliminate, correct, or remedy any exposure or contamination they caused.

342.     As a direct and proximate result of Defendants' failure to provide adequate and sufficient warning regarding of their PFAS chemicals, bunker gear containing PFAS or PFAS-containing materials, and/or Class B foams containing PFAS or PFAS-containing materials, Plaintiffs suffered the injuries and damages described herein for which Defendants are strictly liable.

343.     Defendants acted with willful or conscious disregard for the rights, health, and safety of Plaintiffs, as described herein, thereby entitling Plaintiffs to an award of punitive damages.

344.     Plaintiffs demand judgment against Defendants, jointly and severally, for all actual and compensatory damages suffered, as well as for punitive damages in an amount sufficient to keep such wrongful conduct from being repeated, together with interest, if applicable, and all costs of this action and for such other and further relief as this Honorable Court and/or jury may deem just and proper.

### THIRD CAUSE OF ACTION

### NEGLIGENCE – DESIGN DEFECT

345.     Plaintiffs incorporate by reference all prior paragraphs of this complaint, as though fully set forth herein.

346.     Each Defendant, their predecessors-in-interest, and/or their alter egos, and/or entities they have acquired, have engaged in the business of manufacturing, distributing, supplying, testing, labeling, promoting, or advertising of bunker gear, Class B foam, and/or PFAS chemicals incorporated into such bunker gear and/or Class B foam, through that conduct, have

ELECTRONICALLY FILED - 2025 Jan 29 3:05 PM - YORK - COMMON PLEAS - CASE#2025CP4600398

knowingly placed PFAS-containing products into the stream of commerce with full knowledge that they were d to fire departments and/or to companies that sold bunker gear and/or Class B foams to fire departments for use by firefighters, such as Plaintiffs.

347.    Defendants intended that the bunker gear, Class B foam, and/or PFAS chemicals incorporated into such bunker gear and/or Class B foam that they are and/or were manufacturing, designing, selling, distributing, supplying, testing, labeling, promoting, and/or advertising would be used by firefighters, including Plaintiffs, without any substantial change in the condition of the products from when they were initially manufactured, d, distributed, and/or marketed by Defendants.

348.    Defendants also knew or should have known that Plaintiffs would be exposed to PFAS through ordinary and foreseeable uses of these products for the purpose of firefighting activities and training.

349.    Defendants had a duty to not endanger the health and safety of Plaintiffs who were foreseeable users of the PFAS-containing bunker gear and/or Class B foam that Defendants are and/or were manufacturing, designing, selling, distributing, supplying, testing, labeling, promoting, and/or advertising as firefighter protective safety equipment.

350.    Defendants' duty required that they exercise reasonable care in the manufacturing, designing, selling, distributing, supplying, testing, labeling, promoting, and/or advertising of bunker gear and/or Class B foam.

351.    Defendants breached their duty of reasonable care by negligently manufacturing, designing, selling, distributing, supplying, testing, inspecting, labeling, promoting, and/or advertising of PFAS-containing bunker gear and/or Class B foam which were defective and unreasonably dangerous. The bunker gear and/or Class B foam contained toxic PFAS chemicals

ELECTRONICALLY FILED - 2025 Jan 29 3:05 PM - YORK - COMMON PLEAS - CASE#2025CP4600398

which, as detailed above, are highly mobile, persistent known carcinogens, and immune system disruptors that pose a substantial likelihood of harm to firefighters even when used as directed by the manufacturer for its intended purpose of firefighting activities.

352.    PFAS and/or PFAS-containing bunker gear and/or Class B foam designed, manufactured, marketed, tested, advertised, promoted, d and distributed by the Defendants are and/or were unreasonably dangerous and defective in design or formulation because, at the time in which the products left the hands of the manufacturer or distributors, the utility and benefit of these products did not outweigh the risks inherent in the design or formulation of the PFAS-containing bunker gear and/or Class B foam.

353.    Firefighters wear their bunker gear on every shift and use Class B foam regularly in training and firefighting activities. Defendants have known for decades that exposure to PFAS or PFAS-containing materials is toxic to humans and animals, and results in significant – often catastrophic – health effects, including cancer, ulcerative colitis, thyroid disease and birth defects. This risk is heightened for people, like Plaintiffs, with consistent exposure to these chemicals which have a long half-life and impact the body on a cellular level. The risk of such serious health effects is and/or was not outweighed by the utility and benefit of PFAS or PFAS-containing, particularly in light of the availability of PFAS-free bunker gear and firefighting foam.

354.    The bunker gear designed, manufactured, marketed, tested, inspected, labeled, advertised, promoted, d, and/or distributed by the Defendants were dangerous and defective in design or formulation because, when the PFAS-containing products left the hands of the manufacturer or distributors, these products posed significant health risks and were unreasonably dangerous in normal use.

ELECTRONICALLY FILED - 2025 Jan 29 3:05 PM - YORK - COMMON PLEAS - CASE#2025CP4600398

355. Further, knowing of the dangerous and hazardous properties of PFAS and/or PFAS-containing bunker gear and/or Class B foam, each Defendant could have manufactured, marketed, distributed, and/or d alternative designs or formulations of fluorine-free bunker gear and/or firefighting foam.

356. These alternative designs for both bunker gear and for firefighting foam were already practical, similar in cost, technologically feasible and/or available.

357. Indeed, a viable replacement for PFOA that was less toxic and less-bio-accumulative was identified in the 1990s. In the 2000s, multiple companies developed safer, effective fluorine-free foams. PFAS-free turnout gear is also available and feasible, and would be more widely available if its development, manufacture, and sale were not hindered by Defendants' collective and respective actions and misrepresentations.

358. The use of these alternative designs would have reduced or prevented the substantial likelihood of harm to Plaintiffs that was caused by the Defendants' design, manufacture, marketing, advertising, promotion, sale and/or distribution of PFAS-containing bunker gear and/or Class B Foam.

359. Additionally, PFAS-containing bunker gear and/or Class B foam that was designed, manufactured, marketed, tested, inspected, labeled, advertised, marketed, promoted, d, and/or distributed by the Defendants contained PFAS or PFAS-containing materials that were so toxic and unreasonably dangerous to human health and the environment, with the toxic chemicals being highly mobile and persistent, that the act of designing, formulating, manufacturing, marketing, distributing, and/or selling these products was unreasonably dangerous and the foreseeable risks of causing serious health consequences exceeded the benefits associated with the design or formulation of PFAS-containing bunker gear.

ELECTRONICALLY FILED - 2025 Jan 29 3:05 PM - YORK - COMMON PLEAS - CASE#2025CP4600398

360.   Each Defendant's breached a duty it owed to the Plaintiffs via its respective negligent and/or grossly negligence design of the toxic PFAS chemicals, the PFAS-containing bunker gear, and/or the PFAS-containing Class B foam, and these breaches were a substantial factor in causing Plaintiffs 's injuries.

361.   As a result of Defendants' defective, unreasonably dangerous PFAS-containing bunker gear, and/or PFAS-containing Class B foam, each Defendant is liable for such injuries and damages to Plaintiffs.

362.   Each Defendant acted with willful or conscious disregard for the rights, health, and safety of Plaintiffs, as described herein, thereby entitling Plaintiff to an award of punitive damages.

363.   As a direct and proximate result of the Defendants' collective and respective negligence in  the design, distribution, and sale of their PFAS chemicals, bunker gear containing PFAS or PFAS-containing materials, and/or Class B foams containing PFAS or PFAS-containing materials, Plaintiff has been injured, sustained severe and permanent pain, suffering, disability, impairment, loss of enjoyment of life, loss of care, comfort, economic loss and damages including, but not limited to medical expenses, lost income, and/or other damages.

364.   Plaintiff demands judgment against Defendants, jointly and severally, for all actual and compensatory damages suffered, as well as for punitive damages in an amount sufficient to keep such wrongful conduct from being repeated, together with interest, if applicable, and all costs of this action and for such other and further relief as this Honorable Court and/or jury may deem just and proper.

ELECTRONICALLY FILED - 2025 Jan 29 3:05 PM - YORK - COMMON PLEAS - CASE#2025CP4600398

## FOURTH CAUSE OF ACTION

## NEGLIGENCE – FAILURE TO WARN

365.    Plaintiffs incorporate by reference all prior paragraphs of this complaint, as though fully set forth herein.

366.    Each Defendant, their predecessors-in-interest, and/or their alter egos, and/or entities they have acquired, have engaged in the business of manufacturing, distributing, supplying, testing, labeling, promoting, or advertising of bunker gear and/or Class B foam containing PFAS or PFAS-containing materials and, through that conduct, have knowingly placed PFAS-containing products into the stream of commerce with full knowledge that they were d to fire departments and/or to companies that sold bunker gear and/or Class B foams to fire departments for use by firefighters, such as Plaintiffs .

367.    Defendants' bunker gear and/or Class B foam containing PFAS or PFAS-containing materials were unreasonably dangerous for their anticipated use because of exposure to PFAS poses a significant threat to human health.

368.    Defendants knew or should have reasonably known that the manner in which they were designing, manufacturing, testing, inspecting, labeling, marketing, distributing, and/or selling bunker gear and/or Class B foam containing PFAS or PFAS-containing materials was hazardous to human health, and that firefighters, like Plaintiffs , would be exposed to PFAS through ordinary and foreseeable uses of bunker gear and/or Class B foam containing PFAS or PFAS-containing materials in the course of engaging in firefighting activities and training.

369.    Defendants had a duty to earn against such latent dangers resulting from foreseeable uses of its products of which it knew or should have known.

ELECTRONICALLY FILED - 2025 Jan 29 3:05 PM - YORK - COMMON PLEAS - CASE#2025CP4600398

370.    At the time of manufacture, distribution, promotion, labeling, and/or sale, Defendants could have provided warnings or instructions regarding the full and complete risks of bunker gear and/or Class B foam containing PFAS or PFAS-containing materials.

371.    Defendants, however, breached their duty and failed to provide adequate warnings as to the potential harm that might result from exposure to PFAS or PFAS-containing products that would lead an ordinary reasonable user, such as Plaintiffs, to contemplate the danger to human health posed by such products.

372.    In fact, Defendants failed to issue any warnings, instructions, recalls and/or advice as to the danger of exposure to the toxic PFAS-containing bunker gear and/or Class B foam, and the potential for such exposure to cause serious physical injury or disease.

373.    Defendants also did not instruct Plaintiffs on the proper steps they could take to reduce the harmful effects of previous exposure, the need to have periodic medical examinations, and the need to have immediate and vigorous medical treatment for all related adverse health effects.

374.    Plaintiffs did not and could not have known that the use of bunker gear and/or Class B foam in the ordinary course of performing their duties as a firefighter could be hazardous to their health, cause PFAS to bioaccumulate in the blood, and cause serious health effects, including cancer. Had Defendants adequately warned Plaintiffs, they would have heeded such warnings.

375.    The burden on Defendants to guard against this foreseeable harm to Plaintiffs was minimal, and merely required that they provide adequate instructions, proper labeling, and sufficient warnings about their PFAS-containing products.

376.    Defendants were in the best position to provide adequate instructions, proper labeling, and sufficient warnings about the bunker gear and/or Class B foam containing PFAS or

ELECTRONICALLY FILED - 2025 Jan 29 3:05 PM - YORK - COMMON PLEAS - CASE#2025CP4600398

PFAS-containing materials, and to take steps to eliminate, correct, or remedy any exposure or contamination they caused.

377. As a direct and proximate result of Defendants' failure to provide adequate and sufficient warnings, Plaintiffs suffered the injuries and damages described herein for which Defendants are strictly liable.

378. Each Defendant acted with willful or conscious disregard for the rights, health, and safety of Plaintiffs, as described herein, thereby entitling Plaintiff to an award of punitive damages.

379. As a direct and proximate result of the Defendants' collective and respective breach of their duties to provide Plaintiffs with adequate and sufficient warnings regarding of their PFAS chemicals, bunker gear, and/or Class B foams containing PFAS or PFAS-containing materials, Plaintiffs has been injured, sustained severe and permanent pain, suffering, disability, impairment, loss of enjoyment of life, loss of care, comfort, economic loss and damages including, but not limited to medical expenses, lost income, and/or other damages.

380. Plaintiff demands judgment against Defendants, jointly and severally, for all actual and compensatory damages suffered, as well as for punitive damages in an amount sufficient to keep such wrongful conduct from being repeated, together with interest, if applicable, and all costs of this action and for such other and further relief as this Honorable Court and/or jury may deem just and proper.

## **FIFTH CAUSE OF ACTION**

### **NEGLIGENCE**

381. Plaintiffs incorporate by reference all prior paragraphs of this complaint, as though fully set forth herein.

ELECTRONICALLY FILED - 2025 Jan 29 3:05 PM - YORK - COMMON PLEAS - CASE#2025CP4600398

382.    Each Defendant, their predecessors-in-interest, and/or their alter egos, and/or entities they have acquired, have engaged in the business of manufacturing, distributing, supplying, testing, labeling, packaging, testing, marketing, distributing promoting, or advertising PFAS chemicals, bunker gear containing PFAS or PFAS-containing materials, and/or Class B foams containing PFAS or PFAS-containing materials, and/or PFAS materials incorporated into such bunker gear or Class B foams. In so doing, Defendants acted with the actual or constructive knowledge that PFAS-containing products were being d to fire departments and/or to companies that sold bunker gear or Class B foams to fire departments for use by firefighters, such as Plaintiffs.

383.    Defendants intended that the PFAS chemicals, PFAS-containing bunker gear, and/or PFAS-containing Class B foams that they are and/or were manufacturing, distributing, supplying, testing, labeling, packaging, testing, marketing, distributing promoting, or advertising would be used by firefighters, including Plaintiffs , without any substantial change in the condition of the products from when they were initially manufactured, d, distributed, and/or marketed by Defendants.

384.    Defendants also knew or should have known that Plaintiffs would be exposed to PFAS through ordinary and foreseeable uses of these products for the purpose of firefighting activities and training.

385.    Each Defendant had a duty to individuals, including the Plaintiffs, to exercise reasonable ordinary, and appropriate care in the manufacturing, design, labeling, packaging, testing, instruction, warning, selling, marketing, distribution, and training related to their PFAS chemicals, bunker gear containing PFAS or PFAS-containing materials, and/or Class B foams containing PFAS or PFAS-containing materials.

ELECTRONICALLY FILED - 2025 Jan 29 3:05 PM - YORK - COMMON PLEAS - CASE#2025CP4600398

386.     Each Defendant had a duty to not endanger the health and safety of Plaintiffs, who were foreseeable users of the PFAS chemicals, bunker gear containing PFAS or PFAS-containing materials, and/or Class B foams containing PFAS or PFAS-containing materials that Defendants are and/or were manufacturing, design, labeling, packaging, testing, instruction, warning, selling, marketing, distribution, and training.

387.     Each Defendant's duty required that it exercise reasonable care in the manufacturing, designing, selling, distributing, supplying, testing, labeling, promoting, and/or advertising of PFAS chemicals, bunker gear containing PFAS or PFAS-containing materials, and/or Class B foams containing PFAS or PFAS-containing materials.

388.     Each Defendant breached the aforementioned duties of care owed to Plaintiffs , and was negligent, grossly negligent, reckless, and willful as described herein in the manufacturing, design, labeling, packaging, testing, instruction, warning, selling, marketing, distribution, and training related to its PFAS chemicals, bunker gear containing PFAS or PFAS-containing materials, and/or Class B foams containing PFAS or PFAS-containing materials in one or more of the following respects:

    a.    Failing to design its PFAS chemicals, bunker gear containing PFAS or PFAS-containing materials, and/or Class B foams containing PFAS or PFAS-containing materials so as to avoid an unreasonable risk of harm to individuals, including the Plaintiffs;

    b.    Failing to use reasonable care in the testing of its PFAS chemicals, bunker gear containing PFAS or PFAS-containing materials, and/or Class B foams containing PFAS or PFAS-containing materials so as to avoid an unreasonable risk of harm to individuals, including the Plaintiffs;

    c.    Failing to use appropriate care in inspecting its PFAS chemicals, bunker gear containing PFAS or PFAS-containing materials, and/or Class B foams containing PFAS or PFAS-containing materials so as to avoid an unreasonable risk of harm to individuals, including the Plaintiffs;

    d.    Failing to use appropriate care in instructing and/or warning the public as set forth herein of risks associated with its PFAS chemicals, bunker gear containing PFAS

ELECTRONICALLY FILED - 2025 Jan 29 3:05 PM - YORK - COMMON PLEAS - CASE#2025CP4600398

or PFAS-containing materials, and/or Class B foams containing PFAS or PFAS-containing materials, so as to avoid unreasonable risk of harm to individuals, including the Plaintiffs;

e.    Failing to use reasonable care in marketing, promoting, and advertising its PFAS chemicals, bunker gear containing PFAS or PFAS-containing materials, and/or Class B foams containing PFAS or PFAS-containing materials, so as to avoid unreasonable risk of harm to individuals, including the Plaintiffs;

f.    Otherwise negligently or carelessly designing, manufacturing, marketing, distributing, warning with respect to PFAS chemicals, bunker gear containing PFAS or PFAS-containing materials, and/or Class B foams containing PFAS or PFAS-containing materials; and

g.    In selling and or distributing PFAS chemicals, bunker gear containing PFAS or PFAS-containing materials, and/or Class B foams containing PFAS or PFAS-containing materials, each of which was inherently dangerous to the public; and

h.    In such other particulars as the evidence may show.

389.    As a direct and proximate result of the Defendants' collective and respective negligent breaches of the duties owed to the Plaintiffs, Plaintiffs have been injured, sustained severe and permanent pain, suffering, disability, impairment, loss of enjoyment of life, loss of care, comfort, economic loss and damages including, but not limited to medical expenses, lost income, and/or other damages.

390.    Defendants acted with willful or conscious disregard for the rights, health, and safety of Plaintiffs, as described herein, thereby entitling Plaintiff to an award of punitive damages.

391.    Plaintiff demands judgment against Defendants, jointly and severally, for all actual and compensatory damages suffered, as well as for punitive damages in an amount sufficient to keep such wrongful conduct from being repeated, together with interest, if applicable, and all costs of this action and for such other and further relief as this Honorable Court and/or jury may deem just and proper.

ELECTRONICALLY FILED - 2025 Jan 29 3:05 PM - YORK - COMMON PLEAS - CASE#2025CP4600398

ELECTRONICALLY FILED - 2025 Jan 29 3:05 PM - YORK - COMMON PLEAS - CASE#2025CP4600398

## SIXTH CAUSE OF ACTION

### FRAUDULENT CONCEALMENT

392.     Plaintiffs incorporate by reference all prior paragraphs of this complaint, as though fully set forth herein.

393.     Each Defendant, their predecessors-in-interest, and/or their alter egos, and/or entities they have acquired, have engaged in the business of manufacturing, distributing, supplying, testing, labeling, promoting, or advertising of PFAS chemicals, bunker gear containing PFAS or PFAS-containing materials, and/or Class B foams containing PFAS or PFAS-containing materials, and, through that conduct, have knowingly placed PFAS-containing products into the stream of commerce with full knowledge that they were d to fire departments and/or to companies that sold bunker gear and/or Class B foams to fire departments for use by firefighters, such as Plaintiffs .

394.     Throughout the relevant time period, each Defendant knew that it respective PFAS chemicals, bunker gear containing PFAS or PFAS-containing materials, and/or Class B foams containing PFAS or PFAS-containing materials, was defective and unreasonably unsafe for their intended purpose.

395.     Each Defendant fraudulently concealed from and/or failed to disclose to or warn Plaintiffs, and the public that its respective PFAS chemicals, bunker gear containing PFAS or PFAS-containing materials, and/or Class B foams containing PFAS or PFAS-containing materials was defective, unsafe, and unfit for the purposes intended, and that they were not of merchantable quality.

396.     Each Defendant was under a duty to the Plaintiffs and the public to disclose and warn of the defective and harmful nature of its respective PFAS chemicals, bunker gear containing

PFAS or PFAS-containing materials, and/or Class B foams containing PFAS or PFAS-containing materials because:

    a.    Defendants were in a superior position to know the true quality, safety, and efficacy of their its respective PFAS chemicals, bunker gear containing PFAS or PFAS-containing materials, and/or Class B foams containing PFAS or PFAS-containing materials;

    b.    Defendants knowingly made false claims about the safety and quality of their its respective PFAS chemicals, bunker gear containing PFAS or PFAS-containing materials, and/or Class B foams containing PFAS or PFAS-containing materials in documents and marketing materials; and

    c.    Defendants fraudulently and affirmatively concealed the defective nature of the Defendants' products from the Plaintiffs.

397.    The facts concealed and/or not disclosed by Defendants to the Plaintiffs were material facts that a reasonable person would have considered to be important in deciding whether or not to purchase and/or use the Defendants' products.

398.    Defendants intentionally concealed and/or failed to disclose the true defective nature of the products so that the Plaintiffs would use the Defendants' products, the Plaintiffs justifiably acted or relied upon, to Plaintiffs 's detriment, the concealed and/or non-disclosed facts as evidenced by Plaintiffs 's use of the Defendants' products.

399.    Defendants, by concealment or other action, intentionally prevented the Plaintiffs from acquiring material information regarding the lack of safety and effectiveness of each of their products. Defendants had stated the non-existence of such material information regarding each of their respective' products' lack of safety and effectiveness and dangers and defects, and as though each Defendant had affirmatively stated the non-existence of such matters, such that the Plaintiffs was thus prevented from discovering the truth. Each Defendant therefore has liability for fraudulent concealment under all applicable laws, including, inter alia, Restatement (Second) of Torts §550 (1977).

ELECTRONICALLY FILED - 2025 Jan 29 3:05 PM - YORK - COMMON PLEAS - CASE#2025CP4600398

400. As a direct and proximate result of the collective and respective conduct of the Defendants, Plaintiffs was exposed to hazardous and toxic chemicals which proximately caused Plaintiffs 's injury and death, and all accompanying pain, suffering, mental anguish, disability, impairment, loss of enjoyment of life, loss of care, comfort, economic loss and damages including but not limited to medical expenses, lost income, and/or other damages.

401. Each Defendant acted with willful or conscious disregard for the rights, health, and safety of Plaintiffs, as described herein, thereby entitling Plaintiffs to an award of punitive damages.

402. Plaintiffs demand judgment against Defendants, jointly and severally, for all actual and compensatory damages suffered, as well as for punitive damages in an amount sufficient to keep such wrongful conduct from being repeated, together with interest, if applicable, and all costs of this action and for such other and further relief as this Honorable Court and/or jury may deem just and proper.

## REQUEST FOR PUNITIVE DAMAGES

403. Plaintiffs adopt and re-allege each prior paragraph, where relevant, as if set forth fully herein.

404. The actions and inactions of each Defendant were of such a character as to constitute a pattern or practice of willful, wanton, and reckless misconduct causing substantial harm and resulting in damages to Plaintiffs.

405. More specifically, each Defendant acted with a conscious and flagrant disregard for the rights and safety of Plaintiffs, and/or deliberately engaged in willful, wanton, and reckless disregard for the life and safety of Plaintiffs.

ELECTRONICALLY FILED - 2025 Jan 29 3:05 PM - YORK - COMMON PLEAS - CASE#2025CP4600398

406.   By reason of the foregoing, each Defendant is liable to Plaintiffs for punitive and exemplary damages.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiffs request a trial by jury on all counts so triable, and Judgment:

(1)   Awarding the Plaintiff's prospective, compensatory, and other appropriate damages in amounts to be determined by the evidence at trial and allowed by law;

(2)   Compensatory damages for future damages, including but not limited to Plaintiff' pain and suffering and for severe permanent personal injuries sustained by the Fire fighter Plaintiffs, including for future health care costs, medical monitoring, and/or economic loss;

(3)   Economic damages including but not limited to medical expenses, out of pocket expenses, lost earnings, and other economic damages in an amount to be determined at trial;

(4)   Pre-judgment and post-judgment interest, at the legal rate, on all amounts claimed;

(5)   Attorneys' fees and costs as permitted by law;

(6)   For equitable and injunctive relief, as necessary, to ensure that Defendants refrain from continuing to harm others; and

(7)   Any such further relief as this Court deems just and proper.

## **DEMAND FOR JURY TRIAL**

Plaintiffs hereby demand a jury trial for each cause of action to which they are entitled by law.

ELECTRONICALLY FILED - 2025 Jan 29 3:05 PM - YORK - COMMON PLEAS - CASE#2025CP4600398

ELECTRONICALLY FILED - 2025 Jan 29 3:05 PM - YORK - COMMON PLEAS - CASE#2025CP4600398

Respectfully submitted,

**SIMMONS HANLY CONROY LLC**
Jayne Conroy
Simmons Hanly Conroy LLC
112 Madison Ave., 7th Floor
New York, NY 10016
(212) 784-6402
jconroy@simmonsfirm.com

Daniel P. Blouin
Simmons Hanly Conroy LLC
112 Madison Ave., 7th Floor
New York, NY 10016
(212) 257-8482
dblouin@simmonsfirm.com

Justin Presnal
Simmons Hanly Conroy LLC
5216 Cascades Drive
College Station, TX 77845
(979) 224-2036
jpresnal@simmonsfirm.com

By: */s/ T. David Hoyle*
**MOTLEY RICE LLC**
T. David Hoyle
South Carolina Bar No. 74055, Fed. ID. 9923
Anne McGinness Kearse
South Carolina Bar No. 15642, Fed. ID. 7570
28 Bridgeside Boulevard
Mount Pleasant, SC 29464
(843) 216-9000
dhoyle@motleyrice.com
akearse@motleyrice.com

**SULLIVAN PAPAIN BLOCK MCGRATH COFFINAS AND CANNAVO P.C.**
Thomas J. McManus
Nicholas Papain
Craig Silverman
120 Broadway, 27th Floor
New York, NY 10271
(212) 266-4125
Tmcmanus@triallaw1.com
npapain@triallaw1.com
CSilverman@triallaw1.com

*Attorneys for Plaintiff*

Dated: January 29, 2025

AO 440 (Rev. 06/12)  Summons in a Civil Action

# UNITED STATES DISTRICT COURT

for the

Charleston Division District of South Carolina

|  |  |
|---|---|
| *See attached for member case Plaintiff(s)* )<br> )<br> )<br> )<br> )<br> ) | |
| Plaintiff(s) | |
| v. | Civil Action No.  **MDL 2873** |
| | This Document Relates to<br>*See attached for member case and*<br>*civil number as listed in PDF header* |
| *See attached for member case Defendant(s)* | |
| Defendant(s) | |

## SUMMONS IN A CIVIL ACTION

To: *(Defendant's name and address)*
   ***See attached for member case Defendant(s) name(s) and address(es)***

A lawsuit has been filed against you.

Within 21 days after service of this summons on you (not counting the day you received it) — or 60 days if you are the United States or a United States agency, or an officer or employee of the United States described in Fed. R. Civ. P. 12 (a)(2) or (3) — you must serve on the plaintiff an answer to the attached complaint or a motion under Rule 12 of the Federal Rules of Civil Procedure.  The answer or motion must be served on the plaintiff or plaintiff's attorney, whose name and address are:
***See attached for member case plaintiff's attorney name and address***

If you fail to respond, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

Robin L. Blume
*CLERK OF COURT*

Date:  May 7, 2025

s/R. Heinen
*Signature of Clerk or Deputy Clerk*

AO 440 (Rev. 06/12)  Summons in a Civil Action (Page 2)

Civil Action No.

### PROOF OF SERVICE
#### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 4 (l))*

This summons for *(name of individual and title, if any)* _____

was received by me on *(date)* _____ .

☐ I personally served the summons on the individual at *(place)* _____
_____ on *(date)* _____ ; or

☐ I left the summons at the individual's residence or usual place of abode with *(name)* _____
_____ , a person of suitable age and discretion who resides there,

on *(date)* _____ , and mailed a copy to the individual's last known address; or

☐ I served the summons on *(name of individual)* _____ , who is

designated by law to accept service of process on behalf of *(name of organization)* _____
_____ on *(date)* _____ ; or

☐ I returned the summons unexecuted because _____ ; or

☐ Other *(specify):* _____
_____ .

My fees are $ _____ for travel and $ _____ for services, for a total of $ _____ .

I declare under penalty of perjury that this information is true.

Date: _____

_____
*Server's signature*

_____
*Printed name and title*

_____
*Server's address*

Additional information regarding attempted service, etc:

AO 440 (Rev. 06/12) Summons in a Civil Action

# UNITED STATES DISTRICT COURT

for the

District of South Carolina

|  |  |  |
|---|---|---|
| Justin Alvarez, et al. | ) | |
| | ) | |
| | ) | |
| | ) | |
| _____ | ) | |
| *Plaintiff(s)* | ) | |
| v. | ) | Civil Action No. 2:25-cv-02746-RMG |
| 3M Company (A/K/A Minnesota Mining And Manufacturing Company) et al. | ) | |
| | ) | |
| | ) | |
| _____ | ) | |
| *Defendant(s)* | ) | |

## SUMMONS IN A CIVIL ACTION

To: *(Defendant's name and address)*   3M Company
3M_Service_AFFF_MDL@duffyandyoung.com

A lawsuit has been filed against you.

Within 21 days after service of this summons on you (not counting the day you received it) — or 60 days if you are the United States or a United States agency, or an officer or employee of the United States described in Fed. R. Civ. P. 12 (a)(2) or (3) — you must serve on the plaintiff an answer to the attached complaint or a motion under Rule 12 of the Federal Rules of Civil Procedure. The answer or motion must be served on the plaintiff or plaintiff's attorney, whose name and address are:

> T. David Hoyle
> Motley Rice LLC
> 28 Bridgeside Blvd.
> Mount Pleasant, SC 29464
> 843-216-9000

If you fail to respond, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

*CLERK OF COURT*

Date: _____          _____
                                                                      *Signature of Clerk or Deputy Clerk*

AO 440 (Rev. 06/12)  Summons in a Civil Action (Page 2)

Civil Action No.  2:25-cv-02746-RMG

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 4 (l))*

This summons for *(name of individual and title, if any)* _____

was received by me on *(date)* _____ .

❏ I personally served the summons on the individual at *(place)* _____
_____ on *(date)* _____ ; or

❏ I left the summons at the individual's residence or usual place of abode with *(name)* _____
_____ , a person of suitable age and discretion who resides there,

on *(date)* _____ , and mailed a copy to the individual's last known address; or

❏ I served the summons on *(name of individual)* _____ , who is

designated by law to accept service of process on behalf of *(name of organization)*
_____ on *(date)* _____ ; or

❏ I returned the summons unexecuted because _____ ; or

❏ Other *(specify):*



My fees are $ _____ for travel and $ _____ for services, for a total of $  0.00  .

I declare under penalty of perjury that this information is true.


Date: _____

_____
*Server's signature*

_____
*Printed name and title*

_____
*Server's address*

Additional information regarding attempted service, etc:

Additional Parties- Summons

| |
|---|
| AGC Chemicals Americas Inc.<br>agccaservice@crowell.com |
| Allstar Fire Equipment<br>AFFF-AllstarFire-MDLService@grsm.com |
| Amerex Corporation<br>lkerrigan@kmcllaw.com; mtrevino@maynardnexsen.com |
| Archroma US, Inc.<br>robertjordan@parkerpoe.com; steveweber@parkerpoe.com; charlesraynal@parkerpoe.com;<br>janicestafford@parkerpoe.com; peter.farrell@kirkland.com;<br>ArchromaUS_AFFFMDL_Service@kirkland.com |
| Arkema, Inc.<br>AFFFArkemaService@sidley.com |
| Buckeye Fire Equipment<br>mcarpenter@gastonlegal.com and mssingleton@gastonlegal.com<br>and via U.S. Mail to:<br>Michael L. Carpenter<br>Gray, Layton, Kersh, Solomon, Furr & smith, P.A.<br>516 South New Hope Rd.<br>Post Office Box 2636<br>Gastonia, NC 28053 |
| Carrier Global Corporation<br>KiddeDefendantsAFFF@daypitney.com |
| CB Garment, Inc. (D/B/A CREWBOSS)<br>830 Wilson St.<br>Eugene, OR 97402 |
| ChemDesign Products, Inc.<br>CDPI-AFFFMDLService@grsm.com |

Chemguard, Inc.
mdlafff@jci.com and afffservice@wc.com

Chemicals Inc.
otwaddell@goldbergsegalla.com  *and* jparker@goldbergsegalla.com

Clariant Corporation
robertjordan@parkerpoe.com; steveweber@parkerpoe.com; charlesraynal@parkerpoe.com; janicestafford@parkerpoe.com

Corteva, Inc. (F/K/A DOWDUPONT INC.)
AFFFservice@barlitbeck.com

Daikin America, Inc.
tgrossman@jonesday.com; sngeise@jonesday.com; cyeilding@balch.com; Support.Legal@daikin-america.com; EXT-AFFFMDLServiceDaikinAm@groups.jonesday.com

Deepwater Chemicals, Inc.
Deepwater@wbd-us.com

DuPont de Nemours, Inc. (F/K/A DOWDUPONT INC.)
AFFFservice@barlitbeck.com

Dynax Corporation
DynaxService@smithlaw.com

EIDP, INC. (A/K/A E. I. DU PONT DE NEMOURS AND COMPANY)
DBDWERLKOTTE@shb.com and Jhackman@shb.com and sdrum@shb.com

Fire-Dex, LLC.
c/o BDB Agent Co.
3800 Embassy Parkway, Suite 300
Akron, OH 44334

Fire-Dex, Inc.
c/o BDB Agent Co.
3800 Embassy Parkway, Suite 300
Akron, OH 44334

Fire Service Plus, Inc.
473 Dividend Dr
Peachtree City, GA 30269

Globe Manufacturing Company LLC
AFFF_MDL_Service@orrick.com

Globe Holding Company LLC
c/o CT Corporation System, Registered Agent
37 Loudon Road
Pittsfield, NH 03263

Honeywell Safety Products USA, Inc.
HON-MDL2873-Pleadings@robinsonbradshaw.com; Elissa.preheim@arnoldporter.com
300 S Tryon St Ste 500 Charlotte, NC, 28202-1040

Honeywell International, Inc.
HON-MDL2873-Pleadings@robinsonbradshaw.com; Elissa.preheim@arnoldporter.com

Innotex Corp.,
c/o CT Corporation System
641 South Lawrence St.
Montgomery, AL 36104

Johnson Controls, Inc.
5757 N. Green Bay Ave.
P.O. Box 591
Milwaukee, WI 5320

Kidde PLC, Inc.
KiddeDefendantsAFFF@daypitney.com

Lakeland Industries, Inc.
c/o Corporation Trust Company, Registered Agent
1209 Orange Street, Wilmington, DE 19801

| |
|---|
| Lion Group, Inc.<br>AFFF-LNCurtis-MDLService@grsm.com<br>c/o QI Services, Inc., Registered Agent<br>150 East Fourth Street, Cincinnati, OH 4520 |
| Lion Apparel, Inc.<br>c/o QI Services, Inc., Registered Agent<br>150 East Fourth Street, Cincinnati, OH 45202 |
| L.N. Curtis & Sons<br>AFFF-LNCurtis-MDLService@grsm.com<br>185 Lennon Ln Ste 110<br>Walnut Creek, CA 94598 |
| Milliken & Company<br>2 Office Park Court, Suite 103<br>Columbia, SC 29223 |
| Mallory Safety and Supply, LLC<br>1040 Industrial Way<br>Longview, WA 98632 |
| Mine Safety Appliance Company LLC<br>AFFF_MDL_Service@huschblackwell.com |
| MSA Safety Incorporated<br>600 N. 2nd St., Ste. 401<br>Harrisburg, PA 17101 |
| Municipal Emergency Services, Inc.<br>MES@wbd-us.com; MES@KCIC.com |
| National Foam, Inc.<br>NationalFoam_Service_of_Process@gtlaw.com |

Narcote Holding Corp., (d/b/a Stedfast, Inc. and/or Stedfast USA, Inc.)
Narcoteservice@hinshawlaw.com
251 Little Falls Drive
Wilmington, DE 19808

Narcote, LLC . (D/B/A STEDFAST, INC. and/or STEDFAST USA, INC.)
Corporation Service Company
251 Little Falls Drive
Wilmington, DE 19808

Nation Ford Chemical Company
NationFord@wbd-us.com

PBI Performance Products, Inc.
9800 Southern Pine Blvd.
Charlotte, NC 28273

Perimeter Solutions, LP
mthurlow@bakerlaw.com

Ricochet Manufacturing Co., Inc.
4700 Wissahickon Ave.
Philadelphia, PA 19144

SAFETY COMPONENTS FABRIC TECHNOLOGIES, INC. D/B/A SAFETY
COMPONENTS, INC.;
CT Corporation System
2 Office Park Court, Suite 103
Columbia, SC

Southern Mills, Inc. (D/B/A Tencate Protective Fabrics USA)
mdlservice@tencatefabrics.coms.com
SMI-Mauldin-MDL@kilpatricktownsend.com

Stedfast USA, Inc.
stedfastservice@hinshawlaw.com

The Chemours Company, LLC

DBDWERLKOTTE@shb.com and Jhackman@shb.com and sdrum@shb.com

The Chemours Company FC, LLC
DBDWERLKOTTE@shb.com; Jhackman@shb.com and sdrum@shb.com
1007 Market Street
Wilmington, DE 19899

Tyco Fire Products, LP as successor-in-interest to THE ANSUL COMPANY
mdlafff@jci.com and afffservice@wc.com

United Technologies Corporation
KiddeDefendantsAFFF@daypitney.com

UTC Fire & Security Americas Corporation, Inc. (F/K/A GE INTERLOGIX, INC.);
KiddeDefendantsAFFF@daypitney.com

Veridian Limited D/B/A Veridian Fire Protective Gear
3710 W Milwaukee St.
Spencer, IA 51301

Witmer Public Safety Group, Inc. (D/B/A THE FIRE STORE)
Mark V. Gende
MVG@swblaw.com; brg@swblaw.com; mck@swblaw.com
104 Independence Way
Coatesville, PA 19320

W.L. Gore & Associates, Inc.
WLGore_AFFFMDL_Service@lists.dechert.com
1209 Orange St.
Wilmington, DE 19801